**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CARNEGIE MELLON UNIVERSITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 09-290 |
| | ) | Judge Nora Barry Fischer |
| MARVELL TECHNOLOGY GROUP, LTD., | ) | |
| and MARVELL SEMICONDUCTOR, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

## I.   INTRODUCTION

A number of motions are currently pending before the Court in this case.  (*See* Docket
Nos. 352, 356, 360, 364, 367, 370, 373).  This opinion addresses two of the pending motions
because they raise similar issues.  The first is the Defendants' (collectively, "Marvell") "Motion
for Partial Summary Judgment of No Infringement and No Damages with Respect to
Extraterritorial Conduct." (Docket No. 356).  In that motion, Marvell requests that this Court
determine that it (Marvell) cannot be found liable for infringement of any methods claimed in
U.S. Patent Nos. 6,201,839 ("the '839 Patent") or 6,438,180 ("the '180 Patent") (collectively,
"the CMU Patents") for chips that are never used in the United States, and that Plaintiff
("CMU") cannot recover for sales of such chips as a matter of law.  (Docket No. 357 at 1).
CMU challenges this motion, arguing essentially that it is entitled to recover damages for these
foreign sales, which only arose due to domestic infringement.  (*See* Docket No. 428 at 1).

The second motion is similar.  In that motion, Marvell requests that the Court find that it
(Marvell) cannot be found liable for infringement for the use of the patented technology by non-

party Seagate Technology.  (*See* Docket No. 360).  As with the extraterritorial conduct motion,

Marvell also requests that this Court find that it (Marvell) cannot be liable for damages arising

from its sales to Seagate.  (*Id.*).  As expected, CMU challenges this proposition.  (*See* Docket

Nos. 397, 430).

After consideration of the parties' arguments and the filings pertaining to these motions,

the Court has determined that both motions (Docket Nos. 356, 360) should be granted, in part,

and denied, in part, in accordance with the following.

## II.   BACKGROUND[1]

Much of the factual background of this case has been discussed elsewhere (*see* Docket

Nos. 306, 227), so the Court only addresses here the facts pertinent to the pending motions.  The

instant motions pertain to Marvell's international activities and its sales to Seagate, so the Court

will recount only the facts relevant to those issues.

### a.  Marvell's Business and Sales Cycle

Marvell produces read channel chips[2] which are used in conjunction with hard disk drives

("HDDs").  Marvell's business model revolves around an expensive sales cycle for these chips,

during which Marvell "invest[s] significant resources with each potential customer without any

assurance of sales to that customer."  (Docket No. 402 at ¶¶ 3-4).  At the end of a given sales

---

[1] Because both motions addressed herein are motions for summary judgment, all disputed facts are to be construed in favor of the non-moving party. *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1338 (Fed. Cir. 2010) (citing *Ethicon Endo-Surgery, Inc. v. U. S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998)).  Thus, even where Marvell disputes CMU's facts, the Court's factual summary will address CMU's position, only.  The facts are, therefore, derived largely from CMU's Responses to Marvell's Statements of Fact (Docket Nos. 398, 402), except where necessary for clarity.

[2] For purposes of the pending motion only, Marvell concedes that the accused chips ("Accused Chips") perform the patented method when used.  (Docket No. 357 at 1-2).  "Accused Chips" refers only to the allegedly infringing chips and not all chips produced by Marvell.

cycle, Marvell achieves a "design win" if "the customer decides to go into production" with Marvell and actually does so. (*Id.* at ¶¶ 5-6). Such a design win is generally a winner-take-all affair, as a "design win" in the HDD industry typically results in the winner becoming the exclusive supplier for the customer's specific hard drive or generation of hard drives. (*Id.* at ¶ 7).

