**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CARNEGIE MELLON UNIVERSITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 09-290 |
| | ) | Judge Nora Barry Fischer |
| MARVELL TECHNOLOGY GROUP, LTD. | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM ORDER**

This patent infringement action is set to commence jury selection and trial on November

26, 2012.  The parties have filed a number of motions in limine seeking pretrial rulings on the

admissibility of certain evidence at trial.  Presently pending before the Court are two related

motions by Plaintiff CMU: "Motion *in Limine* No. 4 To Preclude Evidence or Argument

Relating to the Intel Subscription Agreement" (Docket No.  500); and, "Motion *in Limine* No. 5

To Preclude Evidence or Argument Relating to CMU's 2006 'Highly Speculative Forecast'"

(Docket No. 502).  CMU seeks orders excluding the Intel Subscription Agreement and the

"Highly Speculative Forecast" at trial because this evidence is not relevant and its admission

would confuse the jury.  (Docket Nos. 500-1, 502-1).   Marvell maintains that the Intel

Subscription Agreement and the "Highly Speculative Forecast" are both probative of the true

value of patents-in-suit to CMU and the position that CMU would have taken during the

hypothetical negotiation.  (Docket Nos. 557, 558).  Marvell further proffers that such evidence is

necessary to rebut the testimony of CMU's expert, Catharine Lawton as to the reasonable

royalty.  (*Id.*).  The Court heard argument on the Motions during its hearing on October 17 and

1

October 18, 2012.  (Docket Nos. 579, 590, 591).  Upon consideration of the parties' positions,

CMU's Motions [500] and [502] are DENIED.

In so holding, the Court notes the following.  The instant motion surrounds the disputed

factual predicate concerning the calculation of the reasonable royalty in this case by Marvell's

expert, Creighton Hoffman.  CMU bears the burden of proof to establish its damages at trial

through a reasonable royalty.  *See Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301,

1324 (Fed. Cir. 2009) (citation omitted) ("The burden of proving damages falls on the

patentee.").  It has proffered Catharine Lawton, who will testify that a hypothetical negotiation

involving Marvell and CMU would have resulted in a reasonable running royalty of $0.50 for

each sale of the Accused Chips by Marvell from the first date of infringement (March 6, 2003) to

the present.  (Docket No. 461 at 10).  Her opinions concerning the negotiations in this case are

truly hypothetical because there are no established royalties in this case as CMU has never

entered into a running royalty license with a third party for use of only the patents-in-suit.  (Pl.

Ex. 4, Docket No. 501-1 at 14 ("CMU did not at that time, and does not have established royalty

rates but rather, each negotiation is different.")).  Ms. Lawton's opinions instead rely on a

complicated, market-based economic calculation of a potential reasonable royalty for the patents-

in-suit.  After Marvell produces updated sales data closer to trial, and Ms. Lawton applies her

reasonable royalty of $0.50 to these figures, her opinion may result in a damages claim at or near

one billion dollars.[1]

---

[1]     The Court notes that Ms. Lawton's initial damages opinion was expressed prior to the
Court's issuance of its Memorandum Order granting, in part and denying, in part, Marvell's
motion to exclude evidence of CMU's pre-suit damages from alleged infringement of the '839
Patent due to the failure of its licensees to mark products in accordance with 35 U.S.C. § 287(a).
(*See* Docket No. 595).  The Court has ordered CMU to submit a supplemental opinion on
damages consistent with that decision by November 13, 2012 at 12:00 p.m.  (*Id.* at 21).

To counter this evidence, Marvell has proffered Creighton Hoffman as its expert and he opines that a reasonable royalty in this case would be a single lump sum payment of $250,000. (Pl. Ex. 5, Docket No. 501-1 at 18 ("Absent an established rate, a reasonable royalty for both patents-in-suit would be no more than $250,000.")).  As the parties are aware, the Court previously excluded Mr. Hoffman's opinion that $250,000 was an established royalty based on the DSSC agreements between CMU and 3M, Seagate and IBM.  *See Carnegie Mellon University v. Marvell Technology Group, Ltd.*, 2012 WL 3686748, at *2-3 (W.D. Pa. Aug. 24, 2012).  However, the Court denied CMU's motion to exclude Hoffman's opinions that a reasonable royalty would be $250,000 based on the same agreements.  *Id.*  While the Court commented that Mr. Hoffman does not directly address several features in the DSSC agreements in his opinions, including that the industry members of the DSSC shared research and personnel with CMU in exchange for the use of any patents or other technology developed under the DSSC, the Court found that "[h]is failure to address the obvious distinctions between these Agreements and his projected license in this matter is more appropriately addressed by way of cross-examination than through exclusion."  *Id.*  Given this ruling and the fact that CMU has not brought a motion in limine challenging the DSSC agreements, Marvell will present them at trial.

