**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CARNEGIE MELLON UNIVERSITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 09-290 |
| | ) | Judge Nora Barry Fischer |
| MARVELL TECHNOLOGY GROUP, LTD. | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

### I.   INTRODUCTION

The jury trial in this patent infringement case brought by Plaintiff Carnegie Mellon University ("CMU") against Defendants Marvell Technology Group, Ltd. and Marvell Semiconductor, Inc. ("Marvell") commenced on November 28, 2012 and is ongoing.   This Memorandum Opinion provides further support for the Court's bench order granting, in part, and denying in part, Marvell's Motion to Exclude the Testimony of Catharine M. Lawton.   (*See* Docket No. 686 at 29-31; *Trial Trans. 12/10/12*).   During trial, Marvell objected to the proffered testimony of Ms. Lawton, CMU's damages expert, whom CMU proffered as an expert in intellectual property damages.   (Docket No. 684).   Through its objections, Marvell sought all of the following relief: to exclude Lawton's testimony entirely; to limit the scope of her testimony; and/or to preclude her from relying on a proffered slide presentation CMU sought to use during her examination which was marked as Plaintiff's DEMO 9.[1]   (*Id.*).   CMU contended that Marvell waived its objections to Lawton's qualifications to testify, that her testimony should not be

---

[1]   Plaintiff's DEMO 9 was filed at Docket No. 708-8.   For convenience, the Court cites to same as Plaintiff's DEMO 9 throughout this Memorandum Order and to the page numbers on the slide presentation.

limited and that it should be permitted to use its proffered slide presentation, over Marvell's objections.  (Docket Nos. 706 at 186; 686 at 13-17; 683).

The Court heard extensive argument from the parties during hearings outside the presence of the jury which lasted well into the evenings on December 5 and 6 and on the morning of December 7, 2012.  (Docket Nos. 682, 686, 706).  The Court also conducted a *Daubert* hearing outside the presence of the jury on the afternoon of December 6 during which Plaintiff's counsel essentially conducted his direct examination of Lawton, using the proffered slide presentation.[2]  (*See Trans of Daubert Hr'g 12/6/12*; *see also Plaintiff's DEMO 9*).

CMU filed a Bench Brief Regarding the Daubert Standard for Qualification of an Expert Damages Witness on December 6, 2012.  (Docket No. 683).  Marvell then filed its Motion and Memorandum of Law to Exclude the Testimony of Catharine M. Lawton in the middle of the night on December 7, 2012.  (Docket No. 684).

The Court accepted CMU's proffer of Lawton on December 7 and then accepted her as an expert on December 10 and permitted her to testify as to her ultimate opinion on the reasonable royalty in this case.  (*See* Docket No. 686 at 29-31; *Trial Trans. 12/10/12*).  The Court's analysis supporting these decisions follows.

II.  RELEVANT BACKGROUND

   *A.  Procedural History as to CMU's Proffer of Lawton's Expert Testimony*

The Court first recounts the procedural history relevant to CMU's proffer of Lawton's expert testimony.  The Court set deadlines for the disclosure of expert testimony and the filing of *Daubert* motions challenging the "capacity of any expert to testify" in its Pretrial Order issued in

---

[2]      A portion of this hearing was held *in camera* given that certain of Ms. Lawton's disclosures concerning activities undertaken pursuant to certain non-disclosure agreements.  (*See* Docket No. 706 at 144-45, 173).  The portion of the transcript relating to this *in camera* session was ordered to be sealed.  *See Sealed Trial Trans. 12/6/12.*

October of 2011. (Docket Nos. 315, 335). CMU provided Lawton's report to Marvell pursuant to these deadlines. She was also deposed by Marvell, at length. Marvell then moved to exclude her testimony by filing a *Daubert* motion in accordance with the Court's deadlines (which had been extended). (Docket No. 367, 368). After consideration of opposition briefs (Docket No. 395), and oral arguments presented at the hearing on July 10 and 11, 2012 (Docket No. 433), the Court granted, in part, and denied, in part, Marvell's motion. (Docket No. 451). Marvell did not challenge Lawton's qualifications to opine that the reasonable royalty in this case was $0.50 per chip at that time.[3] (Docket Nos. 367, 368). Instead, it raised four separate challenges to her testimony, arguing that: (1) Lawton's purported use of the entire market value rule was unreliable; (2) her apportionment analysis was unreliable; (3) her reliance on an irrelevant PowerPoint slide was unreliable; and (4) a host of other reasons indicated that her opinions were unreliable. (*Id.*). Marvell's motion was granted, in part and denied, in part. The Court held that "[t]he motion is granted to the extent that Ms. Lawton may not testify to total revenue, total profit, or total margin, except to start her analysis. The motion is denied in all other respects, such that Ms. Lawton may refer to the total number of sales, total apportioned revenue, average price per chip, operating profit per chip, and apportioned profit per chip in making her calculations." *See CMU v. Marvell*, Civ. A. No. 09-290, 2012 WL 3679564 at *7.

Closer to trial, Marvell also timely filed a number of motions in limine which challenged Lawton's expert testimony; however, Marvell again did not challenge her qualifications to opine as to a reasonable royalty of $0.50 as of this time. (Docket Nos. 514, 517, 520, 523). The motions in limine were extensively argued by the parties at a two-day motion hearing in October.

---

[3]     The Court notes that Marvell did, however, challenge the qualifications of CMU's expert on the hard disk drive industry and the sales cycle, Dr. Christopher Bajorek. (*See* Docket No. 406). This motion was filed in accord with the Court's deadlines for the filing of *Daubert* motions. (*Id.*).

(Docket Nos. 590, 591).  The Court then provided the parties with written rulings on all of the motions prior to the pretrial conference.  (Docket Nos. 595-596, 601-602, 604-605, 607-614).