At the beginning of Marvell's sales cycle, the company formulates the product's concept and basic design. As Marvell performs the necessary research and development, it uses simulators ("Simulation Programs")[3] to test its new designs. (*Id.* at ¶ 9-10). The Simulation Programs are used throughout the sales cycle to refine and evaluate chip designs. (*Id.* at ¶ 12). Use of the Simulation Programs allows Marvell to confirm performance gains for a given design before it incurs the expense of producing a test run of actual chips. (Docket No. 402 at ¶ 14). The Simulation Programs are developed and operated within the United States. (*Id.* at ¶¶ 17-18).

Once a given Simulation Program performs satisfactorily, Marvell sends the specifications to an offshore manufacturer, who then produces engineering samples for Marvell. (*Id.* at ¶ 26). Marvell and its customers then test the engineering samples, which are Accused Chips, in the United States. (*Id.* at ¶¶ 30, 31, 34). Marvell's customers must sign off on the qualification of the test samples of the Accused Chips before full production begins. (*Id.* at ¶ 35). Marvell retains "golden unit" chips in California for each Accused Chip that is developed. (*Id.* at ¶ 36-37). These golden unit chips are used to test failed production versions of the Accused Chips. (*Id.* at ¶ 38). After a design is settled upon, Marvell provides "tuning guides," "reference settings," and "Application Notes" to help customers use the Accused Chips. (*Id.* at ¶¶ 44-47).

---

[3] For purposes of the pending motion only, Marvell has conceded that the Simulation Programs at issue perform the patented method when used. (Docket No. 357 at 1-2). "Simulation Programs" refers to the allegedly infringing programs specifically, and not all of Marvell's simulations.

It is undisputed that, between March 6, 2003 and March 31, 2010, Marvell sold 1,469,070,073[4] Accused Chips.  (Docket Nos. 359 at ¶ 1; 402 at ¶ 1).  It is also undisputed that only a subset of the Marvell Chips has been installed in products used within the United States.  (Docket Nos. 359 at ¶ 2; 402 at ¶ 2).  At least some of Marvell's customers *do* ship their products, which include the Accused Chips, back into the United States.  (*See* Docket No. 402 at ¶¶ 42-43).

The parties dispute the actual location of the sales of the Accused Chips.  (Docket No. 440 at 7).  CMU's position is that these sales occurred within the United States, and for purposes of the pending motion, Marvell has assumed that the relevant sales do actually take place in the United States.  (*Id.*).  Thus, for purposes of the analysis that follows, the Court will assume that Marvell's sales relating to the alleged infringements occur within the United States.

### b.  CMU's License to Seagate

The parties are in agreement that Seagate and CMU have had an ongoing relationship since the early 1990s.  Although there is some dispute as to the details, the parties agree that, beginning on October 1, 1992, Seagate entered into an "Associate Agreement"[5] with CMU's

---

[4] CMU admits the number only "based on the sales data produced by Marvell to CMU in this litigation."  (Docket No. 402 at ¶ 1).  Further sales data is to be produced by Marvell prior to trial.  (*See* Docket No. 315 at 3).

[5] The Associate Agreement provided, in relevant part:

> All inventions, disclosed, first reduced to practice or for which a patent application has been filed, in the course of or under this Agreement by any Center personnel while engaged in the activities of the Center (hereinafter referred to as "Inventors"[)] shall become the property of the University.  The University shall grant to the Corporation, and all other Associates a worldwide, irrevocable, royalty-free license, to make, have made for their own use, or sell the product of the Inventions.  The University agrees that at such time as it appears to the University, or the Associates that research efforts in the center have isolated a patentable invention, device, idea, etc., it will proceed with all diligence to prosecute the patent application.  In the event that the University decides to offer

Data Storage Systems Center ("DSSC").  (*See* Docket No. 363 at 1; 398 at ¶ 7).  As an Associate Member of the DSSC, Seagate acquired certain rights which are the subject of Marvell's Licensed Use motion.  (Docket No. 360).