In addition to the DSSC agreements with 3M, Seagate and IBM, Mr. Hoffman relies on two other potential valuations of the patents-in-suit for support of his opinion that the reasonable royalty is a lump sum of $250,000: the Intel Subscription Agreement, an option agreement whereby Intel and CMU negotiated and agreed to a price of $200,000 for use of the '180 Patent; and a 2006 internal forecast by CMU personnel estimating the value of a license from Marvell's alleged infringement of the patents of $2,000,000 per year.  (Pl. Ex. 5, Docket No. 501-1 at 19-23).  Marvell intends to present this evidence in conjunction with Mr. Hoffman's opinions as to

the lump sum royalty and to challenge Ms. Lawton's running royalty opinion through rebuttal and cross examination.  (Docket Nos. 557, 558).  With respect to the Intel Subscription Agreement, CMU argues that it should be excluded because it constitutes merely an offer to license the patent to a third party and alternatively maintains that such agreement is not comparable to the hypothetical license and creates a risk of unfair prejudice, confusion of the issues and misleading the jury.  (Docket No. 501).  As to the 2006 forecast, CMU contends that this evidence is "baseless speculation" which is not relevant to the experts' application of the *Georgia-Pacific* factors. (Docket No. 503).  Marvell counters that the challenged evidence is relevant as it is highly probative of the value that CMU placed on the patents and to the position it would have taken as to the patents' value during the hypothetical negotiation, and that introduction of such evidence will not run counter to the principles in Rule 403 of the Federal Rules of Evidence.  (Docket Nos. 557, 558).

"A reasonable royalty contemplates a hypothetical negotiation between the patentee and the infringer at a time before the infringement began." *IP Innovation L.L.C. v. Red Hat, Inc.*, 705 F.Supp.2d 687, 689 (E.D. Tex. 2010) (Rader, J.) (citing *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983)). The hypothetical negotiation presumes that both the patentee and the accused infringer are willing parties to the negotiation, and also assumes that the patent was valid, enforceable, and infringed. *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970). The *Georgia-Pacific* case sets out a series of factors that may be relevant to the analysis of a reasonable royalty. *Id.*  Relevant here, "[t]he first *Georgia-Pacific* factor requires consideration of past and present royalties received by the patentee 'for the licensing of the *patent in suit*, proving or tending to prove an established royalty.'" *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (quoting *Georgia-Pacific*,

318 F.Supp. at 1120) (emphasis in *ResQNet*). Additionally, *Georgia-Pacific* factor number 15 is

a summary of the hypothetical negotiation process and permits the introduction of evidence of

what royalty terms the patentee would have offered to the infringer, including past license offers

to the infringer. *Standard Mfg. Co., Inc. v. United States*, 42 Fed. Cl. 748, 775 (Fed. Cl. 1999).

"Although some approximation is permitted in calculating the reasonable royalty, the Federal

Circuit requires 'sound economic and factual predicates' for that analysis." *Red Hat, Inc.*, 705 F.

Supp. 2d at 689 (quoting *Riles v. Shell Exploration & Production Co.*, 298 F.3d 1302, 1311 (Fed.

Cir. 2002) (citation omitted)).