Relevant here, Marvell filed two related motions, i.e., "Motion in Limine No. D9 to Exclude Reference to the Entire Price, Profit, and/or Margin Associated with Any One or More Accused Chips" and "Motion in Limine No. D10 to Preclude CMU from Introducing Evidence and Argument Regarding Excess Profits, Premiums, and Operating Profit Premiums."  (Docket Nos. 514, 517).  With these motions, Marvell sought to exclude Lawton's references in her reasonable royalty calculations to "entire price," "operating profit," profit margin," "premiums," and "excess profits" at trial in light of the Federal Circuit's decision in *LaserDynamics, Inc. v Quanta Computer, Inc.*, 694 F.3d 51, (Fed. Cir. 2012) and its position that the admission of this evidence would unfairly prejudice Marvell and create confusion for the jury. The Court denied both motions.  *See CMU v. Marvell*, Civ. A. No. 09-290, Docket No. 604 (W.D. Pa. Nov. 5, 2012), Docket No. 607, 2012 WL 5451567, at *1 (W.D. Pa. Nov. 6, 2012).  Hence, these rulings did not limit Lawton's proposed testimony at trial on these issues.

Marvell also submitted its "Motion in Limine No. D12 to Preclude CMU From Introducing Evidence and Argument Regarding Any Compensatory Damages Beyond a Reasonably Royalty," whereby Marvell sought to exclude CMU from presenting "evidence and argument regarding any purported 'harms' or 'damages' other than the loss of the reasonable royalty that would have resulted from the hypothetical negotiation for a license to the patents-in-suit." (Docket No. 523).  The Court granted this motion and precluded CMU from introducing evidence or argument at trial directed to the alleged harms to CMU (as set forth in pages 377–79 of Ms. Lawton's expert report) as a result of the alleged failure of Marvell to enter into a license

for the patents-in-suit.  *See CMU v. Marvell*, Civ. A. No. 09-290, 2012 WL 5409800, at *1 (W.D. Pa. Nov. 6, 2010).

In addition, Marvell filed a motion to exclude a portion of Lawton's damages calculation due to CMU's failure to comply with the marking statute, 35 U.S.C. § 287(a).  (Docket No. 520). The Court granted this motion, in part, finding that CMU's licensees were required to mark all products which contained the '839 Patent and that, as of March 6, 2009, CMU's licensees had sold products which contained the '839 Patent without marking these products.  *See CMU v. Marvell*, Civ. A. No., 09-290, --- F. Supp. 2d ----, 2012 WL 5398818, at *1 (W.D. Pa. Nov. 2, 2012).  As such, the Court precluded CMU from introducing evidence of damages as to the '839 Patent prior to its filing of this lawsuit on March 6, 2009.  *See id.*  Lawton was further ordered to submit a supplemental damages report addressing this ruling.  *Id.* at *11.

Lawton and CMU were also provided with updated financial and sales information by Marvell prior to trial.  Lawton ultimately submitted two updated expert reports to Marvell addressing the changes in her opinions due to the updated financial and sales information. (Docket No. 706 at 91).  She also submitted a supplemental report on November 13, 2012 which conforms her opinions to the Court's decision on the marking issue.   (*Id.* at 91-92).

At trial, CMU has presented evidence through a number of fact witnesses, including the inventors, Aleksandar Kavcic and Jose Moura, its expert on infringement, Dr. Steven W. McLaughlin, its expert on the hard disk drive industry and the sales cycle, Dr. Christopher Bajorek, and Dr. Mark Kryder and Robert Wooldridge, who testified as fact witnesses regarding the technology transfer office at CMU and their respective experiences running that office.

CMU has used slide presentations in conjunction with many of its witnesses thus far.  *See Plaintiff's DEMO* exhibits.   Some of the slides have contained actual exhibits (such as the

patents) which have been admitted into evidence while others have been demonstrative aids which the Court permitted to be shown to the jury given the parties' agreements and finding that the slides would help the jury's comprehension of this complex case.  The Court found the slide presentations to be particularly useful with respect to Dr. McLaughlin's testimony, as it was highly technical in nature.

In this regard, the parties had reached a "gentleman's agreement" pursuant to which they agreed to submit their proposed slide presentations which they intended to use with a witness to the opposition two days before the witness was scheduled to testify in order to permit the opposition the opportunity to object to same.  (*See* Docket No. 708-1 at 2).  With respect to Ms. Lawton's testimony, CMU submitted its initial slide presentation to Marvell on December 4, 2012 at 6:42 a.m. and submitted an additional slide which was added to the presentation at 7:05 p.m. on the same day.  (Docket Nos. 708-1, 708-2, 708-3).  These presentations were exchanged via emails from Plaintiff's counsel, Christopher Verdini, Esquire to the defense team.  (*Id.*).  At this point, the presentation consisted of 185 slides.  *Id*; s*ee also Plaintiff's DEMO* 9.  Marvell responded by objecting to nearly all of CMU's slides in an email forwarded to CMU's counsel after midnight on December 5, 2012.  (Docket No. 708-4).  Those objections were then forwarded to the Court at 12:14 a.m. on December 5, 2012.  (Docket Nos. 708-5, 708-6, 708-7).  Arguments and briefing then ensued, as is described above in the introduction.

> *B.  CMU's Proffer of Lawton's Testimony at Trial and Daubert Hearing on December 6*

> 1.  Lawton's Qualifications

Lawton testified to the following with respect to her qualifications.  She is presently a director at the Berkeley Research Group, LLC ("BRG"), which is an international consulting firm that specializes in, among other things, strategy issues related to complex litigation. (Docket

No. 706 at 75).  She was hired by CMU to conduct an investigation with respect to damages in this case and is proffered by CMU as an expert in intellectual property damages.  *Id.* at 75.

Lawton's educational background is limited to a Bachelor's of Science in Finance, with a Minor in Business Economics, which she earned from the University of Illinois in 1984.  *Id.* at 76.  She has not completed any post-graduate work since that time.  *Id.*  She also has not attained a C.P.A. or any other formal certification in business or finance.  *Id.* at 97-98.  She admitted that she lacks educational and technical experience in the fields of engineering, computer science, algorithms, simulators, architecture read channels, semiconductors, or analyzing patents.  *Id.* at 98-99.  Instead, Lawton has spent her twenty-seven year career as a consultant and expert witness on damages issues.  *Id.* at 99.