The Associate Agreement provided Seagate with, among other things, "a worldwide, irrevocable, royalty-free license, to make, have made for their own use, or sell the product of the Inventions."  (Docket No. 398 at ¶ 11).  The Agreement also required CMU to charge royalty-bearing licenses to third parties who sought licenses for DSSC technologies.  (*Id.*).  Marvell does not have a license to use the CMU Patents.  (*Id.* at ¶ 16).

There is nothing in the record evidence to indicate that Marvell's sales cycle with Seagate proceeded differently from the standard procedure described above.  Hence, it would appear that Marvell did not legally consummate its relationship with Seagate until *after* all of the design testing described above.  Further, there is no indication in the evidence presently before this Court that Seagate instructed Marvell to design the Accused Chips that Marvell eventually sold to Seagate.  (Docket No. 398 at ¶ 25-26).

---

licenses under said Inventions to third parties, said licenses shall be royalty bearing, as decided by the University, and said royalty shall be utilized at the Center to sponsor further research.

Licensing shall be for the life of the patent for those Associates whose Associate Memberships began prior to and were through the period of invention disclosure to patent application.  For those Associates who joined the Center during the period of invention disclosure until patent application, licenses are grant [sic] for the period that they continue as Associate members.

(Docket No. 398 at ¶ 11 (citing Docket No. 399-1, Ex. 5)).

### III.    LEGAL STANDARD

#### a.  Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(a). Pursuant to Rule 56, a district court must enter summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Id.* Therefore, in performing its analysis, a court should "view the evidence in a light most favorable to the opposing party and resolve doubts in its favor." *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998).

When a non-moving party would have the burden of proof at trial, as is the case here, the moving party has no burden to negate the opponent's claim.  *Celotex*, 477 U.S. at 323.  Thus, the moving party does not need to produce *any* evidence showing the absence of a genuine issue of material fact.  *Id.* at 325.  "Instead, … the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Id.*  After the moving party has satisfied this low burden, the adverse party must provide facts showing that there is a genuine issue for trial in order to counter the motion for summary judgment.  *Id.* at 324.

### b. Infringement

CMU's infringement theories arise under 35 U.S.C. §§ 271(a), (b) and (c). (Docket No. 401 at 5). This means that they encompass both direct and indirect infringement, as provided by statute. The three forms of infringement are separate and distinct from one another.

Direct infringement of a U.S. patent occurs when a party, "without authority makes, uses, offers to sell, or sells any patented invention, *within the United States*." 35 U.S.C. § 271(a) (emphasis added). Method claims are not infringed simply by the sale of an apparatus that is capable of infringing use. *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006); *Standard Havens Products, Inc. v. Gencor Industries, Inc.*, 953 F.2d 1360, 1374 (Fed. Cir. 1991). "Because a process is nothing more than the sequence of actions of which it is comprised, the use of a process necessarily involves doing or performing each of the steps recited." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005). Thus, direct infringement of a method claim only occurs if each step of the claimed method is actually performed. *See Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008); *see also Ricoh Co., Ltd. v. Quanta Computer Inc.*, 550 F.3d 1325, 1333 (Fed. Cir. 2008) (citing *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378-79 (Fed. Cir. 2007)).

There are also two forms of indirect infringement: inducing infringement and contributory infringement. These modes of infringement are governed by 35 U.S.C. § 271(b)[6] and (c)[7], respectively. Relevant here is the requirement that, in order for one party to be liable

---

[6] 35 U.S.C. § 271(b) provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer."

[7] 35 U.S.C. § 271(c) provides:

> Whoever offers to sell or sells within the United States or imports into the
> United States a component of a patented machine, manufacture, combination or

for indirect infringement, there must be an act of direct infringement by a third party. *See Alloc, Inc. v. ITC*, 342 F.3d 1361, 1374 (Fed. Cir. 2003) (inducing infringement); *see also Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341 (1961) (contributory infringement).