     In its motions, CMU focuses its arguments on challenging the *values* set forth in the Intel

Subscription Agreement and the 2006 forecast, as the figures of a lump sum of $200,000 offered

to Intel and its 2006 internal discussions concerning the potential of an annual fee of $2,000,000

are drastically less than their expert's initial billion dollar opinion as to the value of the patents in

this case. (Docket Nos. 501, 503). Marvell counters that this evidence is relevant to the position

that CMU would have taken in the hypothetical negotiation, an argument which encompasses not

only the potential *values* of the patents to CMU but also the *type* of royalty that CMU would

have negotiated had it sat down with Marvell and conducted negotiations prior to the alleged

infringing use. (Docket Nos. 557, 558). The Court finds that the Intel Agreement and the 2006

forecast are highly probative of the *type* of license that CMU may have sought during those

negotiations, i.e., a running royalty versus a lump-sum license.

     There are significant differences "between a running royalty license and a lump-sum

license." *Lucent*, 580 F.3d at 1326. A running royalty license, as CMU has advocated through

Ms. Lawton, sets the "amount payable by the licensee to the patentee […] directly to how often

the licensed invention is later used or incorporated into products by the license." *Id.* This

structure shifts many of the "licensing risks to the licensor because he does not receive guaranteed payment." *Id.* Marvell has submitted, through Mr. Hoffman, that CMU would have accepted a lump-sum license, i.e., the payment of a fixed fee for the licensed use of the patents, *see Lucent*, 580 F.3d at 1326. *Id.* The lump-sum license benefits the patentholder by enabling it to raise cash quickly and benefits the licensee by capping liability. *Id.* Many of the risks inherent in a typical arms-length negotiation are shifted via a lump-sum license to the licensor, including eliminating the patentholder's administrative burdens of monitoring the licensee's use of the patents, and the risk of false reporting or underpayment by the licensor. *Id.*

Like the DSSC Agreements, the Intel Subscription Agreement shows, at a minimum, that CMU was willing to license the patents to third parties on a lump-sum basis. (Pl. Ex. 1, Docket No. 501-1). The Intel Subscription Agreement is a fully negotiated and signed agreement whereby CMU granted Intel the right to exercise an option to a lump-sum license of $200,000 for use of the '180 Patent. (*Id.*). CMU makes much of the fact that the Intel Subscription Agreement has many features which are not inherent in the hypothetical negotiation, including that the '180 Patent was one of a "pool" of patents optioned to Intel and that the option was never exercised, in an effort to establish that this agreement is not comparable to the hypothetical license. (*See* Docket No. 501). Again, CMU has no evidence of actual established running royalties for the patents-in-suit upon which its own expert's testimony relies. The Court, therefore, believes that the challenged evidence is highly probative of whether CMU would have accepted a running royalty or opted for a lump sum during the negotiations. *See* FED. R. EVID. 401[2]; *see also Red Hat, Inc.*, 705 F.Supp.2d at 689. The Court further finds, consistent with its

---

[2]    "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401.

*Daubert* decision analyzing Mr. Hoffman's reliance on the DSSC Agreements, that the differences in features between the Intel Agreement and the hypothetical license (including the fact that it pertained to only one of the patents-in-suit) are "more appropriately addressed by way of cross-examination than through exclusion." *CMU*, 2012 WL 3686748, at *2-3; *see also Simon v. Weissmann*, 301 F. App'x 107, 116 (3d Cir. 2008) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)) ("vigorous cross-examination, presentation of contrary evidence, and careful instruction as to burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence").

The Court also rejects CMU's reliance on the fact that the Intel Subscription Agreement was merely an offer for sale and, therefore, not relevant to the hypothetical negotiation and the valuation of the patents. (Docket No. 501). This agreement was the product of arms-length negotiations between two sophisticated entities that arrived at a lump-sum royalty for potential use of the '180 Patent at a price of $200,000. (*See* Pl. Ex. 1). The fact that this option was not exercised by Intel is of little moment because the arms-length nature of the transaction. Further, it was not a settlement offer which is inadmissible under Rule 408 of the Federal Rules of Evidence and would likely run afoul of the Federal Circuit precedent upon which CMU relies. (*See* Docket No. 501 (citing *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983)).