Upon her graduation from Illinois, in 1985, Lawton was hired by Peterson and Company as a staff consultant.  *Id.* at 76, 82.  She was at Peterson until 1998 and during her thirteen-year tenure, she "rose up the ranks" from staff consultant to become a vice-president and managing director.  *Id.* at 82.  She left Peterson in 1998 along with a number of her partners and they started a new firm, Technology and Dispute Resolution Consulting, which later changed its name to InteCap.  *Id.* at 77.  The focus of the firm was on intellectual property issues and Lawton served as managing director.  *Id.*  Lawton moved on to LECG, LLC as a director, where she remained from 2004 until 2011.  *Id.*  She then assumed her present role at BRG in March of 2011.  *Id.* at 77.  Given this resume, Lawton conceded that she had never worked at an accounting firm, a corporation or non-profit academic institution.  *Id.* at 99, 116-17.  She has also never served as a chief financial officer for a company.  *Id.* at 130.

In her career as a financial consultant/expert witness, Lawton testified that she specializes in intellectual property cases; however, she does not specialize in any particular industry within

that broader field.  *Id.* at 77-78.  She clarified that she has "worked extensively" in a number of industries, including: mechanical, computer, information technology, and pharmaceutical.  *Id.* at 78.  Lawton also explained that the methods that she uses to value damages, including the reasonable royalty method at issue in this case, are applied similarly across all of these industries.  *Id.*

Lawton's prior experience is largely litigation-based, although she has some experience in general consulting.  In regard to her litigation experience, she estimated that she has worked on approximately 100 cases involving intellectual property issues during her career.  *Id.* at 82.  She has offered expert testimony in many of these cases.  *Id.* at 78-79.  Indeed, she first testified as an expert witness in the late 1980s.  *Id.* at 78-79.  Since 1997, she has testified at trial as an expert in 16 cases and has given depositions in many other cases, for a total of 58 cases.  *Id.*  She elaborated that most of these cases have involved intellectual property issues.  *Id.* at 79.  Lawton has never been excluded as an expert witness, but the scope of her testimony was limited in *Eastman Kodak Company, Inc. v. Sun Microsystems, Inc.*, Civ. A. No. 02-0674T(F) (W.D. N.Y.), such that she was not permitted to rely on opinions of an expert who had yet to testify at trial.

Lawton explained that the following cases that she has worked on involved computer technology:

7.   *Metavante Corporation v. Emigrant Savings Bank*, Civ. A. No. 05-C-1221 (E.D. Wisc.).

15.  *Amazon.com, Inc. v. Atlantic Mutual Insurance Co.*, Civ. A. No. C05-00719RSM (W.D. Wash.).

24.  *SBC Technology Resources, Inc. v. Inrange Technologies Corp., et al.*, Civ. A. No. 303-CV-418-N (N.D. Tex).

28.  *Eastman Kodak Company, Inc. v. Sun Microsystems, Inc.*, Civ. A. No. 02-0674T(F) (W.D. NY).

29.  *Solaia Technology, LLC v. Appleton Papers, Inc., Hershey Foods Corporation*, Civ. A. No. 03-C00989 (N.D. Ill.).

38. *IBP, Inc. v. HK Systems, Inc.*, Civ. A. No. 8:98CV480 (D. Neb.).

42. *HK Systems v. Mannesmann Dematic Rapistan Corp.*, Civ. A. No. 96-CV-381 (E.D. Wisc.).

45. *Taylor Electric Company v. National Semiconductor*, AAA Arbitration, Milwaukee, Wisconsin.

*Id.* at 135-137; *First Supp. Report of Catharine Lawton*, § B.1. "Deposition and Court Testimony (1997-2012)." She further testified that the *Kodak* matter involved computer hardware and software and the *Metavante case* was not a patent infringement case but a contract matter. (Docket No. 706 at 125).

As to her more general consulting experience, Lawton divulged that she has provided confidential consulting to companies on licensing issues as well as analyzing and valuing the companies' patents. *Id.* at 105, 116-17; *Sealed Trans 12/6/12* at 8, 20.[4] In these discrete assignments, she has been tasked with working with in-house personnel to value technology for the purposes of both increasing the sales price and profits for a particular product and determining whether it was more advantageous for the company to license a patent or to maintain exclusive rights. *Id.* at 8, 13, 20. She was also tasked with valuing patents for a company that was facing a precarious financial situation. *Id.* at 11-12. She further explained that she has engaged in many pre-litigation activities that preceded the client's ultimate involvement in litigation, including valuations of a company's portfolio of patents which was used by the company's chief executive officer to determine if the company should pursue licensing or enforcement. *Id.* at 13-14, 20.

---

[4] The Court notes that a portion of the voir dire was conducted *in camera* given that Lawton remained subject to non-disclosure agreements stemming from the engagements she disclosed. That portion of the record remains under seal and, as such, the Court generically recites the facts from that *in camera* portion of the proceedings.

Lawton admitted that she has no direct, real-world experience negotiating licenses for patents or computer chips such as those at issue in this case.  Docket No. 706 at 120.   Indeed, she has never "sat at the table" during any licensing negotiations with one of her clients.  *Id.*  However, she has had some relevant "behind-the-scenes"-type consulting work supporting actual license negotiations in which her clients were engaged.  *Id.*  In this regard, she testified that she worked quite closely with the chief patent counsel of one company, who would often call her for advice on prospective licensing proposals.  *Sealed Trans 12/6/12* at 27.

Lawton has also given presentations and written articles on intellectual property damages issues but such endeavors were mostly from the late 1990s to the mid-2000s.  (Docket No. 706 at 127-30).   Her presentations have been made to lawyers, in-house counsel and consulting professionals regarding intellectual property and patent valuation and licensing.  *Id.* at 127-28.  Among them, she has given presentations titled: "What is Your Intellectual Property Worth?"; "Valuting Intellectual Property for Licensing and Litigation"; and "The Value of Patents in Protecting Research Investments, Stockholder Equity and Jobs for the Metropolitan Corporate Counsel."  *Id.* at 128-29.