### c. Damages

Patent damages are governed by 35 U.S.C. § 284[8], under which a court is required, "upon finding for the claimant," to "award the claimant damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the invention by the infringer." "[T]he purpose of compensatory damages is not to punish the infringer, but to make the patentee whole." *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1223 (Fed. Cir. 1995). The Court must attempt to assess "the difference between [the patentee's] pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred." *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) (citing *Yale Lock Mfg. Co. v. Sargent*, 117 U.S. 536, 552 (1886)).

The reasonable royalty provided for in § 284 sets the floor for damages. *See Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1555 (Fed. Cir. 1995) ("A patentee is entitled to no less than a reasonable royalty on an infringer's sales for which the patentee has not established entitlement to lost profits.") (citing 35 U.S.C. § 284; *Hanson v. Alpine Valley Ski Area, Inc.*, 718

---

composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

[8] 35 U.S.C. § 284 provides, in pertinent part:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

F.2d 1075, 1078 (Fed. Cir. 1983)); *see also Lucent*, 580 F.3d at 1324 (reasonable royalty is "merely the floor below which damages shall not fall.") (quoting *Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1583 (Fed. Cir. 1983)). The most common means of calculating a reasonable royalty, called the hypothetical negotiation, seeks to arrive at the royalty that the parties would have agreed to had a successful negotiation occurred just before infringement began. *Lucent*, 580 F.3d at 1324 (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970); *Rite-Hite*, 56 F.3d at 1554 n. 13; *Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 788 F.2d 1554, 1557 (Fed. Cir. 1986)). The hypothetical negotiation assumes that the asserted patent claims are valid and infringed. *Lucent*, 580 F.3d at 1325.

## IV. ANALYSIS

### a. Infringement

#### i. Extraterritorial Conduct

As described above, direct infringement of a method patent requires a showing that all of the claimed steps are performed. *NTP*, 418 F.3d at 1318. Moreover, a sale of an apparatus capable of performing the method is not sufficient to prove infringement. *Ormco*, 463 F.3d at 1311. Thus, with respect to the question of *infringement*, the location of Marvell's sales is irrelevant because such sales, at any location, are insufficient to make a showing of infringement.

Although Marvell's conduct cannot be considered directly infringing, Marvell may still be liable for indirect infringement because some of the chips that are sold abroad do eventually make their way to the United States. (*See* Docket No. 402 at ¶¶ 42-43). Marvell's motion does not appear to assert non-infringement on this basis, and indeed, at oral argument, Marvell's attorney implicitly acknowledged that Marvell could be liable for indirect infringement based on

those imported chips.  (*See* **Damages trx at 20-21**).  Given same, the Court does not engage in a full analysis of indirect infringement for the chips that eventually return to the United States.

### ii.    Licensed Use

With respect to infringement, Marvell's licensed use motion is entirely correct, and the Court will grant summary judgment of non-infringement "with respect to licensed use of the patented technology *by* non-party Seagate Technology."  (*See* Docket No. 360 at 1) (emphasis added).  The license clearly grants Seagate, as an Associate Member of the DSSC, "a worldwide, irrevocable, royalty-free license to make, have made for [its] own use, or sell" the patented method.  (Docket No. 398 at ¶ 11).  This language makes clear that Seagate's own use is not infringing, which in turn means that Marvell cannot be indirectly liable for infringement.  Thus, summary judgment is appropriate as to any use *by* Seagate.

Seagate's use, however, is not really what is at issue in this case.  The true question lies with Marvell's use during the sales cycles in which it produced chips for Seagate.  That question is more complicated, but in the end, must be found against Marvell and in favor of CMU.[9]

The only potential means for Marvell to protect itself from infringement under the Associate Agreement is to show that its use was an exercise of Seagate's "have made" rights.  Based on the structure of the sales cycle, Marvell's conduct during the period in which Seagate was "shopping" for chips, prior to an actual design win by Marvell, does not qualify as an exercise of Seagate's "have made" rights.  "The legal effect of licensees exercising their 'have made' rights by commissioning a third party to make licensed products is very different from the legal effect of licensees purchasing allegedly infringing products from a third party."  *Intel Corp.*

---

[9] The Court notes that Marvell's motion itself does not request summary judgment of non-infringement for its own use (*see* Docket No. 360 at 1), but some of its arguments could be construed as arguing that result.  Thus, the Court engages in this discussion for the sake of clarity.