With respect to the 2006 forecast, the spreadsheet created by CMU's then-Director of Intellectual Property, Carl P. B. Mahler, II,[3] sets forth generally that an estimate of a potential annual royalty from Marvell's infringement of its patents was projected as $2,000,000. (Def. Ex. 3 at 3). There are no "economic terms" suggested in this forecast such as basing this projected

---

[3]     The Court notes that Mahler has not been deposed in this case.

figure on a running royalty, despite the fact that running royalty terms are present for many of the other described agreements in the spreadsheet. (*Id.*). The spreadsheet is entitled "Highly Speculative Forecast" and the corresponding emails suggest that this figure was based on revenue information for Marvell's sales of chips for controlling disk drives ($19 million) and sales of systems on a chip ($86 million) as had been reported to Mahler by Jose Moura. (Def. Ex. 2 at 2-3). Mahler further states in his email that his forecasts of potential revenue are typically "conservative" but that the 2006 forecast is "highly speculative" because its figures "would be over and above our conservative one," implying that the figures were higher than CMU would typically project. (*Id.* at 3). CMU's Director of the Center for Technology Transfer and Enterprise, Robert Wooldridge, confirmed that the figure estimated by Mahler was pure guesswork. (Def. Ex. 1).

Like the Intel Subscription Agreement, this evidence suggests that CMU may have sought a lump-sum royalty rather than a running royalty from Marvell and provides insight as to the position CMU may have taken during the hypothetical negotiation as to the type of royalty and the value of the royalty. Also, coupled with the value of the licenses granted under the DSSC Agreements ($250,000) and later option under the Intel Agreements ($200,000) in 2004, it tends to show that CMU's projection of the value of the patents increased over time, leading ultimately to Ms. Lawton's initial one billion dollar valuation. Accordingly, the Court finds that such evidence is relevant for these purposes, *see* FED. R. EVID. 401, as the hypothetical negotiation would require CMU to take a position, in 2001, as to the amount of risk and administrative burdens it sought to take on under the license and whether a lump sum or running royalty was ultimately negotiated by the parties, *see Lucent*, 580 F.3d at 1326.

CMU contends that this projection, through Mahler's own words, is "highly speculative" and that the damages opinion by Mr. Hoffman may not be based on such speculative figures. (Docket No. 503). The Court disagrees as Mr. Hoffman is not directly relying on the $2,000,000 figure set forth in this document to reach his opinion of the reasonable royalty of a lump sum of $250,000. (*See* Pl Ex. 5, Docket No. 501-1 at 21-23). It is simply not part of any of his calculations to reach that figure because, even if the document was excluded, Mr. Hoffman's opinion that the reasonable royalty is a lump sum of $250,000 remains. (*See id.*). Instead, the Court finds that Mr. Hoffman is merely using this document to, in effect, rebut Ms. Lawton's assertion that the damages figure should be based on a reasonable royalty of $0.50 per chip (totaling nearly one billion dollars). (*See id.*). The Court believes that this forecast can be appropriately used in this manner by Marvell and its expert.   *See Simon*, 301 F. App'x at 116.

The Court's final consideration is whether the challenged evidence should be excluded under Rule 403 of the Federal Rules of Evidence. CMU contends that admission of this evidence would cause it unfair prejudice, confuse the issues and mislead the jury. (Docket Nos. 501, 503). For the reasons expressed herein, the Court believes that the challenged evidence is relevant and highly probative of contested issues concerning the hypothetical negotiation, including the state of mind of CMU during such negotiations as to the type of license it would possibly grant Marvell (i.e., running royalty or lump sum) and the value or price of any such license. Under Rule 403, "the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. Balancing these competing concerns, the Court concludes that the challenged evidence is not substantially outweighed by the factors under Rule

403 and that any potential confusion of the issues or confusion to the jury can be obviated by an instruction to the jury as to the proper use of such evidence at trial.

For these reasons, IT IS HEREBY ORDERED that CMU's "Motion *in Limine* No. 4 To Preclude Evidence or Argument Relating to the Intel Subscription Agreement" (Docket No. [500]) and, "Motion *in Limine* No. 5 To Preclude Evidence or Argument Relating to CMU's 2006 'Highly Speculative Forecast'" (Docket No. [502]) are DENIED; and,

IT IS FURTHER ORDERED that the parties shall provide a joint limiting instruction on or before **November 9, 2012 at 5:00 p.m.** with respect to the proper use of the proposed evidence discussed in this Memorandum Order.

*s/ Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge

Date:   November 7, 2012

cc/ecf:  All counsel of record.