## 2.  Lawton's Proffered Opinions

Lawton provided a damages opinion as to the reasonable royalty which the parties would agree to under the hypothetical negotiation framework under *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970).  (Docket No. 706 at 78-80).   Lawton testified that she had used the *Georgia-Pacific* factors in other cases and that this method was used by other damages experts in this area.  *Id.* at 81, 87-88.   She relied on a number of assumptions which are set forth in *Georgia-Pacific* in support of her opinion and also relied on expert testimony provided by Dr. Steven W. McLaughlin and Dr. Christopher Bajorek.  *Id.* at 93,

111.  To this end, she relied on Dr. McLaughlin's testimony that the '180 and '839 Patents are valid and that Marvell's MNP and NLD chips infringed the methods of these patents.  *Id.* at 111, 121, 131-132.  She also considered Dr. Bajorek's testimony that the technology embodied in the patents was "must-have" for Marvell and that this technology was "industry standard."  *Id.*

Lawton opines that the parties to the hypothetical negotiation would have agreed to a reasonable royalty of $0.50 per chip sold by Marvell that contained the patented methods, on March 13, 2001, the date the patents issued.  *See Plaintiff's DEMO* 9 at 11, 181, 182-185.  To reach this figure, she analyzed all of the *Georgia-Pacific* factors and used the actual financials of Marvell for her computations as no projected sales figures for the infringing products were available.  *Id.* at 15, 109.

With respect to her actual computations, Lawton initially computed the price-per-chip ($4.42) and operating profit-per-chip ($2.16) based on Marvell's internal sales data.  *See Plaintiff's DEMO 9* at 7, 8.  She then relied on comments from Marvell's C.E.O., Dr. Sutardja, and deposition testimony of Marvell's marketing executive, Dr. Armstrong, both of which suggest that Marvell's target gross margin for all of its products was 50%.  *Id.* at 155, 156.  She next compared the sales of Marvell's chips to certain customers (Maxtor and Toshiba) for which she had information from the same time period (2003) where products were sold with and without the addition of the allegedly infringing MNP detector.  *Id.* at 162.  From this data, Lawton opines that Marvell received "excess profits" from its sales of the chips containing the MNP, i.e., profit in excess of the 50% target margin, between $0.06 and $0.72.  *Id.* at 158-172.  She refers to this range ($0.06 to $0.72) as the "operating profit premium" and suggests that this range would also have been the range of negotiations between the parties during the hypothetical negotiation.  *Id.* at 172.  Ultimately, Lawton opines that a reasonable royalty in this case is $0.50.

*Id.* at 11, 182-185.  In support of this opinion, she relies heavily on Dr. Bajorek's opinion that the patented technology was "industry standard" and that it was also "must-have" for Marvell's business success.

Lawton has provided several alternative figures for the royalty base and damages estimates, as is disclosed in the following charts.

 If CMU proves that it is entitled to damages for all of the MNP & NLD Chips, she opines that the damages calculation is:

| Patents | Royalty Base | Royalty Rate | Reasonable Royalty |
|---|---|---|---|
| '839 & '180 Patents | 2,338,280,542 | $0.50 | $1,169,140,271 |
| '839 Patent Only | 1,229,180,535 | $0.50 | $614,590,267 |

*Plaintiff's Demo 9* at 182.[5]

Alternatively, if CMU proves that it is entitled to damages for only those MNP & NLD Chips which are imported into the United States, she opines that the damages calculation is:

| Patents | Royalty Base | Royalty Rate | Reasonable Royalty |
|---|---|---|---|
| '839 & '180 Patents | 556,812,092 | $0.50 | $278,406,046 |
| '839 Patent Only | 258,738,067 | $0.50 | $129,369,034 |

*Plaintiff's Demo 9* at 184.

III. APPLICABLE LEGAL STANDARDS

---

[5]     The Court notes that the alternative royalty bases are provided as a result of the Court's decision limiting damages as to the alleged infringement of the '839 Patent as a result of CMU's failure to comply with the marking statute, 35 U.S.C. § 287.  *See CMU v. Marvell*, Civ. A. No., 09-290, --- F. Supp. 2d ----, 2012 WL 5398818, at *1 (W.D. Pa. Nov. 2, 2012).

A. *Expert Testimony*[6]

As the Court has recounted in its prior decisions, Federal Rule of Evidence 702, which memorializes the Supreme Court's landmark case *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the basic framework for the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliable to the facts of the case.

Fed. R. Evid. 702.   The United States Court of Appeals for the Third Circuit has held that "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) (citations omitted).   "[T]he district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury." *Id.; see also IP Innovation L.L. C. v. Red Hat, Inc.*, 705 F.Supp.2d 687, 689 (E.D. Tex. 2010) (Rader, J.) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 578, 589 (1993)) ("The district court acts as a gatekeeper tasked with the inquiry into whether expert testimony is 'not only relevant, but reliable.'"). In this role, the district court is not the finder of fact, but must focus on the methodology of the expert in order to "satisfy itself that 'good grounds' exist for the expert's opinion." *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (citing *Daubert*, 509 U.S.

---

[6]      Under Federal Circuit precedent, the question of "[w]hether proffered evidence should be admitted in a trial is a procedural issue not unique to patent law," so it is governed by regional circuit law. *Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390–91 (Fed.Cir. 2003) (citing *Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1360 (Fed.Cir. 2001)). Thus, the Court applies Third Circuit precedent to determine the admissibility of expert testimony.

at 590); *In re TMI Litigation*, 193 F.3d 613, 713 (3d Cir. 1999) (district court should not conflate

"its gatekeeping function with the fact-finders' function as the assessor of credibility").

> *Daubert* does not require that a party who proffers expert
> testimony carry the burden of proving to the judge that the expert's
> assessment of the situation is correct.   As long as an expert's
> scientific testimony rests upon "good grounds, based on what is
> known," it should be tested by the adversary process-competing
> expert testimony and active cross-examination-rather than
> excluded from jurors' scrutiny for fear that they will not grasp its
> complexities or satisfactorily weigh its inadequacies.   In short,
> Daubert neither requires nor empowers trial courts to determine
> which of several competing scientific theories has the best
> provenance.   It demands only that the proponent of the evidence
> show that the expert's conclusion has been arrived at in a
> scientifically sound and methodologically reliable fashion.

*Mitchell*, 365 F.3d at 244 (quoting *Ruiz-Troche v. Pepsi Cola Bottling Co.*, 161 F.3d 77, 85 (1st

Cir. 1998) (citations omitted); *see also Kannankeril v. Terminix Intern., Inc.*, 128 F.3d 802, 809

(3d Cir. 1997) ("The trial judge must be careful not to mistake credibility questions for

admissibility questions.").   The party asserting the admissibility of the proffered testimony has

the burden to demonstrate by a preponderance of the evidence that the opinions are based on

"good grounds." *Kannankeril*, 128 F.3d at 807.