*v. Broadcom Corp.*, 173 F. Supp. 2d 201, 234 (D. Del. 2001).  Where a licensee commissions the work, a third party's acts do not infringe.  *Id.*  When there is no agreement between the licensee and the third party, the third party's acts do infringe.  *Id.*  A third party "cannot unilaterally rely on the rights of the licensees who purchase its products, when none of those licensees' rights have been conferred" upon the third party.  *Id.*

The evidence of record indicates that Marvell uses the methods at issue during its sales cycle, but this evidence is devoid of any specific agreement between Marvell and Seagate prior to Marvell's design win.  Thus, Marvell's use – prior to achieving a design win – must be considered infringing, even if that use eventually led to non-infringing sales to Seagate.

All told, the Court finds it appropriate to grant summary judgment of non-infringement to Marvell in connection with sales of chips that are never used in the United States and for use of the patented technology by Seagate Technology.

### b.  Damages

In conjunction with its motions for non-infringement, Marvell also asserts that it is not liable for damages arising from the same activities outlined above.  (*See* Docket Nos. 356, 360).  Although the Court found that Marvell's motions should be granted as to non-infringement, the Court will not grant the damages portions of either motion for the following reasons.

In the Court's view, the analysis for both motions is essentially the same.  Recalling that Marvell's burden is "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case," *Celotex*, 447 U.S. at 325, this Court finds that Marvell has failed to meet this burden.

Generally put, Marvell's position is that because its sales – whether to Seagate or of the extraterritorial variety – are non-infringing, CMU may not recover damages based on those sales.

In both motions, Marvell relies heavily on *Mirror Worlds, LLC v. Apple, Inc.*, 784 F.Supp.2d 703 (E.D. Tex. 2011). Marvell's reliance on a readily-distinguishable district court case that has not been reviewed by the Federal Circuit does not meet this burden.

The facts of record – construed in a light most favorable to CMU – show that Marvell infringes the CMU Patents throughout the sales cycle. The facts indicate, and Marvell evidently admits, that Marvell uses the infringing Simulation Programs and Accused Chips throughout its sales cycle. *See supra*, Part II.a. CMU asserts, and Marvell does not deny, that "Marvell would not make volume sales of the Accused Chips but for [the] use of the Accused Chips in infringing modes in the U.S. during the sales cycle." (Docket Nos. 402 at ¶ 8; 415 at ¶ 8). Thus, any profit that Marvell derives from the sale of infringing chips is directly due to its infringements during the sales cycle.

Marvell argues that this Court should follow the holding in *Mirror Worlds* that "because [defendant's] sales or offers for sale do not infringe the asserted method patents, they cannot be the basis for damages." (Docket No. 357 at 5). The Court does not read *Mirror Worlds* as Marvell would have it for several reasons, both legal and factual in nature. First, such a restrictive reading is contradictory to Federal Circuit precedent, which does not require a reasonable royalty to be tied only to use of the patented method (*i.e.*, infringement). *See*, *e.g.*, *Lucent* 5 80 F.3d at 1334 ("A company licensing a patented method often has strong reasons not to tie the royalty amount strictly to usage."); *cf. Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1080-81 (Fed. Cir. 1983) (upholding reasonable royalty based on availability of the method, rather than "actual use of the" invention). Further, one of the simplest ways to determine the value of an infringing use of a patented method during research is to ascertain how many sales were made based on that infringing use.