Qualification requires "that the witness possess specialized expertise." *Fried*, 320 F.3d at

404.   The Third Circuit has "interpreted this requirement liberally," holding that "a broad range

of knowledge, skills and training qualify an expert as such." *In re Paoli R.R. Yard PCB Litig.*,

35 F.3d 717, 741 (3d Cir. 1994).   The expert's level of expertise may affect the reliability of his

or her testimony, *id.*, such that, where an expert's qualifications are sufficiently low, the

testimony may be excluded under the reliability prong. *Elcock v. Kmart Corp.*, 233 F.3d 734,

749 (3d Cir. 2000).

B.  *Damages under Reasonable Royalty Theory*

In a patent infringement action, a successful plaintiff is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284 (2006). Two forms of compensation are authorized by § 284: lost profits and reasonable royalty damages. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). Because CMU does not manufacture or sell products that practice the claimed methods, it is not entitled to lost profits.  CMU thus bears the burden of proof to establish its damages at trial through a reasonable royalty. *See Lucent*, 580 F.3d at 1324 (citation omitted) ("The burden of proving damages falls on the patentee.").

"A reasonable royalty contemplates a hypothetical negotiation between the patentee and the infringer at a time before the infringement began." *Red Hat*, 705 F.Supp.2d at 689 (citing *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983)). The hypothetical negotiation presumes that both the patentee and the accused infringer are willing parties to the negotiation, and also assumes that the patent was valid, enforceable, and infringed. *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970). The *Georgia–Pacific* case sets out a series of factors that may be relevant to the analysis of a reasonable royalty. *Id.*  "Although some approximation is permitted in calculating the reasonable royalty, the Federal Circuit requires 'sound economic and factual predicates' for that analysis." *Red Hat, Inc.,* 705 F.Supp.2d at 689 (quoting *Riles v. Shell Exploration & Production Co*., 298 F.3d 1302, 1311 (Fed. Cir. 2002) (citation omitted)); *see also i4i Ltd. Partnership v. Microsoft Corp*., 598 F.3d 831, 857-58 (Fed. Cir. 2010) (citing *Lucent*, 580 F.3d at 1325) ("any reasonable royalty analysis necessarily involves an element of approximation, and uncertainty").

IV. DISCUSSION

### A.  Alleged Waiver of Present Arguments

The Court turns initially to CMU's argument that Marvell waived its objections to Lawton's qualifications to testify as an expert as it failed to raise them in accordance with the Court's Orders.  (Docket Nos. 706 at 186; 686 at 13-17).  Marvell maintains that its present arguments should be decided because their arguments spring from the more fully developed trial record and CMU's proffer of Lawton is beyond the scope of the initial proffer of her testimony during the prior proceedings.  (Docket No. 684).  Marvell points to the facts that Lawton has submitted two updated expert reports and a supplemental report since the initial *Daubert* proceedings, and also to CMU's proffered slide presentation, *see Plaintiff's DEMO 9*, as well as her testimony during the *Daubert* hearing conducted on December 6, 2012.  (*Id.*).  Marvell argues that CMU is attempting to have Lawton testify as a wide-ranging expert who will be, in effect, summarizing all of CMU's evidence at trial and providing opinions that she is not qualified to express in accord with *Daubert* and Rule 702.  (*Id.*).

Pursuant to Rule 16 of the Federal Rules of Civil Procedure, courts are granted the authority to establish pretrial deadlines, including for the filing of *Daubert* motions and motions in limine.  *See* FED. R. CIV. P. 16(b).  Rule 16(b)(4) provides that deadlines set by the court in a pretrial order may only be extended for good cause shown.  *See* FED. R. CIV. P. 16(b)(4).  To establish good cause, a party must demonstrate that they acted diligently and "carelessness, or attorney error, which might constitute 'excusable neglect' under Rule 6(b), is insufficient to constitute 'good cause' under Rule 16(b)."  *Graham v. Progressive Direct Ins. Co.*, 271 F.R.D. 112, 121 (W.D. Pa. Sept. 15, 2010) (quotation omitted).  If a party fails to adhere to a deadline set in a pretrial order, the court may enter "any just orders," and impose any of the sanctions listed in Rule 37(b)(2)(A)(ii)-(vii), which include prohibiting a disobedient party from opposing

a claim or defense, or introducing designated matters into evidence or striking pleadings.  *See* FED. R. CIV. P. 16(f).

It is well-settled that a party may waive an objection by failing to raise it in accordance with deadlines set by the court.  *See* FED. R. EVID. 103 ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and: (1) if the ruling admits evidence, a party, on the record: (A) timely objects or moves to strike; and (B) states the specific ground, unless it was apparent from the context.").  Such a failure to raise an objection can have adverse consequences on a party's ability to contest certain alleged trial errors on appeal.  *See Waldorf v. Shuta*, 142 F.3d 601, 629 (3d Cir.1998) ("[I]t is clear that a party who fails to object to errors at trial waives the right to complain about them following trial."); *see also HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1281 (Fed. Cir. 2012) (citation omitted) ("As a general rule, an appellate court does not consider an issue not passed upon below.").  However, courts have also recognized that this general waiver rule should not trump its gatekeeper role to scrutinize proffered expert testimony prior to its submission to the jury.  *See Daddio v. A.I. DuPont Hosp. for Children of Nemours Foundation*, 650 F. Supp. 2d 387, 402 (E.D. Pa. Aug. 21, 2009).  Further, courts should exercise their discretion to consider untimely *Daubert* motions to the extent that such motions challenge proffered expert testimony which is outside the scope of the initial proffer of expert testimony in the case.  *Id.*  ("As the plaintiffs have further clarified their positions on the testimony that [their expert] will give at trial, the scope of the issues arising out of that testimony has evolved.").