Second, taken in the context of the entire *Mirror Worlds* opinion, Judge Davis's holding actually undermines Marvell's argument because it is observes that Mirror Worlds should have based its infringement argument on the very same theory upon which CMU relies. "Mirror Worlds' *infringement* theory was based on Apple's *sales*, and Mirror Worlds *did not present sufficient evidence to allow the jury to determine liability resulting from Apple's own use* (direct infringement) of the methods." *Mirror Worlds*, 784 F.Supp.2d at 724 (emphasis added). Thus, Judge Davis was faced with a patent owner asserting infringement based on sales (which cannot infringe a method) and left with no evidence linking those sales to any infringement.

CMU's infringement theory, on the other hand, is based not on Marvell's sales, but on Marvell's own use (direct infringement) of the methods. Marvell has conceded the element of infringing use for purposes of the pending motions. Marvell has also conceded that its infringing use is the but-for cause of Marvell's sales. (*See* Docket No. 415 at ¶ 8). Thus, CMU has demonstrated that Marvell infringes the CMU Patents and that infringement is directly related to Marvell's sales. This evidence was lacking in the *Mirror Worlds* case.

As a final observation, the Court notes that Marvell relies heavily on the rule that U.S. patent laws are not to be applied extraterritorially. (*See*, *e.g.*, Docket No. 357 at 3-7). The Court certainly agrees that this is the general rule. *See Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 454-55 (2007) ("The presumption that United States law governs domestically but does not rule the world applies with particular force in patent law."). Given the posture of this case, however, Marvell's extraterritorial conduct argument is neutered by its admission that the parties dispute whether the actual sales of the Accused Chips took place in the United States or abroad. (*See* Docket No. 440 at 7). If the Court accepts CMU's position that these sales occurred within the United States, as it must at the summary judgment stage, *see Enzo Biochem,* 599 F.3d at 1338,

then no part of the relevant conduct occurs outside the United States: Marvell's infringing use occurs here (Docket No. 357 at 1-2), and if the sales occur in the United States as CMU asserts, then the benefit from that infringing use also accrues here.

The fact that Marvell infringes throughout the sales cycle establishes liability, and that liability is not affected by the Court's grant of summary judgment for non-infringement above. CMU has also provided sufficient evidence to demonstrate that Marvell's sales are tied to its own direct infringement during the sales cycle.  As CMU's assertion that Marvell's sales may be used as a basis for calculating a reasonable royalty is justified, Marvell has failed to meet its burden at this stage of the case, *Celotex*, 447 U.S. at 325, and summary judgment is inappropriate as to the damages portions of Marvell's motions.  (Docket Nos. 356, 360).

## V.     CONCLUSION

For the foregoing reasons, the Court holds that Marvell's motions [356] and [360] are both GRANTED, in part, and DENIED, in part.  The Court grants Marvell's extraterritorial conduct motion [356] insofar as Marvell cannot be found liable for direct or indirect infringement of any method claims of U.S. Patent Nos. 6,201,839 and 6,438,180  in connection with sales of chips that are never used in the United States.  The Court denies that motion [356] with respect to such alleged damages arising from such sales, as the evidence of record, construed in favor of CMU, shows that such sales occur within the United States and they are the but-for result of Marvell's infringement of the CMU Patents during the sales cycle.

The Court also grants Marvell's licensed use motion [360] insofar as Marvell cannot be found liable for direct or indirect infringement of U.S. Patent Nos. 6,201,839 and 6,438,180 with respect to licensed use of the patented technology by non-party, Seagate Technology.  The Court denies that motion [360] with respect to alleged damages arising from Marvell's sales to Seagate,

as the evidence of record demonstrates that such sales occur within the United States and are the

but-for result of Marvell's infringement of the CMU Patents during the sales cycle.


_s/Nora Barry Fischer_
Nora Barry Fischer
United States District Judge


cc/ecf:  All counsel of record

Date: August August 24, 2012