The Court agrees with CMU that Marvell could have raised its general challenge to Lawton's qualifications during the initial round of *Daubert* motions, the deadlines for which have long since passed.  However, the Court believes that Marvell has sufficiently established

"good cause" to raise these arguments now given that the trial proffer of Lawton's testimony, as displayed in the slide presentation, *see* Plaintiff's DEMO 9, and during the *Daubert* hearing, has evolved beyond the initial proffer. *See Graham*, 271 F.R.D. at 121; *see also Daddio*, 650 F. Supp. 2d at 402. In addition, this trial proffer of her expert testimony must be examined with reference to the record as it stands at this point of the trial. Given same, the Court believes that Marvell's counsel diligently raised the present arguments in response to the proffered slide presentation which was presented to them by CMU on December 4, 2012. *See Graham*, 271 F.R.D. at 121. In addition, like the court in *Daddio*, the Court also finds it appropriate to consider Marvell's *Daubert* motion at this time given its role as gatekeeper to scrutinize proffered expert testimony. *Daddio*, 650 F. Supp. 2d at 402. As the Court recounted on the record, the undersigned takes it gatekeeper role seriously, has addressed *Daubert* issues in prior proceedings in this case and other cases, *see Pritchard v. Dow Agro Sciences, Inc.,* 705 F. Supp. 2d 471 (W.D. Pa. 2010), *see also Jackson v. City of Pittsburgh*, Civ. A. No. 07-111, 2010 WL 3222137 (W.D. Pa. Aug. 13, 2010), and will do so again with respect to Lawton's qualifications. For these reasons, the Court overrules CMU's objection that Marvell's arguments have been waived and will now address the parties' substantive arguments.

### B. Challenge to Witness's Qualifications/Proffered Testimony Outside Scope of Witness's Expertise

The main thrust of Marvell's challenge to Lawton's qualifications is that she has no specific "real-world experience" in valuing patents or negotiating license agreements of the type at issue in this case and, therefore should not be able to testify to her opinion that a reasonable royalty in this case is $0.50. (Docket No. 684). Marvell further argues that much of the proffered testimony pertains to technical matters which are not within Lawton's expertise and relies on evidence which has not been introduced or admitted at trial. *Id.* CMU counters that

18

Lawton has been narrowly proffered to testify as an expert in intellectual property damages and meets the Third Circuit's liberal standard of qualification as an expert witness in this area given her educational background, experience and other credentials set forth in her curricula vitae. (Docket No. 683).  CMU points out that she has been qualified as an expert in patent cases, has applied the *Georgia-Pacific* factors in several cases and has withstood a challenge to her credentials in one case.  (Docket No. 686 at 13-25).  Finally, as to the alleged improper scope of her testimony, CMU contends that Lawton may rely on the expert opinions of Dr. McLaughlin and Dr. Bajorek, who have already testified in this case, and rely on evidence that has not been admitted in accordance with Rule 703 of the Federal Rules of Evidence.  (*See e.g.*, Docket No. 706 at 155).

The Court first turns to the general challenge to Lawton's qualifications to render her reasonable royalty opinion in this case.  In the Third Circuit, an expert witness must have "specialized knowledge" in the area of her testimony.  *See Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) ("Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony."); *cf. Elcock*, 233 F.3d at 741 (requiring that an expert possess "specialized expertise").

> The basis of this specialized knowledge "can be practical experience as well as academic training and credentials."  [The United States Court of Appeals for the Third Circuit has] interpreted the specialized knowledge requirement liberally, and ha[s] stated that this policy of liberal admissibility of expert testimony "extends to the substantive as well as the formal qualification of experts."  However, "at a minimum, a proffered expert witness … must possess skill or knowledge greater than the average layman…."

*Waldorf*, 142 F.3d at 625 (citations omitted).  The Court of Appeals has further explicated that:

> [b]ecause of our liberal approach to admitting expert testimony, most arguments about an expert's qualifications relate more to the

weight to be given the expert's testimony than to its admissibility. Thus, witnesses may be competent to testify as experts even though they may not, in the court's eyes, be the "best" qualified. Who is "best" qualified is a matter of weight upon which reasonable jurors may disagree.

*Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 782 (3d Cir. 1996).  Finally, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate."  *Id.*; *see also Pineda v. Ford Motor Co.*, 520 F.3d 237, 245 (3d Cir. 2008) (reversing the district court and holding that expert should have been qualified under Rule 702 even if he was not the "best qualified" expert or possessed the precise "specialization" that the district court deemed appropriate).

The Court agrees with Marvell that an individual with a post-graduate education such as an M.B.A. or Ph.D. in accounting, finance or economics, and/or a certification such as a C.P.A., who had also participated in actual negotiation of patent licenses on behalf of a non-profit entity, such as CMU, or a company in the semiconductor industry, like one of Marvell's competitors, may likely have superior qualifications to Lawton.  This theoretical individual may likely be the "best qualified" expert, with the most helpful background to testify on the damages issues in this case.  However, given the above precedent, CMU was not required to put forth the "best qualified" witness but only an individual who could meet the minimum standards for expert testimony set out by the Third Circuit.  *See Holbrook*, 80 F.3d at 782.  Whether Lawton is the best qualified and most reasonable expert witness vis-à-vis any expert witness put on by Marvell (including Dr. Creighton Hoffman)[7] is a matter for the jury to resolve.  *See id.*

---

[7]     Dr. Creighton Hoffman was proffered by Marvell as an expert in intellectual property damages to counter Lawton's opinions and provide his own.  (Docket No. 709 at 105-290; 711 at 102-140).  He was also offered as an expert in the field of patent licensing.  (Docket No. 709 at

With respect to the challenge to Lawton's lack of experience in negotiating licenses, the Court finds persuasive the decision in *Pulse Medical Instruments, Inc. v. Drug Impairment Detection Services, LLC*, 858 F.Supp.2d 505, 508-511 (D.Md. 2012).  In *Pulse Medical*, Judge Chasanow faced similar arguments challenging an expert's lack of experience in negotiating patent licenses in the practice as a basis to exclude the proffered expert testimony on the hypothetical negotiation required under the *Georgia-Pacific* factors.  *Id.*  As Judge Chasanow points out, the flaw in this type of challenge is that the hypothetical negotiation has no application in the "real-world."  *Id.*  Instead, it is essentially a legal construct developed by the courts in an effort to quantify damages under a reasonable royalty theory, which applies in a situation such as the instant case, i.e., when a "victimized patentee is unable to prove that [it] lost a measurable amount of profits as the result of the infringement."  *Georgia-Pac. Corp.*, 318 F. Supp. at 1127; *see also Pulse Medical*, 858 F. Supp. 2d at 510 ("The application of the *Georgia–Pacific* factors for the purpose of determining a reasonable royalty rate for patent damages is a framework for envisioning a hypothetical negotiation between the parties.").  Further, the framework for the "hypothetical negotiation uses 'common, fixed assumptions,' which are by definition 'artificial' to enable a reasonable royalty calculation," making it very different from actual license negotiations between two companies.  *Pulse Medical*, 858 F. Supp. 2d at 510 (quoting *Cummins-Allison Corp. v. SBM Co.*, 584 F. Supp. 2d 916, 917-18 (E.D. Tex. 2008) and citing *Ariba, Inc. v. Emptoris, Inc.*, 567 F. Supp. 2d 914, 917 & n.2 (E.D. Tex. 2008)).

The Federal Circuit has routinely upheld an expert's use of the *Georgia-Pacific* factors as an appropriate method for assessing damages in patent cases.  *See i4i Ltd Partnership v. Microsoft Corp.*, 598 F.3d 831, 855 (Fed. Cir. 2010) ("We have consistently upheld experts' use

---

165-66).  At trial, the Court accepted Dr. Hoffman as an expert in intellectual property damages, only.  (Docket No. 709 at 172).

of a hypothetical negotiation and *Georgia-Pacific* factors for estimating a reasonable royalty."). Indeed, the Federal Circuit has stated that "[a]n expert's testimony concerning the acceptance of the hypothetical negotiation model among damage experts and economists, combined with a methodical explication of how [s]he applied the model to the relevant facts of the case satisfies Rule 702 and *Daubert*." *Id.* In light of the liberal standard for the qualifications of experts enunciated by the Court of Appeals for the Third Circuit, and the Federal Circuit's approval of the methods used by damages experts to quantify the hypothetical negotiation, it appears that an appropriately credentialed individual on the issue of intellectual property damages may testify at trial as to application of the *Georgia-Pacific* factors, including the artificial hypothetical negotiation, despite a lack of experience in actual negotiations.

Marvell next argues that Lawton's lack of practical experience in accounting, finance or economics makes her simply a "hired gun" or professional witness and that some courts have declined to qualify such professional witnesses as experts. (Docket No. 684). Marvell is correct that courts have disapproved of the use of such professional witnesses; but this is just one of a host of factors to consider when determining whether a proposed expert meets the minimum standards necessary to be qualified under *Daubert*. *See Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 800 (4th Cir. 1989) ("Although it would be incorrect to conclude that Gordon's occupation as a professional expert alone requires exclusion of her testimony, it would be absurd to conclude that one can become an expert simply by accumulating experience in testifying."). Moreover, given the liberal standard for admissibility of expert testimony, the Third Circuit has found that an expert's background as a purported professional witness goes to the credibility of the expert rather than her qualifications. *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 753 (3d Cir. 1994). In this regard, the Third Circuit noted in *Paoli* that "[t]he fact that most of

[plaintiff's expert's] work since 1976 has been for plaintiffs in litigation may undermine her credibility but does not eradicate her expertise. For litigants to have access to experts, it may be necessary for some experts to concentrate on litigation." *Id.* While the Court has expressed its skepticism with the presentation of Ms. Lawton as well as the use of such professional witnesses generally, as is discussed below, she has sufficient minimum qualifications to offer an expert opinion on the reasonable royalty in this case as her overall credentials exceed the floor of the Third Circuit's liberal standards for qualifications. *See Elcock*, 233 F.3d at 742.

Despite its arguments concerning Lawton's lack of a post-graduate education, Marvell cannot meaningfully dispute that Lawton is qualified to render a general damages opinion given her bachelor's degree in finance and economics and extensive consulting work over her twenty-seven year career, as she disclosed during voir dire and through her curricula vita. (Docket No. 706 at 76-78). During this time, she has focused on the area of intellectual property damages. *Id.* She has been qualified as an expert to offer an opinion on patent damages on numerous occasions, and has applied the *Georgia-Pacific* factors, including the hypothetical negotiation and reasonable royalty calculation, in prior cases. *Id.* at 78-81, 87-88. She has testified as an expert in 16 such cases since 1997. *Id.* at 79. Indeed, in *Eastman Kodak Company, Inc. v. Sun Microsystems, Inc.*, Civ. A. No. 02-0674T(F) she survived a similar challenge to her qualifications as is made by Marvell here. Specifically, the *Kodak* Court held that:

> Sun moves to exclude the testimony of Kodak's damages expert Catharine Lawton on grounds that Ms. Lawton is not qualified to testify as an expert with respect to the reasonable royalty that Sun might have paid to Kodak for use of the Khoyi patents,
>
> …
>
> As for her qualifications, Ms. Lawton has extensive experience as a damages consultant, which experience qualifies her to testify as Kodak's expert on the issues of damages. Sun contends that Ms.

> Lawton is not qualified because, among other things, she has no advanced degrees in computer science, economics, or finance; has never taught at a university or been published in a peer-reviewed journal; has no experience in the computer industry or in patent licensing; and has never negotiated a patent license. Again, these are issues that may be raised by Sun before the jury.

*Eastman Kodak Company, Inc. v. Sun Microsystems, Inc.*, Civ. A. No. 02-0674T(F), Docket No. 277 at 14-15 (W.D. N.Y. Sept. 7, 2004).  While most of her consulting work has been litigation-based, she has also worked on a number of discrete consulting assignments with clients where she was tasked with valuing intellectual property for business purposes, rather than litigation. *Sealed Trans 12/6/12* at 8-20.  Despite the fact that she has never been "at the table" during her client's negotiations of patent licenses, Lawton has consulted with chief patent counsel at one company and provided advice on how he should proceed during active license negotiations.[8]  *Id.* at 27.  Although she has not done so recently, in the late 1990s to early 2000s, Lawton spoke on intellectual property valuations and damages to attorneys and in-house counsel, among other attendees.  (Docket No. 706 at 127-30).  In addition, Lawton impresses the Court as well-versed in the facts of the case and very knowledgeable of her subject matter.  She is also a very articulate witness.  Hence, her testimony (although disputed by Marvell) should assist the jury in this case.  *See* FED. R. EVID. 702(a) (expert opinion admissible if it "will help the trier of fact to understand the evidence or to determine a fact in issue.").

Based on the totality of the evidence concerning Lawton's credentials, the Court finds that she meets the minimum qualifications necessary to be qualified as an expert in the area of

---

[8]     The Court notes that this testimony directly refutes Marvell's position that Lawton's qualifications were so lacking that no one would seek to consult with her during actual patent negotiations.  *See* Docket No. 706 at 118-19.  (Marvell's counsel arguing that Ms. Lawton was "trying to morph herself into a general financial economic expert, and she does licensing consulting; it's hard for me to imagine who would pick up the phone and ask her for licensing advice.").

intellectual property damages and the Court so qualified her at trial.  *See Pineda*, 520 F.3d at 245.  She was then subject to cross-examination by Marvell's able counsel.  *See Holbrook*, 80 F.3d at 782 ("Who is 'best' qualified is a matter of weight upon which reasonable jurors may disagree.").

However, the Court also holds that CMU's proffer of Lawton's testimony through its slide presentation and the voir dire exceeded the scope of her expertise, such that she was opining, at times, on more technical matters concerning Marvell's business, the semiconductor industry and the market for computer chips and the patented technology.  (Docket No. 686 at 29; *see also Plaintiff's DEMO 9*).  It is evident that Lawton does not have expertise in these areas and she does not claim to have same.  (Docket No. 706 at 97-99).  In place of her lack of expertise, she has relied on the expert testimony on validity and infringement issues from Dr. McLaughlin and the expert testimony on the semiconductor and chip markets and the "must-have" nature of the subject technology to Marvell from Dr. Bajorek.  (Docket No. 706 at 111, 121, 131-132).  While the Court holds that Lawton may rely on these other expert witnesses, who have already testified, she may not express her own opinions on these matters, or, as is discussed below, exhaustively summarize the testimony of these other experts.  *See Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir.2002) (Posner, J.) ("Now it is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert.").  Accordingly, the Court restricted Lawton's testimony to her damages opinion in this case.

### C.  Improper Use of Expert as Summation Witness / Challenged Slide Presentation

Marvell also challenged the manner in which CMU proffered Lawton's testimony as she was to be assisted by an extensive slide presentation and the breadth of her comprehensive

consideration of the evidence in this case during the proffer.  (Docket No. 684).  After hearing

argument on the numerous objections that Marvell posed to the slide presentation and proffer,

the Court excluded the slide presentation and ruled that Lawton would testify the "old fashioned

way," i.e., without the assistance of a slide deck.  (Docket No. 686 at 29-31).  The Court found

that the proffered slide presentation with accompanying testimony, as a whole, was prejudicial to

Marvell given that it contained many objectionable elements, including inadmissible evidence,

an exhaustive summary of the evidence in this case akin to a closing argument, and encouraged

testimony which amounted to legal conclusions. *Id.*   The Court's ruling on Lawton's

presentation, however, was without prejudice to CMU's admission of the challenged slides and

exhibits after laying the appropriate foundation through the normal course during trial.  *Id.*

At the outset, the slide presentation is properly characterized as a demonstrative aid or

demonstrative exhibit because it contained not only admitted exhibits but also exhibits which had

not been admitted into evidence and other demonstrative elements, including her damages

calculations.  *See Plaintiff's DEMO* 9.   The Court recognizes that it has broad discretion in

considering whether to permit the parties to use such demonstrative evidence.  *See United States

v. Blackwell*, 954 F. Supp. 944, 971-72 (D.N.J. 1997); *see also* FED. R. EVID. 611, cmt. (""the

use of demonstrative evidence ... and the many other questions arising during the course of a trial

which can be solved only by the judge's common sense and fairness in view of the particular

circumstances.").  The purpose of the use of such evidence is to aid in the jury's understanding

of the case but, like admitted evidence, the use of demonstratives is restricted by Rule 403.  *See

Altman v. Bobcat Co.*, 349 F. App'x 758, 763 (3d Cir. 2009).  Under Rule 403, the Court "may

exclude relevant evidence if its probative value is substantially outweighed by a danger of one or

more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403.

With respect to the expert's reliance on evidence not presently in the trial record, Rule 703 provides that:

> [a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

FED. R. EVID. 703. The Third Circuit has explained that "Rule 703 permits otherwise inadmissible evidence to be disclosed to the jury if the trial court determines that the probative value in assisting the jury substantially outweighs the prejudicial effect. However, the Rule's balancing test clearly establishes a presumption against disclosure to the jury of otherwise inadmissible evidence." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 247 (3d Cir. 2008).

Finally, an expert is not permitted to testify in a manner that is essentially a closing argument for a party by summarizing evidence and drawing inferences therefrom. *See In re Rezulin*, 309 F.Supp.2d 531, 551 (S.D. N.Y. 2004); *see also Snyder v. Wells Fargo Bank, N.A.*, No. Civ. 4496(SAS), 2012 WL 4876938, at *4 (S.D. N.Y. Oct. 15, 2012) (preventing an expert to give a "summation" of evidence from the witness stand). Expert testimony presented in this manner usurps the jury's function of resolving factual disputes at trial. *Id.* To this end, expert testimony is not permitted if it consists of the expert drawing simple inferences "from uncomplicated facts that serve only to buttress [a party's] theory of the case." *Id.*; *see also Snyder*, 2012 WL 4876938, at *2-3 ("Expert testimony is also inadmissible when it addresses

27

"lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help.").

In all, the aforementioned legal principles essentially require the Court to carefully balance the admissibility (or use) of the presentation in accord with Rule 403 and determine if the probative value of the evidence (or demonstrative presentation) was outweighed by prejudice to the opposing party, confusion of the issues, potential to mislead the jury or involved the needless presentation of cumulative evidence. *See* FED. R. EVID. 403. As applied to proffered presentation as a whole, the Court found that the factors under Rule 403 substantially outweighed the probative value of the evidence and the helpfulness of the demonstrative aspects of the presentation to the jury. (*See* Docket No. 686 at 29-31). Given same, along with the time constraints of an ongoing jury trial, the Court found it appropriate to exclude the entirety of the slide presentation, without prejudice, to CMU's proper introduction of exhibits into evidence during her testimony. *Id.*

V. CONCLUSION

Based on the foregoing, as well as the Court's findings made on the record during trial, Marvell's Motion [684] is granted, in part and denied, in part.

*s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Judge

Date:   December 15, 2012

cc/ecf:  All counsel of record.