IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

CARNEGIE MELLON UNIVERSITY,
                    Plaintiff,

                                        Civil Action
          vs                            No. 09-290

MARVELL TECHNOLOGY GROUP, LTD.,
and MARVELL SEMICONDUCTOR, INC.
                    Defendants.
_____


          Transcript of Day 16 Trial Proceedings held on
Tuesday, December 18, 2012, United States District Court,
Pittsburgh, Pennsylvania, before the Honorable
Nora Barry Fischer, U.S. District Court Judge.


APPEARANCES:

For the Plaintiff:          Douglas B. Greenswag, Esq.
                            Patrick J. McElhinny, Esq.
                            Christopher M. Verdini, Esq.
                            Mark G. Knedeisen, Esq.


For the Defendant:          David C. Radulescu, Esq.
                            Edward J. DeFranco, Esq.
                            John E. Hall, Esq.
                            Joseph Milowic, Esq.
                            Raymond N. Nimrod, Esq.


Court Reporter:             Shirley Ann Hall, RDR, CRR
                            Virginia S. Pease, RMR
                            6260 U.S. Courthouse
                            Pittsburgh, PA 15219
                            (412) 765-0408


Proceedings recorded by digital stenography; transcript
produced by computer-aided transcription.

P R O C E E D I N G S

* * * * *

1
2
3       (In open court, without jury.)

4       THE COURT:  Okay, this is the time and place for

5  continuing proceedings in Carnegie Mellon versus Marvell

6  technology.  Yesterday we heard argument on the motion to

7  strike Mr. Hoffman, is there anything further to add?

8       Otherwise, that argument is concluded?

9       MR. McELHINNY:  Your Honor, just very briefly, in

10  light of the written opposition we got last night or this

11  morning, Marvell argues that we waived this, that CMU waived

12  this argument.  Clearly that's not the case.  We addressed

13  that in -- effectively in our paper.

14       Our objection here and our motion is premised on the

15  testimony as a whole, not one particular question.  The

16  WhitServe case makes it clear that that's what the Federal

17  Circuit was evaluating there, the testimony as a whole.  And

18  when you look back at Mr. Hoffman's testimony, you see that

19  nowhere did he engage in a substantive discussion of the

20  Georgia Pacific factors.

21       More importantly, there was no discussion of the use

22  of Marvell's -- or Marvell's use of the CMU invention.  He

23  just assumed that it was ongoing and continuous, and he did

24  that based on his assumption that it was a lump sum agreement.

25       That puts the cart before the horse on the Georgia

1   Pacific factors.  You can't get there and conclude the lump

2   sum agreement is the full agreement until you do the full

3   analysis; and he even went right out of the box and said lump

4   sum and, therefore, I don't need to look at use; and, B, that

5   illustrates exactly our point on the -- on the established

6   royalty that he testified to effectively; and he went straight

7   to that instead of going to the Georgia Pacific factors.  So

8   his analysis is flawed, either direction that he runs.

9          And, finally, his conclusion on the form of the

10  license is really just ipse dixit.  He doesn't explain how he

11  gets there, just says it's an established royalty.  He doesn't

12  go through any analysis to get there.  And that's

13  inappropriate under both this Court's order on the established

14  royalty and WhitServe and a whole slew of cases on what an

15  expert needs to do in order to express an opinion that's valid

16  on these types of issues.

17         Thank you.

18         THE COURT:  Okay.

19         Anything more, Ms. Gay?

20         MS. GAY:  Yes.  Good morning, Your Honor.

21         With respect to our preview last night, we did get a

22  paper filed for Your Honor's consideration.

23         THE COURT:  I read it last night.

24         MS. GAY:  Thank you, Your Honor.

25         And with regard to the waiver, yes, there was

1    colloquy at the side bar before -- certainly at various times

2    encouraging us to ask specific questions, some of which we

3    declined to do because of time; but when we got to the

4    ultimate providing of Mr. Hoffman's conclusion, what his

5    number was, what his license -- you know, recommendation was,

6    and the fact of the hypothetical negotiation, which was in the

7    12/12/12, transcript at 243, Lines 2 to 15, I stopped, you

8    know, fully in front of the jury and asked the Court if I

9    could proceed at that point.

10          And then the Court asked very clearly Mr. McElhinny

11   if there was any objection.  Mr. McElhinny said no.  The Court

12   said:  Then proceed.  And the question was, you know:  Could

13   you tell this jury what your determination of a reasonable

14   royalty would have been, with full knowledge between both

15   parties, with all these factors, the best they can read them,

16   back in 2001.  And then Mr. Hoffman provided his testimony

17   that would have been a barebones license for $250,000 and

18   explained a bit more.

19          So, Your Honor, under Federal Rule 103, certainly

20   they were required to at least object at that point if they're

21   going to object to this -- his ultimate conclusion and his

22   explanation therefor.  And with regard to that, I would cite

23   the Court to Grace v --

24          THE COURT:  I'm sorry?

25          MS. GAY:  Grace, G-R-A-C-E, versus Mauser-Werke,

1    M-A-U-S-E-R, dash, W-E-R-K-E; and the cite for that is

2    700 F.Supp. 1383.  It's an Eastern District of Pennsylvania

3    case.  Judge Weiner in that case on Page -- let me just be

4    sure here -- looks like -- looks like Page 1387.  And I can

5    hand that case up if need be to the Court.

6            But just briefly beyond the waiver issues, it cannot

7    be the case, Your Honor, that an expert who has relied on real

8    world licenses in this case, starting with DSSC as a

9    threshold, going on to Intel, going on to look at real world

10   marketing conditions, the total lack of a market for this

11   license, the fact that key industry players had no industry --

12   interest in this, that third -- looking at real world customer

13   conditions -- and that is what Marvell's customers would have

14   been willing to pay for these patents -- it can't be that even

15   though we're talking about a hypothetical world, that it is

16   permissible to ignore the real world evidence.

17           Again, Mr. Hoffman went through the licensing on

18   CMU's side, went through what Marvell's customers would know,

19   went through what the industry would know.  And so to that

20   extent, looking at all those actual, real things, especially

21   the licenses offered by CMU for these particular patents is

22   precisely what the Federal Circuit has encouraged parties to

23   do, rather than spinning out hypothetical theories as to what

24   might have been when there's actual proof of what the licenses

25   were used for.

1           With regard to -- again, Mr. McElhinny has gone back
2   to the Georgia Pacific issue.  Georgia Pacific itself doesn't
3   require a recitation of these specific issues; and I would
4   note, by the way, that Miss Lawton's chart of her factors that
5   she put up do not track item by item the Georgia Pacific
6   factors.  I would also note that WhitServe again says if
7   you're going to put them out there, don't just put them in a
8   list and say thumbs up, thumbs down, which is exactly what
9   happened here on the other side.
10          Now, in terms of the lump sum that Mr. Hoffman
11  identified, he made it very clear that that's what the
12  license's offer to the patent at suit had been, as it was
13  Intel, and he did not rely in whole on DSSC, but he was
14  looking specifically at the licensing pattern for these
15  patents.
16          Miss Lawton did not cite a single example of these
17  patents being offered for anything that was a hybrid royalty,
18  a running royalty, anything else; and the record is clear in
19  this case that to the extent these patents were offered at
20  all, it was for a lump sum.  And Mr. Hoffman made that clear.
21          In terms of apportionment, which is something that I
22  don't think was touched on this morning, but which CMU
23  mentions in their papers, it's clear that under Laserdynamics
24  that's not required when a lump sum royalty is what is seen as
25  an appropriate form as a reasonable royalty.  And to that end,

1   again, I would just reiterate a fact the Court already knows,

2   which is that the only evidence of licenses for the patent in

3   suit here is the form of the lump sum.

4          And with that, I think I'll just rely on my comments

5   and our brief filed last night.

6          THE COURT:  Okay.  So the motion to strike

7   Mr. Hoffman's argument is now concluded.  The Court now has

8   this Grace case; we'll take that into consideration as well.

9   I'm inclined to deny the motion to strike.

10          Now, let's turn to the motion to strike

11   Richard Blahut.

12          MR. McELHINNY:  Your Honor --

13          THE COURT:  Who is going to argue that?

14          MR. McELHINNY:  Your Honor, before we get there --

15   and I know the Court probably has a list of things it wants to

16   accomplish this morning -- we do have one issue on

17   Dr. McLaughlin; and I wanted to make sure we get to that

18   before we get the jury here at 10:00.

19          It is one slide.  I'll hand it up.  In light of the

20   presentation yesterday, which addressed -- Dr. Proakis did

21   not, until we objected, lay out any kind of test for the

22   anticipation or obviousness analysis; so having -- with him

23   having failed to do that, Mr. DeFranco put his report on the

24   screen -- or on the ELMO to lay out the test.  We just thought

25   this would be an easier way to approach it, since I think it

1    went by pretty fast for the jury.

2            We proffered this slide last night.  This is a short

3    form of what is in Dr. McLaughlin's report, and Marvell has

4    objected to it on the grounds that it contains statements of

5    law.  It is really the test that is being applied that he has

6    to apply.  He would explain that.  The Court, of course, can

7    instruct as to the law, that it's the arbiter on what the law

8    actually is.  This is the test that Dr. McLaughlin applied and

9    it would facilitate the presentation.

10           THE COURT:  Mr. DeFranco?

11           MR. DeFRANCO:  Your Honor, a couple points.  And,

12   really, it's -- part of it is to get the Court's guidance at

13   this part of the case.

14           As Your Honor will recall with respect to

15   Miss Lawton, we had one of the first slides which was a

16   statement of the law and we objected.  The Court struck that

17   slide before it struck everything else; it wasn't just swept

18   in with her entire presentation that was struck.  It was --

19   that's the role of the Court; and I think generally the

20   parties have followed that throughout this case.

21           We haven't seen slides from experts saying, you

22   know, here's the legal framework, here's the legal standard;

23   and we filed that -- followed that with our experts.

24           THE COURT:  But you used such slide yesterday with

25   Dr. Proakis because he needed an aid; so the objection is

1    overruled, so the slide can be used.  And, of course, the jury

2    will be instructed once again that I'm the final arbiter of

3    the instructions.  All right?

4              Let's go on to the Blahut argument.

5              MR. DeFRANCO:  Your Honor, may I ask one other

6    question about a different issue?  We're working on

7    supplemental JMOLs, one on willfulness, for example, based on

8    additional evidence.  Does the Court prefer a renewed motion

9    that is -- has all the evidence in one place or a supplemental

10   brief that adds additional information?

11             THE COURT:  However you want to do it is fine; but

12   the more of these motions, briefs and arguments you put before

13   the Court, the more likely this jury is not going to hear your

14   closings until Thursday.  All right?

15             MR. DeFRANCO:  The other question, Your Honor, is

16   we've made some further progress --

17             THE COURT:  I'm sorry?

18             MR. DeFRANCO:  We've made some further progress --

19             THE COURT:  -- I saw, on the verdict slip.

20             I'd like to hear the argument on Dr. Blahut, for the

21   third time.

22             MR. ANGELIS:  Your Honor, thank you; Theo Angelis

23   for CMU.  I'll be arguing the Blahut motion.

24             There are two questions before the Court.  One is

25   did Dr. Blahut express a new or a changed opinion; and the

1   second is, if so, should the Court apply the presumptive

2   sanction of striking that new opinion.

3          Dr. Blahut undeniably expressed a new opinion.  In

4   Exhibit 2 to our motion we reproduced Dr. Blahut's deposition

5   testimony, and I'm reading here from Page 177.

6          Here Mr. Greenswag asks Dr. Blahut to turn to

7   Paragraph 106 of his report.  I'm reading from Line 13.  And

8   he says -- Mr. Greenswag is reading here now:  And you state

9   in Paragraph 106, it says the non-linear filters process up to

10  two error events per code word and again compute the path

11  metric.

12         THE COURT:  Slow down a little bit.  Our court

13  reporter needs to take this down; I need to find it in the

14  deposition.

15         MR. ANGELIS:  Thank you, Your Honor; will do.

16         THE COURT:  All right.

17         MR. ANGELIS:  So I'm reading here from Line 19 at

18  Page 177, which is at the bottom right corner.

19         THE COURT:  I'm there.

20         MR. ANGELIS:  I'll re-read it.  And you state in

21  Paragraph 106, it says the non-linear filters process up to

22  two error events per code word; and, again, compute the path

23  metric based on the difference between the Viterbi plus path

24  plus error and the Viterbi path.  Do you see that?  "Yes" was

25  the answer.

1       The next question:  So the MNP does compute a path

2   metric, isn't that true, sir?  The answer -- first Dr. Blahut

3   clarifies that he's talking about the MNP, and he says:  I

4   want to be careful I don't do what I did before and think

5   about the other.  And then he says:  The MNP does compute a

6   path metric.

7       And then Mr. Greenswag later on -- and now I'm

8   reading from Page 178 of the deposition, Line 21, and he says:

9   Okay.  Can you circle it on the exhibit, please?  And we're

10  talking now about the computation of the path metric.

11  Dr. Blahut says:  And what would you like me to circle?

12      Mr. Greenswag says:  I would like you to circle

13  where you think the path metric is.

14      There's an objection.  And he says -- and here's the

15  answer on Page 179:  I don't think there's a path metric.  I

16  think there's a computation of a path metric.  And that is

17  Dr. Blahut's opinion, those expressed at his deposition and in

18  his report.

19      So why is this important?  Well, Dr. McLaughlin,

20  when he testified, he said that the MNP meets the claim

21  limitations, and he showed that computing a path metric

22  involves computing branch metrics.  And Marvell's counter to

23  that is, well, we compute a path metric, sure; but -- but just

24  because we compute a path metric doesn't mean there is a path

25  metric.

1           And CMU's response to that argument before the jury

2    and with all the witnesses, including Dr. Wu, Dr. Blahut and

3    Mr. Burd, is to show the absurdity of that position, that you

4    compute a path metric but there is no path metric; and that

5    what Marvell's opinion is is that the words "path metric" and

6    "branch metric" as used in the context of the MNP means

7    something totally different.  They don't have the meaning that

8    the internal Marvell documents say that they have.

9           So what CMU did with all these fact witnesses -- and

10   they were fact witnesses -- is to take them through this

11   syllogism where there is a path metric, there is a branch

12   metric; where there is a branch metric, there are branches;

13   where there are branches, there's a trellis.

14          That was done with Dr. Wu on Pages 51 to 52; and

15   Page 56 of the transcript when Dr. Wu testified on the

16   12th of December.  It was also done with Dr. Blahut

17   repeatedly; and they testified then in the context of the

18   Viterbi detector that syllogism holds true; and that is the

19   way in which CMU has built its case responding to Marvell's

20   non-infringement arguments.

21          Now, Dr. Blahut evidently recognized he was in big

22   trouble if the jury understood that there was computing of a

23   path metric, decided on direct that he was going to change his

24   testimony and he was no longer going to testify that there was

25   computation of a path metric.  And he would say flat out

1    exactly the opposite.  He would say there is no computation of
2    a path metric, even though that's what his report says and
3    that's what he said under oath in his deposition.
4          Now, the testimony is, again, where he testifies to
5    the contrary is on the 13th, December 13th at Pages 254.
6    He says:  The MNP processor, it does not compute a path
7    metric.  And he says the same thing again on Page 274.
8          Now, Dr. Blahut was confronted with this radical
9    change in his testimony; and the first thing he did, like a
10   child caught doing something wrong, is:  Oh, it's a typo; it
11   was a grammatical error.  And that was on Page 274 he said
12   that.
13         Well, that clearly wasn't true.  Mr. Greenswag
14   showed on cross that -- this was a long colloquy in
15   Dr. Blahut's deposition.  He had been asked to circle exactly
16   where the computation occurs; that was put up.  And then
17   Dr. Blahut said:  Well, you know, in context, my testimony was
18   actually different.  You haven't really proven anything.  I'll
19   take your word for it that I circled something, but my
20   testimony was actually different; and implied to the jury that
21   he had said something different and CMU wass improperly cross
22   examining him.
23         The same opinion, the same new opinion, undisclosed
24   opinion --
25              THE COURT:  Let's stop there.

1              When Blahut was deposed, was he counseled about
2      reading his transcript?  And signature?  And waiver of
3      signature?
4              MR. JOHNSON:  I'm not sure I follow Your Honor's
5      question.
6              THE COURT:  Well, there's a rule that requires when
7      somebody is deposed, that they either waive signature or they
8      agree to read the transcript and sign off that it's true and
9      accurate.  And the Federal Rules particularly have a whole
10     procedure that pertains to same.
11             It would seem to me that a professional such as
12     Dr. Blahut would have wanted to read his transcript and to
13     correct the transcript to make sure that it said what he meant
14     it to say.  If he didn't do that, then and in that event the
15     transcript stands.
16             MR. JOHNSON:  And, Your Honor, I don't know the
17     answer to that.
18             THE COURT:  Well, nobody has Blahut's full
19     transcript here?
20             MR. GREENSWAG:  I do, Your Honor.
21             THE COURT:  All right.  Mr. Greenswag.
22             MR. GREENSWAG:  It does say at the end -- and I
23     don't pretend to understand the ins and outs -- it does say at
24     Page 342 of his transcript, it says:  Signature reserved,
25     which to me means --

1          THE COURT:  So signature was reserved.  And then and

2     in that event he did not promptly make the changes that he was

3     required to do within 30 days under Rule 32(d)(4).  So any

4     objections or corrections or additions have been waived.  All

5     right?

6          MR. ANGELIS:  Thank you, Your Honor.  I'll go on --

7     and I certainly agree with that.

8          So then the question is because this is a new and

9     undisclosed opinion, expressed for the first time on direct

10    examination, during trial, what is the remedy?  And Rule 37

11    indicates that the presumptive remedy in this situation is

12    exclusion.  And as Your Honor well knows -- I won't quote

13    Your Honor's Pritchard and Jackson opinions back to her, but

14    that's the presumptive remedy.

15          But as the Court knows, under Third Circuit law, the

16    Court is to also consider what are sometimes called the

17    Pennypack factors.  And there are between four and six

18    factors, depending on who is applying them; but they more or

19    less are all the same.

20          And the first factor is:  Is there prejudice or

21    surprise?  And that's in the disjunctive, prejudice or

22    surprise.  There certainly was surprise here.  This was a

23    brand new opinion, never expressed before.  And there is

24    prejudice.  As I indicated, this is CMU's response to

25    Marvell's non-infringement position, which is to expose the

1  absurdity of the fact that there's a computation of a path

2  metric but no path metric; and it's prejudicial to CMU to have

3  Dr. Blahut get up and try to change the situation and change

4  his testimony on the stand.

5          And, Your Honor, the cases that Marvell cites on

6  this point are not trial cases.  None of them involve changes

7  of testimony.  They cite two cases, one from the District of

8  Delaware, V. Braun, and then Dow Chemical, and neither of them

9  involve trial.  And we cite several cases that involve a

10 change of opinion at trial.  We cite the CSB System

11 International, Incorporated, versus SAP case, which is from

12 2012.  It's 2012 Westlaw 1645582.  We also cite the Jarrow,

13 J-A-R-R-O-W, case, the Rembrandt case, and the Oracle case

14 which both parties have relied on in this case at various

15 times.

16         And in those situations the Court basically presumes

17 prejudice when there's a change of testimony at trial, in part

18 because of the second factor, which is the ability to cure.

19 There is no ability to cure on direct examination -- after

20 direct examination.  And it's important to note that in both

21 the LG case, which was a District of Delaware case,

22 265 FRD 189, which is --

23         THE COURT:  -- Judge Horan.

24         MR. ANGELIS:  That's right, Your Honor, and within

25 the Third Circuit.  And then in the Rembrandt and Frasier

1   cases which we cited which are not in Third Circuit, all of

2   them indicate that there's -- at trial the prejudice is

3   maximized.  It's maximum prejudice and there is just no

4   ability to cure.

5          The same is true with the third factor, which is:

6   Is it a disruption of the order of presentation of proof in

7   the case?  Absolutely.  You know, we have had direct

8   examinations occur based on this opinion and with our -- with

9   CMU's counter to Marvell's non-infringement opinion occurring

10  based on this opinion; and when it suddenly changes, that

11  disrupts the ability and the -- to present proof.

12         And then, finally, the fourth factor -- and it's

13  also the fifth and sixth factor in various cases -- is this

14  idea of willfulness or what the Court sometimes calls bad

15  faith.  And what I'd like to emphasize there, Your Honor, is

16  it's not a subjective malevolent standard.  It's not the case

17  that the Court has to find that Marvell was -- had evil

18  intent.  It's only something that is, quote, beyond a lack of

19  diligence.  If it is beyond a lack of diligence, that is

20  willfulness.  And that's the Stein versus Formax case, I

21  believe, US District Lexis 12211, out of the Eastern District

22  of Pennsylvania, from 2001.

23         The other point to emphasize on all of these

24  factors, the Pennypack factors -- or as they've often been

25  called -- Your Honor cited them as the Penn State University

1  factors, sometimes the In Re: Paoli factors, is that the
2  burden is on Marvell; and in the CSB System International case
3  it was pointed out that under Rule 37, Marvell has the burden
4  to prove a lack of prejudice to CMU.  It is not CMU's burden
5  to prove prejudice, although we've indicated here what the
6  prejudice is.  It is Marvell's burden to prove that there's an
7  absolute lack of prejudice to CMU --
8          THE COURT:  Now you're citing Footnote 5 of
9  Buckwalter's opinion?
10          MR. ANGELIS:  That's correct, Your Honor.
11          And that was in the context of a newly asserted
12  claim, unequitable conduct there; but the Rule 37 standard
13  that's cited is the same because Rule 37 is the implementing
14  vehicle for the requirement under Rule 26 that all opinions,
15  whether they're original or new or changed, be timely
16  disclosed.
17          And with that, Your Honor, I'm happy to answer any
18  questions you may have.
19          THE COURT:  No, I have read your motion, I've read
20  all the underlying cases, and I've gone back through
21  Dr. Blahut's testimony.
22          All right.  Let's hear your response.  Mr. Johnson?
23          MR. JOHNSON:  Thank you, Your Honor.
24          Your Honor, Mr. -- Dr. Blahut's opinion here was not
25  a new and undisclosed opinion.  It was anything but that.  And

1    I want to just start with where I think it's important.

2          I mean Paragraph 106 of his report must be read in

3    context with Paragraph 98, which states that the path metric

4    computation is a difference between path metrics.  If you look

5    specifically at Paragraph 98, it couldn't be more clear in

6    that regard:  For each of the dominant error events, the

7    post-processor then computes the difference between the path

8    metrics of the Viterbi path plus error event and to the

9    Viterbi path.

10         We heard repeatedly from Dr. Wu, Dr. Blahut about

11   this difference and how it's different from measuring the

12   actual heights of people or the heights of the blades of grass

13   or even the actual branch metrics.  And what's interesting is

14   Mr. Angelis pointed us to paragraph -- I'm sorry, Page 178 of

15   Dr. Blahut's deposition transcript, and he skipped over the

16   very question in the middle of the testimony that is -- that

17   shows that Dr. Blahut's testimony was consistent.

18         Page 178 of his deposition, which counsel did not

19   read, the question is at Line 10:  Can you, sir, point to

20   me -- point to me where the path metric is or where it should

21   be shown on this diagram?  Answer:  So without analyzing the

22   circuit in detail or reading the entire -- my entire report,

23   I'll try to save time by only -- by referring only to the

24   diagram and looking at it.  So the -- the -- the difference in

25   the paths is computed by the difference between the upper and

1    the lower FIR filters that have been fed with information that

2    has non-linear adjustments in it.

3            When -- and then Mr. Angelis pointed to the very

4    next question and answer, talking about the computation of a

5    path metric, when Dr. Blahut was talking about the computation

6    of a path metric there.  The question and answer directly

7    preceding that points that he was talking to the difference

8    between the upper and lower FIR filters.  That's exactly what

9    his testimony was.  That's what his testimony has been.

10           And during the depo and when he was asked to

11   identify and circle the path metric calculation, Dr. Blahut

12   clarified that the path metric he was referring to was the

13   difference in the paths.  Again Page 178, Lines 10 to 21.

14   CMU's argument on this mischaracterizes his testimony.

15           And during Dr. Blahut's testimony when he said that

16   the -- the statement that we computed a path metric is not

17   true, he was really addressing Dr. McLaughlin's statement

18   regarding path metrics of the type that are calculated in the

19   Viterbi detector by calculating branch metrics in the trellis.

20           So the argument regarding path metrics here,

21   Your Honor, has nothing to do with the claims.  The claims

22   only require calculation of a branch metric and have no path

23   metric limitation.  Dr. Blahut has consistently opined that

24   there's no trellis in the MNP; the trellis is in the Viterbi.

25   We're heard that from the beginning of this case, both in the

1    cross examinations of Dr. McLaughlin and in the testimony from

2    Marvell's fact witnesses and in the testimony from Dr. Blahut.

3            Dr. Blahut also stated in his report that the path

4    metric in the MNP post-processor is not a trellis, and that

5    the metric was not a branch metric.  That's at Paragraph 285

6    of his report.  CMU's cross examination questions really

7    reference a path metric in the Viterbi; and as we've seen both

8    in the expert report and through the deposition, Marvell's

9    argument is not new here.  They've known about it.  They asked

10   him about it in his deposition, they've had the report.

11           And I just want to go back to where we are.

12   Dr. Blahut is Marvell's non-infringement expert here.  His

13   testimony is as In Re: Paoli at 35 F.3d 717 talks about, is

14   critical evidence and should not be excluded without a showing

15   of willful deception or flagrant disregard of a Court order.

16   Here Dr. Blahut stated he had a different -- let me go back.

17           The Rembrandt case that CMU relies upon is a

18   situation where the expert said, you know, I didn't do what

19   was in my report; I didn't do what I said I did in my report.

20           THE COURT:  He did an entirely different test.

21           MR. JOHNSON:  Completely different than what was

22   laid out in his report.  In the CSB case, there the Defendant

23   made absolutely no attempt to argue that its theory of

24   inequitable conduct was raised anywhere in its answer or

25   counterclaims.  That case is not on point either.  And when

1    you look at -- you know, when you look at the Jarrow case, in

2    that case again the expert reports just completely ignored the

3    deadlines, and ultimately the Plaintiff filed five untimely

4    expert reports on the same day that the -- their oppositions

5    to Plaintiff's summary judgment motion were due.

6              THE COURT:  And the doctor said he wasn't an expert,

7    yet he was retained as a consultant and he was billing out at

8    $300 an hour.

9              MR. JOHNSON:  Precisely, precisely.

10             So I also want to go back to the fact that this -- I

11   heard Mr. Angelis talk to the fact that Dr. Blahut was caught

12   like a child.  I mean here there's been no prejudice in the

13   sense that they had the opportunity to cross examine

14   Dr. Blahut.  They established what they wanted to establish.

15   This goes to the weight of Dr. Blahut's testimony, and this

16   jury will weigh his credibility and weigh his opinions and

17   make their own determination in that regard.

18             And his position was outlined in his expert report.

19   He reiterated his position during his deposition.  And

20   Marvell's non-infringement positions in this case have

21   remained the same.  There's no trellis in the MNP and there's

22   no calculation over branch metric.  Those are not new

23   arguments.  Everybody has been addressing those throughout

24   this trial, including Dr. Blahut.

25             THE COURT:  Any further argument why Dr. Blahut

1   should be stricken?

2          MR. ANGELIS:  Very briefly, Your Honor.

3          In this case the jury has to decide between the

4   credibility of Dr. Blahut and the credibility of

5   Dr. McLaughlin.

6          THE COURT:  Right.

7          MR. ANGELIS:  CMU's primary argument on that point

8   is that Dr. Blahut's opinion that -- and I'm quoting here --

9   "I don't think there's a path metric; I think there's a

10  computation of a path metric," is absurd on its face.

11  Dr. Blahut evidently recognized that very late in the game

12  when he got on the stand or when he heard Dr. Wu's testimony

13  and saw that CMU walked Dr. Wu through the syllogism of path

14  metric to branch metric, branch metric to branches, branches

15  to trellis.  And Dr. Blahut decided on that day that he was

16  going to change his testimony and walk away.

17         THE COURT:  The testimony helped him to decide.

18         MR. ANGELIS:  I think it did, Your Honor.  So I

19  think for the jury -- and then, instead of admitting I'm

20  changing my mind, now he's saying, well, you're taking me out

21  of context; and he's telling the jury that CMU is improperly

22  trying to twist his words when, in reality, it's Dr. Blahut

23  that fundamentally changed his opinion --

24         THE COURT:  It was a typo.

25         MR. ANGELIS:  It was a typo or grammatical error;

1    not that he reconsidered it.

2              THE COURT:  That's been heard, too.

3              MR. ANGELIS:  Your Honor, that's the point, which is

4    in evaluating the credibility of two witnesses, CMU is

5    entitled to rely on Dr. Blahut's sworn testimony as to what

6    his opinion is.  When he changes it so that he can look more

7    credible in front of this jury, that is prejudicial; that

8    happened at trial and that is the basis for exclusion.

9              THE COURT:  All right.

10             Mr. Johnson, anything further?

11             MR. JOHNSON:  Just briefly.

12             There's -- again, there is no change in his

13   testimony.

14             THE COURT:  Well, we'll determine that.

15             MR. JOHNSON:  And ultimately that's right,

16   Your Honor, it's for the jury to determine and weigh the

17   credibility.

18             THE COURT:  Maybe.

19             MR. JOHNSON:  Striking a non-infringement expert and

20   not letting those -- his opinions be assessed by the jury in

21   this case when Dr. McLaughlin testified to the exact opposite

22   and there's no surprise with respect to what his testimony has

23   been in this case is incredibly prejudicial.  So we'd ask that

24   Dr. Blahut's testimony be -- not be stricken and that the jury

25   have the ability to basically assess both sides' experts.

1          THE COURT:  All right.  So now we finally have heard

2     the argument on Blahut, and we will continue our analysis of

3     his opinion.

4          Going into this argument, I was seriously

5     considering striking it; so I'll take another look.

6          All right.  Now, we've dealt with those two motions

7     to strike.  Then we have another motion that relates to

8     attorney/client privilege.  Who is going to take the lead on

9     that?  Mr. McElhinny?

10          MR. McELHINNY:  Your Honor, the -- we address this

11     in some --

12          THE COURT:  Mr. Milowic, didn't you see that motion

13     come across your desk?  Do you have a response to that?

14          Mr. McElhinny.

15          MR. McELHINNY:  Your Honor, we addressed this in

16     some detail yesterday, and I don't know that it's necessary to

17     rehash it all.  This is -- it's two parts.  One is directed at

18     Mr. Wu's testimony -- or Dr. Wu's testimony regarding this

19     consultation with counsel, and the other is addressed to

20     closings because it's becoming increasingly apparent through

21     the Burd slides that didn't get in and through what we believe

22     was the sort of rehearsed testimony of Mr. Burd, where he

23     blurted out on numerous occasions that he -- he proffered the

24     Kavcic patent to counsel in answers that were not responsive

25     to the questions asked --

 1          THE COURT:  We used to call that being taken to the
 2   woodshed.
 3          MR. McELHINNY:  I suspect that's where Mr. Burd
 4   spent a lot of time during the last couple of weeks.
 5          THE COURT:  I would suggest that's the case.
 6          MR. McELHINNY:  But the bottom line is Marvell
 7   through the veil of privilege or whatever it did on the
 8   subject of consultations with counsel.
 9          THE COURT:  Right.  The privilege log that was very
10   general in nature.
11          MR. McELHINNY:  And, frankly, in light of where the
12   argument headed yesterday, it seemed to us to be pretty
13   misleading in nature.  If Marvell now wants to take the
14   position that, well, we proffered these Kavcic patents to
15   counsel for the purpose of evaluating not whether or not we
16   infringed, that's absolutely not what the privilege log says.
17   As the Court saw, on January 2nd, 2002, allegedly Marvell
18   was talking about patent prosecution, not about infringement.
19   And that's what they're stuck with.
20          We, of course, given that description and Marvell's
21   express disavowal on the reliance on counsel defense --
22   Mr. Radulescu expressed that early in the status conference
23   with the Court, that's on the record -- given that and the
24   repeated instructions -- and I think you've even heard
25   Mr. Greenswag read from -- I believe it was Mr. Burd's

1   transcript, deposition transcript where he wasn't even allowed

2   to ask the foundational question of:  Did you consult with

3   counsel.

4           THE COURT:  Right.  It was blocked.

5           MR. McELHINNY:  And so, given that, then the

6   question becomes:  What can and what should Marvell be

7   permitted to tell this jury about consultations with counsel?

8   And the answer is, plainly, nothing.  Because as the cases

9   cited in our papers demonstrate, once you invoke that veil of

10  secrecy, you're not entitled to suggest to the jury that you

11  got favorable advice from counsel or you got any advice from

12  counsel because that -- that fact, even if it's -- concededly,

13  that fact is not a privileged fact.  It is not privileged; you

14  can't maintain the privilege as to whether or not you

15  consulted with counsel.  Absolutely true; we concede that

16  point.

17          But that fact, standing alone, without evidence of

18  what transpired during that consultation, tells the jury

19  nothing.  It's an invitation to speculate.  Marvell would like

20  the jury to speculate, well, we were the good guys -- I think

21  I heard that evidence yesterday -- we were the good guys; we

22  went to counsel.  Well, that inference only follows if counsel

23  said:  You're in the clear.  But we don't know here what

24  counsel said.

25          Marvell has taken advantage, as it's entitled to, of

1    the privilege.  But that decision has strategic consequences.

2    It's a strategic decision to make that call, to assert the

3    privilege not to rely on advice of counsel.  That decision has

4    consequences.  One of the consequences is you can't imply to

5    the jury that we went to counsel and he blessed what we were

6    going to do and then -- without disclosing the actual content

7    of that communication.

8              And that's all we're seeking here, Your Honor, is

9    for the references to counsel be stricken.  I think you did

10   strike Mr. Burd's question and answers -- or Mr. Burd's

11   answers on the subject.  And we have a little bit from Dr. Wu.

12             And, more importantly here, is to prevent Marvell

13   from arguing at closing that there is some consultation with

14   counsel that is meaningful in some way and provides them a

15   defense and makes them the good guys; because the fact of the

16   matter is that consultation with counsel without the

17   information about what was said -- I mean for all we know,

18   Mr. Janofsky could have said:  Hey, this is a real problem; we

19   better be careful; you better not do this.

20             THE COURT:  We better run out and get our own

21   patent.

22             MR. McELHINNY:  We better run out and get our own

23   patent so we can at least have an argument someday.  But we

24   don't know what transpired there.

25             We -- what we do know is that Marvell made a

1    strategic decision several years ago to say:  And you're never

2    going to know, CMU.  We respect that decision, but now they

3    have to live with the consequences of it.

4              Thank you, Your Honor.

5              THE COURT:  Who is responding?  Mr. DeFranco?

6              MR. DeFRANCO:  Yes, Your Honor.  We hadn't seen the

7    motion until a moment ago, so we'd like the chance to submit a

8    response --

9              THE COURT:  It was filed a while ago; the Court has

10   had an opportunity to read it.

11             MR. DeFRANCO:  I'll respond, Your Honor.  I don't

12   know --

13             THE COURT:  I don't have 19 lawyers on my team.

14             MR. DeFRANCO:  I don't know what the count is -- if

15   somebody knows, 19 --

16             MR. MILOWIC:  I apologize.

17             MR. DeFRANCO:  A very short -- a very brief story.

18   I had a case as a young lawyer in front of Judge Lefkow.

19   There was an issue that the parties were not allowed to talk

20   about.  And I remember, as we're all tired, at the podium

21   asking a question.  I asked one of their experts a question:

22   Have you seen any testimony in this case to indicate

23   otherwise?  And the issue was not supposed to come up, and it

24   was a question that shouldn't have been asked.  Judge Lefkow

25   read me the riot act.  She said:  That issue, I had said that

1    is not going to come into the case.  You can't suggest that

2    the event never happened.

3            That's exactly what they've done in opening

4    statement here.

5            Could I have the ELMO going?

6            (Off the record discussion.)

7            MR. DeFRANCO:  Your Honor, first of all, as an

8    aside, you know, I'd like to say the Federal Circuit I think

9    over the course of willfulness decisions has put a more

10   practical approach in case.  I've been practicing for

11   25 years.  I had never seen an opinion of counsel in

12   litigation, in pre-litigation where -- where the lawyers said:

13   You better not do this because you're going to infringe.

14           Find cases -- you can find fifteen hundred cases

15   where there's, you know, an opinion that says, you know,

16   here's a blank check; go for it.  How many cases are there out

17   there where somebody contradicted an opinion of counsel that

18   said go the other way?  Practically speaking, consultation

19   with lawyers is often a checkmark.  That's why the Federal

20   Circuit is saying we're going to look at the facts and

21   circumstances to see what's really going on here.

22           Is this a case where somebody got the product

23   secretly, took it apart, and made the same product because

24   they know they couldn't compete with a competitor in the

25   marketplace?  Those are the situations where you're finding

1  willful infringement today.

2          But, anyway, the point on this motion, Your Honor,

3  is they're saying we cannot say -- we cannot tell this jury

4  the fact that we followed our typical procedure and had a

5  consultation with an attorney, because we didn't waive

6  privilege -- yes, it's true we didn't waive privilege, so the

7  substance of that communication from years ago -- by the way,

8  it's years ago now because of their delay in filing this

9  case -- can't come in.

10          But look at what they told the jury in opening

11  statement, and look what they're going to conclude with.  They

12  say:  So what did Marvell do after it learned?  Well, the

13  evidence in this case is going to show that Marvell actually

14  has a policy about what to do in these circumstances, and that

15  policy requires it to consult with an attorney and say -- to

16  determine whether they are about to -- what they are about to

17  build is going to violate this patent that they have now been

18  given notice of.  The evidence will show Marvell violated this

19  policy.

20          So what do they want to do?  They want to do exactly

21  what Judge Lefkow said in that other case I referred to is

22  absolutely out of bounds.  You can't exclude evidence based on

23  the legal argument that's made in this case.  For example,

24  here, based on our decision to not waive privilege and then

25  argue the untruth, say that event never occurred.  That's

1   exactly what they're doing here.  They invoked this issue

2   specifically by the argument they made in opening statement,

3   and we're entitled -- we're not only entitled, we're

4   absolutely obligated to make sure that this jury and the

5   record is -- shows the truth, which is that we did follow our

6   policy.

7            Otherwise, the jury has incorrect information.

8   Otherwise, there's no way this can stand up on review to have

9   inactual -- factual information presented to the jury if

10  willfulness gets there on which to base their opinion; and

11  also it permeates the case.  In what other -- what other

12  factual area of this case do we have an assertion about an

13  internal policy that was not specifically followed?  And what

14  do they want to do?  They want the jury to believe that

15  Marvell didn't follow that policy when that is absolutely not

16  the case.  Absolutely not the case.

17           They've invoked this issue.  We absolutely have a

18  right to defend ourselves and say just that, say there was a

19  conversation with an attorney, as Dr. Wu testified.

20           MR. McELHINNY:  Can you move that up?

21           MR. DeFRANCO:  Sure.

22           Do you want to respond to this?

23           MR. McELHINNY:  Yeah.

24           MR. DeFRANCO:  Go ahead.

25           MR. JOHNSON:  Just quickly, Your Honor, with respect

1    to the --

2              THE COURT:  Excuse me.  Somebody has a tail and left

3    the door open, and we have a gal back there playing with her

4    Blackberry; she can close it.

5              MR. JOHNSON:  Your Honor, during the trial Dr. Wu

6    testified at Lines -- at Page 323 of the trial transcript.

7              THE COURT:  323?

8              MR. JOHNSON:  Yes, Your Honor.

9              Back in 2002, when you became aware of Dr. Kavcic's

10   patent, did you review the patent at that time?  Answer:  I

11   reviewed the patent with our internal patent attorney at

12   Marvell.

13             At Marvell, and who was that?

14             And Your Honor then instructed Dr. Wu that -- to the

15   extent that you talked to the attorney about the patent,

16   anything that relates to your communications is privileged and

17   you can't talk about it.

18             And then I asked:  You can provide the name of the

19   person; and he then said:  Mr. Eric Janofsky.

20             That testimony, Page 323, is completely in line with

21   his deposition testimony --

22             THE COURT:  Excuse me.  That same gal has left the

23   door open again -- who is that gal?

24             MR. JOHNSON:  One of CMU's, I believe, mock jurors.

25             THE COURT:  Okay.

1              Go ahead, Mr. Johnson; sorry for the interruption.

2              MR. JOHNSON:  No, no problem.

3              THE COURT:  I can see the jurors coming in and the

4       jurors should not be privy to these kinds of discussions.

5              MR. JOHNSON:  So as I was saying, at Page 323

6       Dr. Wu identified Mr. Janofsky.  There wasn't any objection at

7       that point for privilege or otherwise.

8              THE COURT:  Right, I recall.

9              MR. JOHNSON:  And that statement -- those statements

10      are exactly what he testified to in his deposition, at Page 23

11      of his deposition.

12             THE COURT:  All right; I read his deposition.

13             MR. JOHNSON:  And that's all we intended to put in,

14      is to basically take on this statement that Mr. Greenswag made

15      in his opening statement.  There is no attempt to go into any

16      discussions or rely upon any discussions with respect to

17      willfulness.  In that opinion -- I mean those discussions are

18      privileged.  We have not waived the privilege in that respect.

19      But that testimony even in his deposition came in without

20      objection or any, you know, attempt to invoke the

21      attorney/client privilege.

22             So all we're doing is trying to refute, basically,

23      the take on this, that there's some policy in place and

24      Marvell didn't -- violated that policy.

25             THE COURT:  Okay.

1              Mr. McElhinny, your response?

2              MR. McELHINNY:  Briefly, Your Honor, two points.

3    First, I think Mr. DeFranco makes my case in some respects

4    when he says that all the hundreds of opinions that are out

5    there on reliance on counsel and opinion letters and the like,

6    there's never -- there's never an opinion that says you can't

7    go ahead.

8              Well, that sort of proves the point here because

9    here there is no opinion; so if we're going to draw an

10   inference about what transpired in that consultation, the

11   inference would be Marvell was not in a position where it

12   could write an opinion that blessed what they were about to

13   do.

14             Second --

15             THE COURT:  So you're asking for an inference

16   instruction?

17             MR. McELHINNY:  I think that would be appropriate if

18   they're going to argue this point.

19             And, second, Your Honor, this idea here that we

20   opened the door to this really is --

21             THE COURT:  Well, you did speak to it.

22   Mr. Greenswag, actually, spoke to it.

23             MR. McELHINNY:  And -- absolutely.  We said the

24   policy requires it to consult with an attorney to determine

25   whether what they are about to build is going to violate this

1   patent that they now have been given notice of.

2          And the privilege log suggests that's not what this

3   alleged consultation was all about.  The privilege log

4   suggests a totally different purpose for the consultation.  So

5   certainly if the privilege log had said consultation regarding

6   potential infringement of Kavcic patent --

7          THE COURT:  It doesn't say that.

8          MR. McELHINNY:  -- Mr. Greenswag probably wouldn't

9   have said what he said in his opening.  But the privilege log

10  says consultation re: patent prosecution.

11         THE COURT:  Right.

12         MR. McELHINNY:  And so when Mr. Greenswag says what

13  he said in his opening, he's perfectly entitled to say that.

14  Marvell has no evidence -- not even its privilege log -- that

15  there was such a consultation regarding whether or -- what

16  they were about to build is going to violate this patent that

17  they now have been given notice of.  There is no evidence of

18  that.

19         And for Marvell to say, well, not only did we cloak

20  these conversations in the veil of privilege, we also describe

21  them in a way that is inconsistent with the point they're

22  trying to make.  And -- but we, Marvell, should be allowed to

23  argue that because CMU opened the door.

24         Well, there was no opened door here.  The fact of

25  the matter is the record that we had, the positions that

1    Marvell has taken, the testimony of Dr. Armstrong all support

2    the view that there was a violation of the policy.  And for

3    Marvell to argue that, well, we had this consultation and we

4    ought to be able to at least talk about that just flies in the

5    face of its own privilege log.

6              MR. DeFRANCO:  Briefly, Your Honor.

7              THE COURT:  I think we should probably make that

8    portion of the privilege log part of the record in this case;

9    and I'm now looking at Dr. Wu's testimony, July 28, 2010,

10   Pages 23 and 24.  Mr. Radulescu was defending the deposition.

11             I reviewed it under the supervision of our patent

12   lawyers, his answer.

13             Question:  Was that in-house attorney?  Answer:

14   Someone --

15             Question:  Or someone outside of Marvell?  Answer:

16   In-house attorney.

17             Question:  Did you ever have occasion to review --

18   Answer:  Uh-huh.  Question:  -- Dr. Kavcic's patent with

19   outside counsel; it's just a yes or no question.  Answer:  No.

20             Do you know whether Marvell has ever gotten an

21   opinion of outside counsel as to whether the company -- any of

22   the company's read channel products infringe any of the claims

23   of Dr. Kavcic's patents?

24             Mr. Radulescu:  Before you answer that, just give me

25   a second to think about your question -- how do you pause the

1   screen, by the way?

2            Reporter:  Click on the text.

3            Mr. Radulescu:  Okay, got it.  Okay.  On the basis

4   of the question, asking the advice that he received from

5   counsel, I'll instruct the witness not to answer the question.

6            Mr. Greenswag:  Okay.

7            Witness:  I actually want to make a clarification

8   for the previous question.

9            Question:  Sure.  Answer:  When you asked me whether

10  I have ever reviewed his patent outside direction of the

11  counsel, I don't remember.  I don't remember I did, but it has

12  been many years.

13           Then he talks about his meeting with Kavcic in

14  Boston.

15           MR. DeFRANCO:  Your Honor, a couple of points in

16  response.  First, we are not going to argue to this jury that

17  an opinion of counsel would have been a waste of time because

18  they're a rubber stamp of the position a company takes; that's

19  my argument, that's not our position.

20           They knew full well that any inference that goes to

21  the fact that we decided not to waive privilege would be

22  entirely incorrect as a matter of law.  And that would undo

23  any willfulness finding per se.  There is no question about

24  it.

25           But the point is, as that testimony shows, we're

1    talking about communications from years ago, which invokes

2    their delay in bringing this lawsuit.  Exactly as his

3    testimony says, memories have faded.  But it's not disputed on

4    this record -- and you heard the testimony of Dr. Wu, and the

5    jury can assess credibility -- that he went to in-house

6    counsel.  And the fact that it's in-house counsel and he

7    obtained advice doesn't mean that it disqualifies as

8    sufficient under the law.

9           An outside opinion of counsel is not required.  Some

10   of the cases we cited, for example Cohesive Technology, where

11   no willfulness was found, it was an in-house opinion of

12   counsel.

13          And my point earlier, Your Honor, and I've given

14   talks about willful infringement and the scope of infringement

15   opinions, by the way, and what often happens is you're faced

16   with a decision of, you know, a couple of things.  If you have

17   written opinions that are lengthy in detail, it becomes a

18   satellite litigation in front of the jury as to changes in

19   claim construction between what the outside or in-house

20   attorney thought versus what's now pursued in litigation.

21          Or different prior art references that are relied

22   on.  Everybody gets smart about the technology that goes on.

23   One attorney, often sitting in a room, comes to markedly

24   different decisions than a well-informed Court facing

25   arguments by both sides.  Those are the kinds of decisions

1    that one makes when they decide whether or not to waive

2    privilege.

3            Am I going to put on an inexperienced testifier, an

4    opinion of counsel type lawyer whose views and conclusions

5    differ from the Court's on claim construction, who considered

6    different art, who had different non-infringement positions?

7    It becomes a major decision about is that going to be a

8    distraction from the jury?  And my point earlier was that's

9    the trend that the Federal Circuit's going.  That, you know,

10   willfulness is now a recklessness standard in terms of is this

11   truly the bad behavior that warrants enhanced damages?  That's

12   the point.

13           THE COURT:  Well, I understand that that's the

14   point, and I understand that's the status of the law.  I don't

15   know that Mr. Janofsky would have been that naive.  I think

16   he's been in other litigation.

17           But I also look back at one of our telephone status

18   conferences, August 27, 2010; and Mr. Radulescu points out the

19   fact that:  No, we will not be asserting the advice of counsel

20   defense.  And the further communication, Your Honor -- and

21   I'll just be pretty straightforward about it -- the reason why

22   we've been careful is -- I think this is correct -- if you go

23   back five years and ask who was in the legal department, I

24   think none of those people are around.

25           So you met Ms. Jin Peng Jang at the tutorial.  She

1    has the longest tenure.  She doesn't go back to that time

2    period.  So with respect to back in the early days, we don't

3    have the -- we don't have anyone at the company who was in

4    that office; and so we have a file.  And to the extent that

5    the file contains privileged communications, they've been

6    logged.

7           I think in this case it probably was copies of the

8    patent or something like that that we would not -- if it is

9    logged, we would simply just produce them.  The issues that

10   have been getting into happened five years ago or six years;

11   we don't got people -- it's sort of hard.  We're trying to

12   work through these very sort of strange issues when you don't

13   have the people around.

14          And I don't think Mr. Janofsky has left the earth;

15   but be that as it may --

16          MR. DeFRANCO:  And, Your Honor, that is part of what

17   I was describing.  That's the kind of analysis you go through.

18   We're talking about an -- oral communications here that were

19   years ago, by people that are no longer with the company.  And

20   you look at the facts and you make the decision about whether

21   you're going to waive privilege or not and put that at issue.

22          Now, maybe given where we are today, if I could turn

23   back the hand of time, I would have made a different decision.

24   Lots of people in this courtroom, that's -- that point has

25   been made.  We're in this case at that point in time.  But

1   that doesn't prove that there was bad information there and

2   some inference should be drawn.  It proves the opposite; that

3   we're years after, when memories -- as the deposition

4   testimony shows, memories have faded, people have moved on.

5   The issue is not fresh.

6           All of that factored into the discussion that Mr. --

7   Dr. Radulescu made at that point before the Court.

8           THE COURT:  Now, Mr. Janofsky is vice-president,

9   general legal affairs, at Lam, L-A-M, Research Corporation,

10  per LinkedIn.

11          Okay.  The jury is now here, so we're going to have

12  to pause and we will resume all of our arguments.

13          What's going to be the order in terms of rebuttal?

14          Mr. McElhinny?

15          MR. McELHINNY:  Your Honor, we're going to call

16  Dr. McLaughlin first and then Ms. Lawton.  I had a question on

17  the Court's order.  I saw that you permitted Miss Lawton to

18  testify at least as to two specified areas.

19          THE COURT:  Right.  Because as far as the numbers

20  go, she's given us quite an explication; and I think she could

21  have anticipated whatever it was that Hoffman had to say or

22  didn't have to say.

23          Relative to the two individuals who were never

24  deposed in this case and she didn't have the benefit of their

25  testimony, whereas Hoffman may or may not have, whether it was

1    live or whether it was by meeting in the hall or in prep or

2    however it was conducted, then and in that event I think it's

3    only fair that she be able to comment.  But I think it should

4    be short and to the point, no narratives.

5          MR. McELHINNY:  Okay.  And, Your Honor -- how are we

6    treating the clock on cross?

7          THE COURT:  How -- well, you know, that's -- you

8    know, that's up to --

9          MR. McELHINNY:  Consistent with your earlier ruling?

10         THE COURT:  Right.  I mean the time is ticking.

11         MR. DeFRANCO:  Well, Your Honor, we would renew our

12    request for some additional time, just for the record, to

13    cross Dr. McLaughlin on the order of ten minutes.

14         And equally important, if not more important, given

15    this, you know, new submission by Miss Lawton on rebuttal, we

16    would ask time to be able to cross her on the limited

17    testimony she's going to put in and not have it come out of

18    the remaining time for our closing.  I think under the

19    circumstances that's not an unreasonable request.

20         MR. McELHINNY:  Your Honor --

21         MS. GAY:  Your Honor, if I could just be heard on

22    that.

23         THE COURT:  Well, to that end, once again, our jury

24    is waiting.  Okay?  So we're going to bring in the jury and at

25    least get through McLaughlin; and then if we have to have

1     further argument -- but I will say this for the how many time?
2     When I set up this trial, I was given a proposal by allegedly
3     very experienced patent counsel that this case could be tried
4     in 20 hours, number one.

5                Number two, the Court repeatedly suggested to the
6     lead trial counsel, who is here in front of me, Mr. DeFranco:
7     Don't you want to consider bifurcating this case?  Nope; I'll
8     consider it and I'll give you an answer.  The answer was no.

9                Now we have a clock.  The clock has been running.
10    We've already had one motion for enlargement; I've granted it.
11    And so to that end, given all the experience in this room,
12    people should have budgeted their time.

13               I've also said at side bar as far as the damages
14    experts, in this Court's estimation both of those
15    presentations could have been truncated.  In addition, this
16    Court has said at side bar that relative to the expert
17    qualifications, there could have been stipulations; there
18    could have been agreements so that we would have gotten to the
19    meat of the issues, whether they be invalidity, whether they
20    be infringement, whether they be the scope of the damages.
21    But, no, we have not had a trial like that.  And, instead,
22    we've had a very lengthy trial with numerous side bars.
23    That's what we've had.

24               Okay?  So we're going to start again on the record
25    at 10:15 to give our court reporter a break.

 1                (Whereupon, the morning recess was taken.)

 2                (In open court.)

 3                THE COURT:  All right, Mr. Galovich, if you'll bring

 4     the jury in, please.

 5                MR. GALOVICH, DEPUTY CLERK:  Yes, Your Honor.

 6                (Off the record discussion.)

 7                THE COURT:  All right.  Now that everybody has

 8     assembled and it's 10:15, as the Court said, we will start.

 9                Before we move into the rebuttal phase, any further

10     motion?  Anything else anybody wants to bring?

11                MR. McELHINNY:  Your Honor, we --

12                THE COURT:  You have tentatively rested with the

13     exception of certain witnesses that you allegedly had

14     agreements with Marvell about, so where are we in terms of

15     resting?  Mr. Johnson clearly stated on the record he rested.

16                MR. McELHINNY:  Your Honor, we have rested our

17     case-in-chief in light of Mr. Burd's appearance finally

18     yesterday.  We have a motion on file as of this morning, while

19     we were in court, on the invalidity piece.  We previewed that

20     yesterday at side bar, and we had folks up throughout the

21     night putting together a draft.

22                THE COURT:  I know.  I just received the motion and

23     the brief.

24                MR. McELHINNY:  And we apologize for the time, but

25     since Marvell had one witness and sort of an ever shrinking

1    validity case, we really had no idea what we were going to see

2    yesterday with Dr. Proakis.  We went from sixty some slides to

3    a much smaller subset; and some of the things that were even

4    in the jury instructions as of the most recent version

5    disappeared from his -- from his testimony.

6              So in light of that, we put together something as

7    quickly as we could.  We got it on file.  And we can either

8    discuss that, which I suspect we don't want to do, or -- we

9    have it on file; we can reserve on that and we can have some

10   argument.

11             THE COURT:  You're going to reserve on that because

12   we're not going to waste any more of this jury's time.

13             MR. McELHINNY:  Absolutely.

14             MR. JOHNSON:  I don't want to be seen as waiving

15   anything now that they rested; we would renew our motion and

16   supplement our JMOL motions.

17             THE COURT:  Similarly, we're going to hear argument,

18   as I said.

19             MR. McELHINNY:  Understood, Your Honor.

20             THE COURT:  Because we're going to have all these

21   arguments and all these motions, we may not get around to

22   closing and instructions 'til Thursday; so be it.  All right?

23             MR. GALOVICH, DEPUTY CLERK:  Is it as of today or at

24   the conclusion of Mr. Burd's testimony?

25             THE COURT:  Your resting is at the conclusion of

1   Mr. Burd's testimony?

2              MR. GREENSWAG:  Yes.

3              MR. McELHINNY:  Yes.

4              MR. GALOVICH, DEPUTY CLERK:  I will make it -- since

5   nothing was stated on the record, Defendant closed around

6   four -- shall I say around 3:30 yesterday for the memorandum

7   of trial, just for recordkeeping purposes?

8              MR. McELHINNY:  I'll take your word for it,

9   Mr. Galovich.

10             MR. GALOVICH, DEPUTY CLERK:  I'll just put the date

11  then.

12             THE COURT:  All right?

13             Mr. Galovich you're going to bring in our jurors.

14  You've already distributed the notebooks; and while we were

15  off the record, notebooks concerning Dr. McLaughlin have been

16  distributed.

17             (Jurors seated.)

18             MR. GALOVICH, DEPUTY CLERK:  Please be seated.

19             THE COURT:  Thank you, ladies and gentlemen of the

20  jury.  And thank you once again for being on time.  The Court

21  asks your pardon in our late start.  Once again the Court had

22  to address a number of legal matters with the attorneys.

23             At this stage of the trial we are moving into what's

24  called rebuttal; and to that end, Mr. McElhinny is going to

25  call two witnesses.

1             Your first witness Mr. McElhinny?

2             MR. McELHINNY:  CMU calls Dr. McLaughlin,

3    Your Honor.

4             THE COURT:  Dr. McLaughlin, if you'll approach, be

5    sworn by Mr. Galovich.

6             MR. GALOVICH, DEPUTY CLERK:  You want me to re-swear

7    him again?

8             THE COURT:  Yes, it's been a while.

9             MR. GALOVICH, DEPUTY CLERK:  Please raise your right

10   hand -- actually, please state and spell your name for the

11   record again, sir.

12            THE WITNESS:  Steven, S-T-E-V-E-N, William,

13   W-I-L-L-I-A-M, McLaughlin, M-C-L-A-U-G-H-L-I-N.

14            MR. GALOVICH, DEPUTY CLERK:  Place raise your hand.

15                         * * * * *

16            STEVEN McLAUGHLIN, a witness herein, having been

17   first duly sworn, was examined and testified as follows:

18            MR. GALOVICH, DEPUTY CLERK:  Thank you; please take

19   the witness stand, sir.

20            THE COURT:  All right.

21            Dr. McLaughlin, have a seat.  You'll recall the

22   instructions from last time around.  While we were on break, a

23   binder has been placed there.  Please speak into the

24   microphone.

25            Mr. McElhinny.

DIRECT EXAMINATION

1

2  BY MR. McELHINNY:

3  Q       Good morning, Dr. McLaughlin.  Welcome back.

4  A       Thank you.

5  Q       Dr. McLaughlin, did you hear Dr. Proakis testify

6  yesterday on the subject of validity?

7  A       Yes, I did.

8  Q       And are you here today to respond to that testimony?

9  A       Yes.

10 Q       Sir, are you familiar with what was called the Worstell

11 patent?

12 A       Yes, I am.

13 Q       And have you studied that patent?

14 A       Yes, I have.

15 Q       Do you have any opinions, sir, regarding the validity

16 of Claim 4 of the '839 patent and Claim 2 of the '180 patent,

17 the CMU patents?

18 A       Yes, I do.

19 Q       And before we get to those opinions, sir, did you

20 prepare a report summarizing your views?

21 A       Yes, I did.

22 Q       And I'd like you to talk generally -- explain to the

23 jury generally what you did in order to form your opinions.

24 A       Well, I certainly read the patents in this case, CMU

25 and Worstell patents, read a bunch of the background

1    information, kind of articles related to that technology; and

2    then I studied the claims, studied the contents of the patents

3    to determine validity, particularly relating to the Worstell

4    patent.

5    Q       Sir, when you said you studied articles and the like,

6    can you give the jury a broader description of what you

7    studied?

8    A       Sure.  Generally refer to that as the prior art; looked

9    at related articles prior to the time of the CMU patents,

10   around the time of the Worstell patents, read articles, read

11   other patents to try to understand kind of the state of the

12   art at that time.

13   Q       And Dr. Proakis mentioned the Zeng article yesterday,

14   Z-E-N-G.  Did you read that one?

15   A       Yes, I did.

16   Q       And he mentioned something about Lee, did you read that

17   as well?

18   A       Yes, I did; sure did.

19   Q       Sir, did you -- as part of your analysis, did you have

20   to rely on the Court's claim construction?

21   A       Yes, yes.  Always use the claim construction, the

22   dictionary of the terms in the claims.

23   Q       And is that the same one you used for your infringement

24   analysis when you were here?

25   A       Yes.

1   Q       Okay.  Sir, did you apply certain tests in reaching

2   your conclusions regarding validity of the patents?

3   A       Yes, I did.

4   Q       Can we show Slide P Demo 18.

5           Sir, does P Demo 18 help you describe the tests that

6   you applied in reaching your conclusions?

7   A       Yes.

8   Q       Can you explain that slide to the jury.

9   A       Sure.  What we're trying to determine here is whether

10  the CMU patent is valid in the face of another patent, and

11  there are two tests.  One is called anticipation, and the

12  other is call obviousness.  These are kind of technical

13  descriptions.

14          Kind of in layman's terms, what anticipation means is

15  we ask the question is there another piece of prior art, a

16  single article or a single patent that teaches all of the

17  elements of the CMU claim?  That would be the -- the claims.

18  That would be what anticipation is.  Anticipation is kind of

19  like before, is there anything before, one single article or

20  patent that covers that?

21          And obviousness is obviousness.  And there's again some

22  technical conditions, but try to think of whether a patent is

23  obvious, what we would do is look at all the things that are

24  out there at that time, whether it's articles and other

25  patents, and then compare those, compare the -- what's --

1    what's out there with the current invention; and that

2    comparison needs to be done by someone with ordinary skill in

3    the art.

4           And with all those three things, that person with skill

5    in the art, if they deemed that to be obvious, then it

6    would -- then it would fail or pass the obviousness test.

7    What we're looking for is whether the new invention is

8    obvious, kind of in the context of everything that's out

9    there.

10   Q     And, sir -- well, first of all, I understand that I

11   misspoke.  This should be P Demo 19 for the record.

12          You talked about finding each element of the claim in

13   the anticipation piece.  Are those the little boxes we

14   checked?

15   A     That's correct.

16   Q     Okay.

17   A     That's correct.

18   Q     That was during your infringement testimony.

19   A     Yes.

20   Q     Okay.  Sir, what generally are your opinions regarding

21   the validity of the asserted claims here?

22   A     Well, that they are valid.

23   Q     Okay.  And can you just describe generally why and then

24   we'll drill down a little bit?

25   A     Sure.  As we've heard, the CMU invention by Doctors

1   Kavcic and Moura was oriented toward solving this kind of big

2   media noise problem; media noise problem that has a correlated

3   noise and signal dependent noise.  As we heard, they came up

4   with an approach that used a set of signal dependent branch

5   metric functions and applied those, applied those signal

6   dependent branch metric functions on the trellis.

7             MR. DeFRANCO:  Objection, Your Honor; we've gone

8   from leading to a narrative.

9             THE COURT:  Sustained.

10  BY MR. McELHINNY:

11  Q     Dr. McLaughlin, you were talking about the need to

12  apply the set of branch metric functions to the trellis.  Can

13  you elaborate further as to why you believed that these

14  patents were valid?

15  A     Yeah.  Those set of signal dependent branch metric

16  functions were applied to a plurality of signal samples, and

17  kind of all of those together constitute the invention.

18  Q     And, sir, as a result of your study of the prior art,

19  did you find anyone who had done that before?

20  A     No.

21  Q     Let's talk a little bit and drill down a little bit to

22  your testimony here.  Dr. Proakis showed some slides yesterday

23  regarding your testimony about whether Doctors Kavcic and

24  Moura were the first to address signal dependent noise.  Do

25  you recall that?

1  A     Yes.

2  Q     And he also showed slides regarding whether they were

3  the first to address correlated noise.  Do you recall that?

4  A     Yes.

5  Q     What, if anything, are the differences between those

6  detectors that Dr. Proakis referred to yesterday and the

7  inventions described in the asserted claims?

8  A     Well, there's a number of differences.  Maybe I'll just

9  quickly highlight them in the Zeng and Lee references, which

10  were the ones referring to signal dependent noise.

11      In that case those references were referring to a

12  single signal sample, and they were also directed just towards

13  transition noise.  The Kavcic invention is oriented towards

14  multiple signal samples, and it also is intended to compensate

15  for or address noise associated with a specified sequence of

16  symbols, not just say one transition; so that's the difference

17  with that.

18      And on the correlated noise, the Kavcic invention does

19  address correlated noise; but the prior art, that was --

20          MR. DeFRANCO:  Objection; narrative again,

21  Your Honor.

22          THE COURT:  Sustained.

23  BY MR. McELHINNY:

24  Q     Dr. McLaughlin, you were talking about the differences

25  between Kavcic/Moura and the prior art regarding correlated

1    noise.  What did you find in the prior art?

2    A      That the -- in the prior art those -- those references

3    did not consider signal dependent noise.

4    Q      Okay.  So let's talk some specifics about the Worstell

5    patent.  In reaching your opinions regarding the Worstell

6    patent, Dr. McLaughlin, did you consider whether Worstell

7    describes use of -- what's been called an FIR filter?

8    A      Yes.

9    Q      And does Worstell use an FIR filter?

10   A      Yes.

11   Q      How many?

12   A      One.

13   Q      Was that significant to your analysis?

14   A      Yes, it was.

15   Q      Why?

16   A      Because the Kavcic invention, both of the claims under

17   consideration here, require a set of signal-dependent branch

18   metric functions and Worstell only contemplates one.

19   Q      Sir, were you here for Dr. Kavcic's testimony early in

20   the case?

21   A      Yes.

22   Q      Did you see slides that he used that would help you

23   illustrate this point to the jury?

24   A      Yes.

25   Q      Can we display P Demo 3, Slide 59.

1          Dr. McLaughlin, can you explain what this slide shows

2    and its relevance to your invalidity analysis.

3    A       Yes.  Very briefly, this is the slide where Dr. Kavcic

4    highlighted the fact that his invention has many different

5    signal dependent branch metric functions, one for each one of

6    the branches of the trellis.  And this was his picture to

7    demonstrate this with sliders and knobs.  But on top it's

8    Figure 3-B from the patent that indicated this is how it is he

9    described it in the patent, so there are many FIR filters --

10         MR. DeFRANCO:  Your Honor, could we have a brief

11   side bar, please?

12         (At side bar.)

13         THE COURT:  Okay.

14         MR. DeFRANCO:  I have three points, Your Honor.  The

15   first is beginning with the leading.  I know everybody is

16   under time constraints; I don't want to be seen as trying to

17   interrupt or obstruct the testimony, but the leading has to

18   stop.  The leading questions have to stop.  He is racing this

19   man through his testimony with leading questions.

20         THE COURT:  Right.

21         MR. DeFRANCO:  Okay.  That's got to stop.

22         THE COURT:  I have sustained the objection at least

23   twice.  He is a skilled witness, you're a skilled lawyer;

24   question, answer; question, answer.

25         MR. DeFRANCO:  And that also -- that also applies to

1    the narrative.

2            THE COURT:  The jury is captive; it's not like

3    they're going to be running out the door.

4            MR. DeFRANCO:  We've got five leading and a

5    narrative, five leading and a narrative; and I would ask,

6    Your Honor, as you've done with other witnesses, to ask that

7    he not give a narrative and allow his attorney to ask

8    questions.  That's the first part.

9            THE COURT:  The third time is the charm.

10            MR. DeFRANCO:  The second point is the slide wasn't

11    identified to us --

12            THE COURT:  No, that was new.

13            MR. DeFRANCO:  -- that it was going to be used; and

14    I'll object on that basis.  I have no notice of it.

15            MR. JOHNSON:  And foundation.

16            MR. DeFRANCO:  There's so many slides in this case,

17    I don't remember what Dr. Kavcic said about this one; so it's

18    pretty difficult to object on what it is being used for when

19    they're saying Dr. Kavcic said this, Dr. Kavcic said that

20    without prior notice.

21            I object to them putting slides up on the screen;

22    that's not been the practice in this case.  It's a little bit

23    late in the game to change the rules now.

24            THE COURT:  It was not in the slide deck we looked

25    at this morning.

1          MR. McELHINNY:  No, Your Honor, it wasn't because
2     it's already in.  I mean it's already been used.  The fact of
3     the matter is the point of all the previews of the slide decks
4     is to demonstrate whether they're misleading or not.
5     Dr. McLaughlin has this one and one other one from
6     Dr. Kavcic's presentation.  I didn't see there was any point
7     to --
8          THE COURT:  Well, I think there is a point.  That's
9     been the way you've been practicing with all these late night
10    e-mails, the slide decks back and forth; people are supposed
11    to have an opportunity to look at them so they know what's
12    happening.
13         MR. DeFRANCO:  That's exactly the point.  There has
14    been prior notice of people using slides from others, so it
15    can't be an excuse to say it's already used in this case.
16    Also not having a chance to check -- I remember nothing in
17    this report; that is one of the things we do check in the late
18    hours so we can address it with the Court in the morning.  We
19    ask that the testimony -- the slide not be used.
20         THE COURT:  You had a full half hour before I got on
21    the bench today because I was conducting a case management
22    conference that turned out to be longer; there was plenty of
23    time to go over these slides in person before I got on the
24    bench.  Why doesn't this happen?
25         MR. McELHINNY:  Your Honor, the fact of the matter

1   is --

2          THE COURT:  Especially when we're under these time

3   constraints that you all artificially placed on this case.

4   You all, not the Court.  You all.

5          MR. McELHINNY:  I understand and appreciate that.  I

6   have to tell you I don't view this as any different than any

7   exhibit that's already been used in this case.  We don't get

8   an advance notice of the exhibits that they're going -- they

9   were going to put on 'til they show up in the courtroom.  This

10  is an exhibit that's in.  It's been used.  It's -- the Court

11  has found it to be not misleading because it's been used.  I

12  don't have to preview the direct to them, like they don't have

13  to preview their direct --

14         MR. DeFRANCO:  Absolutely incorrect.  The rule of

15  this case --

16         THE COURT:  Shall we take a break so you can look at

17  the slides and you can look at whatever Dr. Kavcic said about

18  that slide?  Shall we do that?  And let this jury sit for

19  another half hour?

20         MR. DeFRANCO:  Your Honor, I stand on my objection

21  that this is -- this violates our procedure here.

22         MR. McELHINNY:  It really does not.

23         MR. DeFRANCO:  And they cannot backtrack --

24         THE COURT:  No, it's already been projected.

25         MR. DeFRANCO:  We ask --

1          MR. McELHINNY:  I have one other slide.

2          MR. DeFRANCO:  We ask that the slide and testimony

3    be stricken, Your Honor, because they did not follow the

4    procedures and they cannot do it on the fly, not at this late

5    time.

6          MR. McELHINNY:  There is no procedure --

7          MR. DeFRANCO:  It is absolutely inappropriate.

8          MR. McELHINNY:  There is no procedure to put

9    people -- we don't get exhibits in advance --

10         THE COURT:  I know yesterday we had this over and

11   over again.

12         MR. McELHINNY:  And, frankly, we don't get -- we

13   don't get a preview of anyone else's testimony.  You've

14   already ruled that these slides are not misleading.  They were

15   already displayed to the jury.  There's no reason and there's

16   no rule and there's no practice in this case where I would

17   have had to display --

18         THE COURT:  Here's what we're going to do.  You've

19   already projected this slide.  We're going to take a break

20   when he's done with direct, so that you can get prepared for

21   cross.

22         MR. DeFRANCO:  We object to --

23         MR. McELHINNY:  I have one more.

24         THE COURT:  What is the one more?

25         MR. McELHINNY:  Slide 44 from Kavcic.

1          THE COURT:  Slide 44 from Kavcic.

2          MR. JOHNSON:  Your Honor, I just want to go back.

3   None of this is in his report.  None of the slides are in the

4   report.  The slides are not referenced in the report.  They

5   haven't laid a foundation to establish --

6          MR. McELHINNY:  Illustrative.

7          MR. JOHNSON:  Now we're --

8          MR. GREENSWAG:  Let me speak; may I speak?

9          THE COURT:  I can see another motion to strike

10  coming.

11         MR. GREENSWAG:  In fact, Your Honor, this discussion

12  of the difference between there being a branch metric

13  computation circuit for each branch of the trellis versus

14  Worstell, who is a single FIR, --

15         THE COURT:  I got that.

16         MR. GREENSWAG:  -- is all over Dr. McLaughlin's

17  Worstell declarations which were explicitly incorporated into

18  his report.

19         THE COURT:  Right, which I read over the weekend.  I

20  read all the Proakis and all the Worstell -- I went through

21  all the slides.

22         MR. GREENSWAG:  To say it's not in his report is

23  wrong.

24         MR. JOHNSON:  None of these slides are; show me

25  where they are.

 1          MR. McELHINNY:  It doesn't matter.  There's

 2   testimony -- there's a section of his report.  Like

 3   everybody -- every other witness that has testified in this

 4   case, the demonstratives would be prepared in advance, and

 5   that's what we did.

 6          MR. JOHNSON:  There was never anything that this

 7   witness was going to be using these slides.

 8          MR. GREENSWAG:  Mr. Hoffman didn't have his slides

 9   in his report; Mr. Proakis --

10          MR. McELHINNY:  Dr. Proakis, Dr. Blahut --

11          MR. DeFRANCO:  The point is, Your Honor, if it's not

12   clear by now that we get prior notice so we have time to

13   investigate and consider this issue, I don't know what else is

14   clear in this case.

15          MR. McELHINNY:  Absolutely not.

16          MR. DeFRANCO:  And any argument -- the arguments

17   that we violated some order or we haven't played fair, any of

18   that is just nonsense.  Okay?  We did not in any instance put

19   up a slide for an expert -- another witness that we didn't

20   give them prior notice of.

21          MR. McELHINNY:  The Court has ruled you can have

22   your break.

23          MR. DeFRANCO:  It's completely, completely out of

24   bounds.

25          THE COURT:  Everybody has said their piece.  We're

1    going to get through this.  We're going to take a break, and

2    then you can take a look and see what you can come up with in

3    terms of cross.  You've preserved your opinion.

4          But given the stage we are in this trial, given what

5    the proffer was, given that everybody knew what he was going

6    to say, given everybody knew what Kavcic already said,

7    everybody saw what Worstell wrote, you know, I don't know that

8    there's such prejudice here that we can't go ahead.  Okay?

9    But -- my understanding was and all of your agreements were

10   you were supposed to show each other slides in advance.

11         MR. DeFRANCO:  Your Honor -- and I understand your

12   point; and I think that that applies equally to their

13   arguments about Blahut, to say that's all new when it's

14   squarely in his expert report is gamesmanship.  It's not

15   appropriate in a case of this magnitude.

16         MR. McELHINNY:  We're tired of that.

17         (In open court.)

18         THE COURT:  Dr. McLaughlin, I know this has been a

19   long trial.  The jurors know this has been a long trial.  And

20   we certainly appreciate your trying to get to the point; but

21   we still need question and answer.

22         THE WITNESS:  Okay.

23         THE COURT:  Okay?

24         THE WITNESS:  Okay.

25         THE COURT:  So let's try to move away from the long

1    narratives.

2              THE WITNESS:  Okay.

3    BY MR. McELHINNY:

4    Q      Okay, can we put that slide back up?

5              Dr. McLaughlin, I'm not sure where we left off, so can

6    you describe how Slide 59 of P Demo 3 informs your views?

7    A      Yes.  This is just from Dr. Kavcic's presentation where

8    he described the idea of different FIR filters on different

9    branches according to his invention.

10   Q      Okay.  Let's show slide -- or did Dr. Kavcic have

11   another slide that would facilitate your explanation of the

12   Worstell patent?

13   A      Yes.

14   Q      Can we show Slide 44 of P Demo 3?

15             Dr. McLaughlin, can you explain to the jury what you

16   draw from Slide 44 regarding the Worstell patent.

17   A      So, first of all, you notice this is about fifteen

18   slides prior.  This was during his discussion on failed

19   attempts to solve the full media noise problem.  And in this

20   attempt he came up with one FIR filter, and this is really the

21   same thing as the Worstell inventions.  It was during his

22   attempts to solve the problem; this was one of the things that

23   he gave up on.

24   Q      And in terms of the number of filters that are involved

25   and where they're applied, what are the differences between

1   the two?

2   A      In this case there is just one filter, as you can see,

3   apply that single filter to all branches.

4   Q      Okay.  And, sir, the -- Dr. Proakis testified yesterday

5   about transition noise adjustment in connection with signal

6   dependent noise.  Have you considered that transition noise

7   adjustment from Worstell?

8   A      Yes.

9   Q      Can we put the Worstell patent up?

10         Sir, have you looked at Equation 20 of the Worstell

11   patent?

12   A      Yes.

13   Q      Can we go to Equation 20?  Blow it up, please.

14         Sir, what is Equation 20 of the Worstell patent?

15   A      Equation 20 is the expression for the branch metric

16   calculation, according to Worstell.

17   Q      And what does it show?  Does it contain a transition

18   noise adjustment?

19   A      No, this is just the single FIR filter.

20   Q      Does the Worstell patent contain any equation anywhere

21   with a transition noise adjustment?

22   A      No.

23   Q      Does the patent discuss a transition noise adjustment?

24   A      Yes.

25              MR. DeFRANCO:  Your Honor, we -- leading --

 1            THE COURT:  Sustained.

 2            MR. DeFRANCO:  -- leading, leading.

 3   BY MR. McELHINNY:

 4   Q      Is there any discussion of the transition noise

 5   adjustment in Worstell?

 6            MR. DeFRANCO:  Same objection, Your Honor.

 7            THE COURT:  Sustained.

 8   BY MR. McELHINNY:

 9   Q      How does the Worstell patent treat transition noise

10   adjustments?

11   A      There are some narratives I think in -- I think it's in

12   the next column over, right around in the same location.

13   Q      Column 10?

14   A      Yes.

15   Q      Sir, taking -- directing your attention to say Lines 48

16   through 67, is this Worstell's discussion of transition noise

17   adjustment?

18   A      Yes, it is.

19   Q      What does Mr. Worstell say about transition noise

20   adjustment?

21   A      He says a couple things.  First of all, he wants to

22   take into account transition noise.  And then further down

23   below he says the -- a branch metric can be modified by

24   multiplying the metrics which correspond to transitions by a

25   fraction which depends on the standard -- on the transition

1    noise deviation.

2    Q       Okay.  And what does he say about how that might be

3    implemented?

4    A       He says, down below, he says that it could be

5    implemented in a straightforward way, using eight multipliers,

6    one for each one branch, leading to each state; and then he

7    describes one of the inputs to the multipliers is a constant.

8    Q       Okay.  And are those comments about the one branch and

9    the constant significant to your analysis?

10   A       Yes.

11   Q       Why?

12   A       Because he's just highlighting that this modification

13   takes place, this fraction takes place just for the one

14   branches.  He makes no mention of what happens to the other

15   branches, the branches -- the zero branches.

16   Q       Okay.

17   A       So presumably there's no modification to those

18   branches.

19   Q       What about the constant piece, how does that play into

20   your analysis, if it does?

21   A       It says that the -- that the -- the fraction doesn't

22   vary from branch to branch; it's constant for all the one

23   branches.

24   Q       And what does that -- what does that mean vis-a-vis

25   your analysis?

1    A      It means that this is different than what's discussed

2    in the Kavcic patent, in the claims.

3    Q      And is this description in Worstell, does that describe

4    a set of signal dependent branch metric functions?

5    A      No.

6    Q      Why not?

7    A      Because, as you remember, the signal dependent branch

8    metric functions go towards a specific specified sequence of

9    storage symbols, and so this doesn't do that.

10   Q      Sir, let me direct your attention to Slide 12-14, used

11   during Dr. Proakis's testimony.  Sir, does this equation on --

12   that Dr. Proakis called a further modified branch metric, does

13   that equation appear at -- anywhere in the Worstell patent?

14   A      No, it does not.

15   Q      And do you have any views on its significance for your

16   analysis?

17   A      Well, I think -- what I would do and what I did do is I

18   looked into the description, the verbiage that he gave

19   describing the adjustment; and I would walk through that and

20   try to explain whether this makes sense or not to add this.

21          This has been made up.  This is a made-up equation,

22   this entire thing; it doesn't appear in the patent.  And so if

23   you look at kind of the individual pieces of -- that Worstell

24   describes, they don't map to the use of that constant.

25   Q      Well, when you say it's a made-up equation, what

1    doesn't map to the use of the constant?

2    A      Well -- so, first of all, he talks about a fraction.

3    This is a fraction, but only one type of fraction.  He

4    describes standard deviation; this is not standard deviation,

5    this is a variance.  The other thing is the subscripts here,

6    BNT, BNT, those correspond to different branches.  What is --

7    what this is referring to is the branch metric value for a

8    particular branch.  This is implying that it's different for

9    all the branches.  And as we have already seen, there's no --

10   nothing applied for the zero branches.  And for the one

11   branches this is all constant, so I think this is very

12   misleading.

13   Q      And did Dr. Proakis talk about the order of steps

14   yesterday?

15   A      Yeah.  Yeah, that was pretty interesting because if you

16   remember what Mr. Worstell described is -- Mr. Worstell

17   describes first computing a branch metric value, so that's

18   this piece, just the blue piece, and then applying the

19   fraction.  So, again, I don't -- this is not -- this is not in

20   the Worstell patent.

21          But if it was, he describes a process that does blue

22   first, then yellow; but if you remember, Dr. Proakis did

23   exactly the opposite.  He did yellow first -- yellow first and

24   then blue.  So the way the -- that Dr. Proakis described the

25   Worstell invention, it was exactly opposite as to how Worstell

1    describes his invention.  So, yeah, just it's not applicable.

2    Q      All right.  Sir, is the -- does the Worstell transition

3    noise adjustment, does it apply to a plurality of signal

4    samples?

5                MR. DeFRANCO:  Objection, leading.

6                THE COURT:  Sustained.

7    BY MR. McELHINNY:

8    Q      Is there any application or -- what does Worstell say

9    regarding application of the transition noise adjustment to

10   plurality of signal samples?

11   A      He doesn't say anything about that.

12   Q      So do you have any conclusions from that?

13   A      It does not -- his adjustment is not applied to a

14   plurality of signal samples.

15   Q      Sir, let's skip ahead to P-161.  Are you familiar with

16   P-161, sir?

17   A      Yes.

18   Q      Did you consider it as part of your analysis?

19   A      Yes, I did.

20   Q      And let's direct your attention to Page -- I think it's

21   two or three -- do you recognize this piece of P-161?

22   A      Yes.

23   Q      What is it?

24   A      It's an e-mail from Glen Worstell on April, 1997, to

25   some other folks at Seagate.

1    Q       So that's all -- some time ago; and what did

2    Mr. Worstell say -- is this Mr. Worstell the same Mr. Worstell

3    on the patent?

4    A       Yes, it's the same Worstell.

5    Q       And what did Mr. Worstell say about -- in this e-mail?

6    A       He says:  I have reviewed the DSSC correlation

7    sensitive adaptive sequence detector patent proposal.  I'd

8    like to wade through the math before filling out the

9    evaluation form, but so far it looks interesting.

10          A couple of years ago I did some work on a Viterbi

11   detector modification to account for noise correlation.  This

12   invention is related but goes beyond my work and is probably

13   more interesting.

14          I also know of the work at UCSD and IBM which is

15   related but, again, as far as I know, the DSSC work is

16   different enough to warrant investigation.

17              MR. DeFRANCO:  Objection, Your Honor.  For the

18   completeness of the record I ask the entire e-mail be read,

19   not stop there, please.

20              THE COURT:  Dr. McLaughlin, continue reading.

21              THE WITNESS:  An important issue is the circuit

22   complexity required.  I'll try to look at that, too.  Expect a

23   better evaluation next week.  Cheers, Glen.

24   BY MR. McELHINNY:

25   Q       And, sir, did this affect your opinion at all?

1   A      Yes.

2   Q      In what way?

3   A      It confirms my opinion.

4   Q      Okay.  Sir, one last point on our slide with the tests

5   for -- that you applied.  There was this phrase again,

6   secondary considerations.

7   A      Yes.

8   Q      What does that mean?

9   A      Well, that was with respect to obviousness.  And the

10  secondary considerations were in order to determine whether

11  something is obvious, it's also possible to look at these

12  secondary factors.  Some of those factors are praise for the

13  invention, solving a long-perceived problem, long-pursued

14  problem.

15  Q      Did you hear Dr. Proakis discuss any secondary

16  considerations yesterday?

17  A      No.

18  Q      And did you consider secondary considerations?

19  A      Yes, I did.

20  Q      What did you -- can you describe for the jury what you

21  considered in that regard.

22  A      Yeah.  I think, just in short, we've heard a lot of

23  praise for the invention, both by Marvell testimony here and

24  also in general.  We've read things that said it solved a

25  long-standing problem.  So that praise would have been one of

1    the secondary factors that showed that it's not obvious.

2    Q       Okay.  And, sir, just in conclusion, what is your

3    opinion regarding whether the asserted claims of the Carnegie

4    Mellon patents are anticipated?

5    A       They are not anticipated by the Worstell.

6    Q       And, sir, what is your opinion regarding whether the

7    asserted claims of the Carnegie Mellon patents are obvious?

8    A       They're not obvious in view of Worstell.

9             MR. McELHINNY:    Thank you very much, sir.

10            THE COURT:  All right.

11            Ladies and gentlemen of the jury, as I have given

12   you before, I'm going to give you a short limiting

13   instruction.

14            You may recall yesterday that Dr. Proakis also

15   testified concerning these issues of anticipation and

16   obviousness in a slide that was used relative to his

17   testimony.  And relative to both Dr. Proakis as well as

18   Dr. McLaughlin, and in regard to these particular issues, in

19   part they have to be guided by legal principles.  But just as

20   I stated before, I alone will decide the rules of law that

21   apply to this case.  You must base your decision on the

22   evidence in the case and the Court's instructions about the

23   law of the case.

24            And to that end, as I've repeatedly told you, I'll

25   provide you final instructions; and part of those final

1    instructions will also relate to these issues that both

2    Dr. Proakis yesterday and Dr. McLaughlin spoke to in the

3    slides that each of them used.

4           Now, while we were assembling, we tried to get our

5    backup court reporter here.  She was engaged with another

6    judge; and so that we can give Ms. Hall a little bit of a

7    break, we're going to take a break, too, right now and find

8    out what her status is in terms of joining with us.

9           So we're going to take our morning break a little

10   earlier than what we would have anticipated, and we'll get

11   back on the record here at 11:15.  So if you would, just leave

12   your materials there on your chair and Mr. Galovich will

13   escort you out.

14          Once again, you're going to keep all of those good

15   thoughts about this case in your head until the time that you

16   get to deliberate on this case.

17          All right, Mr. Galovich.

18          MR. GALOVICH, DEPUTY CLERK:  All rise.  This

19   honorable court will recess until 11:15.

20          (Jurors exit courtroom.)

21          THE COURT:  And, Dr. McLaughlin, you can step down,

22   and you know the rule.  You can't talk to any of these folks

23   during your break because you're under oath.

24          THE WITNESS:  Yes.

25          THE COURT:  So we'll go back on the record at 11:15.

1            MR. GREENSWAG:  Thank you, Your Honor.

2            MR. DeFRANCO:  Your Honor, may we have a moment

3     before the jury comes back to speak or --

4            THE COURT:  Please close the door in case any of our

5     jurors leave their room.

6            MR. DeFRANCO:  Your Honor, we will review those

7     slides during the break.  In view of the lack of notice and

8     our position and argument on clear violation of the law and

9     procedures in this case, we would ask for five minutes for

10    cross examination to be added --

11           THE COURT:  You've got it.

12           MR. DeFRANCO:  Thank you.

13           (Whereupon, the morning recess was taken.)

14           (In open court, without jury.)

15           JOHN GALOVICH, Deputy Clerk:  Please be seated.

16           THE COURT:  All right.  Mr. DeFranco, Mr. Johnson,

17    is someone prepared to proceed?

18           Dr. McLaughlin, you can proceed.  You can resume the

19    stand.

20           Bring our jurors back in.

21           JOHN GALOVICH, Deputy Clerk:  Yes, Your Honor.

22           (Juror are brought into open court.)

23           JOHN GALOVICH, Deputy Clerk:  Please be seated.

24           THE COURT:  Okay.  Ladies and gentlemen of the jury,

25    you can see Miss Pease has now joined us.  We're all hooked up

1  and we're ready to go.

2          Mr. DeFranco.

3          MR. DeFRANCO:  Yes.  Just a few questions.

4                    CROSS EXAMINATION

5  Q.     Dr. McLaughlin, you ended your testimony on secondary

6  considerations; remember that?

7  A.     Yes.

8  Q.     That's a discussion to try to overcome or counter an

9  argument that a patent is obvious is that fair?

10 A.     Yes.

11 Q.     You talked about praise and long-standing -- solving a

12 long-standing problem as some of the things you relied on; you

13 remember that?

14 A.     Yes.

15 Q.     Now, you were here for the testimony during this case

16 where we heard that no specific company has ever expressed

17 interest in the technology claimed in the Kavcic patents.

18 Were you here for that testimony?

19          MR. McELHINNY:  Objection to the characterization.

20          THE COURT:  Overruled.  This is cross.

21 Q.     Were you here for that testimony, sir?

22 A.     Yes.

23 Q.     And you were here for the testimony that no company in

24 the industry has ever actually taken a license to the Kavcic

25 patents.  Were you here for that, sir?

A.      Yes.

Q.      And as a matter of fact, you were here for the testimony that the companies that have not taken a license, included the company on which Dr. Kavcic serves as a member of the advisory board, Lincoln Media.  Were you here for that, sir?

A.      I don't remember that specific piece.  But yes, yes, I was -- I've been here, yeah.

Q.      Let's shift gears.  Part of your work on this case, sir, you examined the file histories to the patents in suit in this case; right?

A.      Yes.

Q.      You testified about an e-mail from Dr. Worstell, the same Dr. Worstell who altered the patent that Marvell relies on as invalid; is that correct, sir?

A.      That's correct.

Q.      That e-mail, if my memory is correct, is April, 1997; is that right, sir?

A.      I believe so, yes.

Q.      That was before or -- the prosecution of the patents we're talking about here.  Isn't that fair, sir?

A.      I believe so, yes.

Q.      And Dr. Worstell was talking about his work, wasn't he, in that e-mail?

A.      Yes.

1    Q.     And his work was widely known in the industry; wasn't

2    it, sir?

3    A.     That, I'm -- I can't attest to.

4    Q.     Do you deny on this record, sir, that the inventors in

5    this case knew about Dr. Worstell's work before they applied

6    for their patents?

7            MR. McELHINNY:  Objection, calls for state of mind.

8    Q.     Do you have --

9            THE COURT:  Sustained.

10   Q.     Do you have an answer for that; yes, or, no?

11           THE COURT:  Sustained.  The question has been -- the

12   objection has been sustained.  Rephrase Mr. DeFranco.

13   Q.     You have a view, one way or the other, where

14   Drs. Kavcic and Moura were aware of Dr. Worstell's work

15   generally?

16           MR. McELHINNY:  Same objection, Your Honor.

17           THE COURT:  Sustained.

18   Q.     We saw from that e-mail that CMU was aware of the work

19   by Dr. Worstell.  Do you see is that --

20           MR. McELHINNY:  Your Honor, same objection.

21   Q.     -- in the e-mail, Dr. McLaughlin?

22           THE COURT:  Sustained.

23   Q.     May I ask you this, you reviewed the file history; did

24   you?

25   A.     Yes, yes.

1    Q.      Did you see any evidence in there that during the

2    prosecution, the Patent Office was informed of the work of

3    Dr. Worstell in any respect?

4    A.      I don't believe so.

5    Q.      Okay.  You talked about, on direct examination,

6    technical issues.  Obviously, that's what this case is all

7    about.  You talked a bit about transition noise in the

8    Worstell patent.  You remember that?

9    A.      Yes.

10   Q.      And you talked a little bit about signal dependent

11   noise.  You remember that?

12   A.      Yes.

13   Q.      You would agree, wouldn't you, Doctor, that transition

14   noise discussed in Worstell's is signal dependent?  Would you

15   agree what that; yes, or, no?

16   A.      It's a type of signal dependent noise, yes.

17   Q.      Qualifications.  Talked about your qualifications.

18   You're qualified as an expert in signal processing; is that

19   right?

20   A.      That's correct.

21   Q.      You were here for Dr. Proakis.  Obviously, he's -- he's

22   designated also or qualified also as an expert in signal

23   processing; true?

24   A.      Digital signal processing.

25   Q.      Yes, sir.

1   A.      Which is what his were.

2   Q.      In addition, though, he was qualified as, by this

3   Court, as an expert in this read channel technology isn't that

4   true?  Were you here for that?

5   A.      I'll take your word for it.  I don't - I was here for

6   that, yes.

7   Q.      You were not qualified as a read channel expert?  Do

8   you remember that?

9   A.      I believe that's correct.

10  Q.      Let's put up D Demo slide 12-3, please.

11          You were here when Dr. Proakis talked about his

12  qualifications and talked about his extensive experience

13  designing read channel systems; weren't you, sir?

14  A.      Yes.

15  Q.      He has more practical experience, real world experience

16  designing actual read channels than you do.  Isn't that fair,

17  sir?

18  A.      I don't think that's fair.

19  Q.      You would disagree with that?

20  A.      I disagree with that.

21  Q.      We'll let the record stand on that.

22          You also talked about -- let's put up the slide on the

23  law, please.  This is Dr. McLaughlin's slide on the law.

24          This is your summary of the law overall; right?

25  A.      Part, yeah.

1   Q.      You talked about ordinary skills.  The claims are

2   analyzed in the patent and read from the perspective of one of

3   ordinary skill in the art; right?

4   A.      Yes.

5   Q.      You don't dispute that Dr. Proakis is one of ordinary

6   skill in art?

7   A.      I do not dispute that.

8   Q.      Okay.  And were you here when Dr. Proakis gave this

9   specific testimony?  Let me read it to you:  Worstell does, in

10  fact, take into account signal dependent noise.  He described

11  this as a further modified branch metric function in Column 10

12  of his patent, and he says that in order to take

13  signal-dependent noise into consideration, you just simply

14  take Equation 20, you multiply it, when you scale those, you

15  scale those branch metrics that have signal dependent noise by

16  a fraction, which depends on the transition noise standard

17  deviation.

18          Were you here for that testimony?

19  A.      Yes.

20  Q.      And you, obviously, disagrees with that testimony; yes,

21  or, no, sir?

22  A.      That was a mouthful.  So maybe we have to dissect that

23  kind of piece by piece.

24  Q.      Well, in the interest of time, sir, if you can't say,

25  you can't say.  But you were here for that testimony?

1   A.      I was here for that testimony.

2   Q.      Thank you very much.

3           THE COURT:  Mr. McElhinny, any redirect?

4           MR. McELHINNY:  No redirect, Your Honor.

5           THE COURT:  All right, then.  Dr. McLaughlin, you

6   may step down.  May Dr. McLaughlin be excused at this time?

7           MR. McELHINNY:  Yes, Your Honor.

8           THE COURT:  All right.  Dr. McLaughlin, you may also

9   be excused.

10          Does anyone want to retrieve Dr. McLaughlin's

11  binder?

12          MR. GREENSWAG:  I'll get it, Your Honor.

13          THE COURT:  Before we go any further, we do have a

14  technology problem.  I'm just getting a signal, wireless

15  connection successful.

16          All right.  Okay.  Miss Gay asked for a sidebar.

17          (Sidebar conference was held on the record:

18          MISS GAY:  Your Honor, I just wanted to make sure

19  that we understand the ground rules for Miss Lawton.  So, I'll

20  be back up here again, actually, before I start my cross, but

21  as I understood it, the Court said nothing relating to

22  Mr. Hoffman and the numbers at this point, because they have

23  been fully vetted.

24          Is that -- I just want to make sure that's clear.

25          THE COURT:  That's exactly what I said this morning.

1  We've talked all about the numbers every which way.  We have

2  talked about the 2.16, everything else.

3          What she is supposed to be addressing is whatever

4  Sutardja said, and whatever Baqai said.  All right.  That is

5  what she is going to be talking about.  Question, answer,

6  question, answer.  No narratives.

7          MISS GAY:  There's been a lot I have --

8          THE COURT:  Is there a slide dispute?

9          MR. JOHNSON:  We have no idea what exhibits or

10  slides they are going to use.

11          MR. McELHINNY:  I told them last night I was going

12  to put this Chart 8 from her report.

13          THE COURT:  Chart 8.

14          MR. McELHINNY:  Yes.

15          MISS GAY:  I didn't hear that last night.

16          MR. McELHINNY:  Well, I know we sent the e-mail to

17  Mr. DeFranco.  I don't know -- I think we sent it to the whole

18  team.

19          THE COURT:  Pull Chart 8.

20          MISS GAY:  Let's just take a look at that now,

21  because we haven't seen that.

22          MR. McELHINNY:  And then, I was going to use

23  Schedule 24, which has already been used on numerous

24  occasions.  And in fact, the first time it was used both by

25  Marvell.  And I expect to use P Demo 13, Page 3.

1          MISS GAY:  So, we would like to take a look at all

2    of those, because that's news to me.  If we got the e-mail, I

3    certainly haven't seen it.

4          MR. McELHINNY:  Two of the three are ones that have

5    been used already in the case.

6          MR. JOHNSON:  With her?

7          MR. McELHINNY:  I think -- I can't remember whether

8    24 was used with her.  I know P Demo 13 at 3 was used with

9    her.

10          MR. JOHNSON:  How about Chart 8?

11          MR. McELHINNY:  No, we haven't used that before.

12    It's in her report.  That's the one I disclosed to you last

13    night, because we hadn't used it yet.

14          THE COURT:  Okay.  I was just handed a binder,

15    Schedule 24.

16          MR. JOHNSON:  Do you have a binder?

17          THE COURT:  Chart 8, Schedule 38 --

18          MR. McELHINNY:  The rest of it, Your Honor --

19          THE COURT:  -- which I couldn't read the first time

20    it was shown.  P306, and P307.

21          MR. McELHINNY:  And Your Honor, I don't think we're

22    going to go there.

23          THE COURT:  So, which are we using now?

24    Schedule 24.

25          MISS GAY:  We -- all of these have numbers on them,

1    Your Honor.  I thought we were staying away from that.

2              THE COURT:  Schedule 24, okay.  And then --

3              MR. McELHINNY:  Chart 8.

4              THE COURT:  Chart 8.  Okay.

5              MR. McELHINNY:  Then P Demo 13.

6              THE COURT:  The question is, what is your proffer?

7    How is Schedule 24 impacted by Sutardja and Baqai?

8              MR. McELHINNY:  Well, Your Honor, Mr. Baqai

9    testified about one of the chips on the Western Digital slide.

10   I think it's the Grand Slam 3.  And he was not in position to

11   talk about the rest of the chips.

12             I want Miss Lawton to talk about her analysis of the

13   Western Digital sales from the Marvell's financial records,

14   vis-a-vis the different programs.  So that's what she is going

15   to testify about.

16             THE COURT:  He only addressed Grand Slam 3.  I

17   remember that.

18             MISS GAY:  He didn't testify as to any specific

19   numbers as to that, Your Honor.

20             MR. McELHINNY:  Exactly the point.

21             THE COURT:  And thence, Chart 8.  What is the

22   proffer on this.

23             MR. McELHINNY:  Your Honor, Chart 8 is part of

24   Miss Lawton's response on Dr. Sutardja's testimony regarding

25   the success of Marvell being attributable to SoC's.

1              MISS GAY:  What specifically is she going to say?

2     Because let me just make my record.  The Court has already

3     ruled that she's not a technical expert.  To the extent

4     there's any industry testimony here, she has to rely on

5     Bajorek, who didn't testify about anything here.

6              MR. McELHINNY:  She is going to talk about her

7     analysis of the business situation and Marvell's financial

8     records, and that's what she has been doing, and that's

9     entirely consistent with her past testimony on the subject.

10             MISS GAY:  Your Honor, the Court has ruled in the

11    meantime that to the extent she has no technical expertise,

12    and to extent she talks about the semiconductor and chip

13    market, or the must-have nature of the subject, it has to be

14    from Bajorek.

15             Dr. Bajorek expressly disavowed an opinion on

16    Western Digital, and he also did not comment on Dr. Sutardja's

17    testimony.

18             MR. McELHINNY:  Because he hadn't heard it yet.

19             MISS GAY:  Well, and the Court specifically ruled

20    she cannot express her own opinions on these matters.

21             THE COURT:  In terms of technology, certainly.

22             MR. JOHNSON:  But in terms of the business

23    situation, Your Honor.  Now we're crossing over the line.  I

24    mean, Dr. Sutardja talked about SoC's and in integration from

25    the technical standpoint.  This witness can't talk about the,

 1   whether the integration or otherwise contributed to the
 2   success.  She has no technical background or experience even
 3   in the business, and now, we're talking about the numbers
 4   here.
 5              THE COURT:  Okay.  Well --
 6              MR. JOHNSON:  That is what she is doing.
 7              THE COURT:  How does she get in in terms of How many
 8   Marvell SoC units were implemented?  Where does she derive
 9   that from?
10              MR. McELHINNY:  From the records.
11              THE COURT:  She can talk about numbers, in light of
12   this, as it relates to Sutardja and Baqai.
13              All right.  Now, Schedule 38; in, or, out?
14              MR. McELHINNY:  You, as I understand Your Honor's
15   ruling --
16              THE COURT:  We've already talked about this, for
17   what it's worth.
18              MISS GAY:  Extensively.
19              MR. McELHINNY:  As I understand your Honor's ruling,
20   I'm not permitted to go there.  If I am, I'm happy to do it.
21   But I thought from the ruling this morning, she was not going
22   to talk about it.
23              THE COURT:  That was my ruling.  Plus, as I said,
24   it's very difficult to read, at best.
25              Right now, are we doing anything with P306 and P307?

1          MR. McELHINNY:  I don't think so, given the time I

2     have been allotted.

3          THE COURT:  I allotted for her.  All right.

4          How about P Demo 13, Page 3?  It's also not in this

5     binder.

6          MR. McELHINNY:  It's this one, Your Honor.  It's

7     already displayed.

8          THE COURT:  This is based on the SoC, again?

9          MR. McELHINNY:  Yes.

10          THE COURT:  This is to rebut what Sutardja and Baqai

11     had to say?

12          MR. McELHINNY:  Absolutely, Your Honor.

13          THE COURT:  All right.  It comes in.  It can be

14     used.  All right?

15          MR. GREENSWAG:  Your Honor --

16          MISS GAY:  Your Honor, with respect to that,

17     obviously, Miss Lawton is in a different situation than

18     McLaughlin, in that McLaughlin was long, seemed to be a

19     rebuttal testimony on invalidity, which, of course, is

20     traditional in patent cases.  But in terms of Miss Lawton's

21     testimony, this was brought up for the first time, and we had

22     less than an hour to go.  I would request an extra ten minutes

23     on her.

24          MR. McELHINNY:  Your Honor, they had anticipated we

25     were going to have rebuttal in this case.

1          MISS GAY:  Not Miss Lawton.

2          MR. McELHINNY:  I don't know why, because you put in

3     a whole bunch of new evidence and new theories in your case,

4     A.

5          B, that's a risk you take, that we're going to have

6     rebuttal.

7          C, with respect to the five minutes, and we really

8     have a question as to whether the five minutes that got added

9     on during -- for McLaughlin are, should have properly been

10    added on, because he didn't ask him a single question about

11    the slides, which was the whole genesis of that whole five

12    minute deal.

13         MR. GREENSWAG:  Right.

14         MR. McELHINNY:  So, this is just another --

15         MR. GREENSWAG:  Didn't ask him about the slides that

16    he used.  That was the point you made.

17         MR. McELHINNY:  This is just a whole, another, don't

18    count it against us, Your Honor.

19         MR. GREENSWAG:  Count it against CMU; don't count it

20    against us.

21         MR. McELHINNY:  Excuse us.  I honed down

22    significantly what we wanted to do with Miss Lawton, because

23    we want to adhere to the time limitations.  They don't get a

24    free pass here.

25         MR. GREENSWAG:  The five minutes should be taken

1    back, because the whole purpose of the five minutes on cross

2    examination for McLaughlin was so they could respond to the

3    two slides that Dr. McLaughlin used, which they objected to.

4    They didn't ask him a single question about those slides, or

5    frankly, about those issues.

6            Those slides had to do with how does Kavcic work,

7    and how does Worstell work.  What they did with their

8    testimony -- what they did with their examination is attempt

9    to use Dr. McLaughlin to rehabilitate Dr. Proakis' reputation.

10   That had nothing to do with those slides.  That should come

11   off their clock.

12           MR. JOHNSON:  The part that Mr. DeFranco asked about

13   related to the testimony from Dr. Proakis goes right to the

14   heart of the slides that they used.  It's exactly the same

15   point.  And the witness said that he, he didn't, didn't know

16   whether he would agree or not agree with that testimony.

17   Relates exactly to those slides.  It's the whole point of

18   that.  That's just -- that is just not correct.

19           Going back to the issue of this Miss Lawton, again,

20   it's ten minutes; right?

21           MR. GREENSWAG:  It's always ten minutes.  It's five

22   minutes, it's three minutes, it's zero minutes.

23           THE COURT:  One at a time.

24           MR. JOHNSON:  We're always differential.  Whenever

25   they interrupt, we let them talk.  But we would like to be

1    heard on this.

2            We did not understand that, and frankly, this is the

3    first time -- maybe it's just me -- the first time in 22 years

4    of practicing that a damages expert comes back to rebut

5    testimony.  So the fact that we could foresee this in our case

6    and set aside time to address the issues; she's going to go on

7    the stand, and we have no idea, really, what she's going to

8    say to address these points, on slides they have identified

9    for us for the very time.

10           We're now here asking for ten minutes to do the

11   cross, so the jury has the benefit of hearing the whole story.

12   We think, one, it's within your discretion, Your Honor.  But

13   we would ask that we be given the opportunity to -- Miss Gay

14   be given the opportunity to address those points.

15           THE COURT:  Mr. McElhinny, how long are you going to

16   take on your direct?

17           MR. GREENSWAG:  Seven minutes.

18           MR. McELHINNY:  If Mr. Greenswag has his way, it's

19   going to be seven minutes.  I suspect it might be a little

20   longer than that.  I don't really know.

21           MR. GREENSWAG:  Because we're sticking to the rules.

22           MR. McELHINNY:  We might have multiple objections.

23   I'll see what I can do.  I'm going to be in and out as quickly

24   as I can.  But they are not entitled to more time than they

25   have already gotten.

1          MR. GREENSWAG:  They have already gotten an extra
2     five hours, and that was --
3          MR. McELHINNY:  That was plenty.
4          MR. GREENSWAG:  -- over our objection.
5          MISS GAY:  Your Honor, this witness has been on the
6     stand, before she takes the stand now, for seven plus hours,
7     six of which were on direct.
8          THE COURT:  I appreciate that.  You're going to get
9     the time to cross her.  Okay.  But she's not going to give
10    long-winded answers.  All right?
11         MISS GAY:  Do you want us back up here again before
12    I begin, to tell us how much time?
13         THE COURT:  Why am I going to tell you how much
14    time?
15         MISS GAY:  All right.  Thank you.
16         THE COURT:  You're going to do your direct, ten
17    minutes; you're going to do your cross, ten minutes.  Okay.
18         MISS GAY:  Thank you, Your Honor.
19         THE COURT:  They are going to get ten minutes to do
20    the cross on this lady.
21         MR. GREENSWAG:  So, do we get ten minutes added to
22    our clock?
23         THE COURT:  We'll take about that later; okay?
24         Let's get this done.
25         (Sidebar conference concluded.)

 1              THE COURT:  All right.  Mr. McElhinny, ready to

 2     proceed?

 3              Miss Lawton, if you'll step forward, please.

 4              Mr. McElhinny, you are calling Miss Lawton as your

 5     next rebuttal witness; correct?

 6              MR. McELHINNY:  You anticipated that, Your Honor.

 7              THE COURT:  All right.  CMU does call Miss Lawton

 8     for its rebuttal case.

 9              JOHN GALOVICH, Deputy Clerk:  Please state and spell

10     your name for the record again, ma'am.

11              THE WITNESS:  Catharine Mary Lawton.

12     C-A-T-H-A-R-I-N-E, M-A-R-Y, L-A-W-T-O-N.

13              JOHN GALOVICH, Deputy Clerk:  Please raise your

14     right hand.

15              THE COURT:  All right, Mr. Verdini.

16              Miss Lawton, welcome back to the stand.  You know

17     the rules.  Adjust the microphone down from where

18     Dr. McLaughlin had it.  And you have a binder.  The Court

19     already has her binder.

20              Mr. McElhinny.

21                         * * * * *

22                      REBUTTAL TESTIMONY

23              CATHARINE M. LAWTON, a witness herein,

24     having been first duly sworn, testified as follows:

25                      DIRECT EXAMINATION

1   BY MR. McELHINNY:

2   Q.      Good morning, Miss Lawton.

3   A.      Good morning.

4   Q.      Miss Lawton, were you here for the testimony of

5   Mr. Baqai of Western Digital?

6   A.      Yes, I was.

7   Q.      Did you hear his testimony regarding the Grand Slam 3

8   chip?

9   A.      Yes, I did.

10  Q.      Did you review Marvell's records of sales to Western

11  Digital for the number of chips sold and when they were sold?

12  A.      Yes.

13  Q.      And the Schedule 24 to your report reflect some of that

14  information?

15  A.      Yes.

16          MR. McELHINNY:  Your Honor, if we could display

17  Schedule 24, which we're going to mark as P Demo 20, because I

18  don't think we've been able to find in the record that it's

19  been marked yet.

20  Q.      Miss Lawton, let me direct your attention to the top of

21  P Demo 20.  The top quarter there, where we have the "WD", all

22  the way across.

23          What does this reflect, Miss Lawton, with respect to

24  sales to Western Digital?

25  A.      This reflects the sales to Western Digital that include

1   an MNP or an NLV-type technology.

2   Q.      Okay.  And the top line, I see a reference to Grand

3   Slam 3?

4   A.      Yes.

5   Q.      What does that reflect with respect to the timing and

6   number of chips sold to Western Digital for the Grand Slam 3?

7   A.      The design went out on Grand Slam 3 was in July of

8   2004, and the total number of chips sold in accord with that

9   program were about 29 million.

10  Q.      So, July of 2004.  And did you hear Mr. Baqai testify

11  that he left the division of Western Digital with the sell

12  read channels in 2005?

13  A.      Yes.

14  Q.      And that -- what was the number of Grand Slam 3 chips?

15  A.      29 million.

16  Q.      And what's the -- what are the other categories of

17  chips here on Schedule 24, where Western Digital was a

18  customer?

19  A.      The other items listed here are other programs, and

20  they reflect chips that include MNP or NLV-type chip,

21  including the EMNP.

22  Q.      And did you take a look at the total number of chips

23  sold under these various programs?

24  A.      Yes.

25  Q.      And what is the timing of those sales vis-a-vis the

1  Grand Slam 3?

2  A.      They all come later in time; from August of '04 through

3  September of '09.

4  Q.      So, this One million unit category, what does that

5  reflect in terms of the timing of the sales to Western

6  Digital?

7  A.      That, that time is the time of the design win.

8  Q.      That's the design win.

9  A.      Yes.

10  Q.      That's when they shipped a million units?

11  A.      Yes.

12  Q.      Now, Miss Lawton, you said that the Grand Slam 3 was a

13  about 29 million chips?

14  A.      Yes.

15  Q.      What percentage of that is that of all the other sales

16  to Western Digital?

17  A.      About one percent.

18  Q.      Okay.  Now, Miss Lawton, did you investigate further

19  the business situation between Western Digital and Marvell at

20  this time, in this time frame here with the Grand Slam 3 chip?

21  A.      Yes, I did.

22  Q.      And what did you find?

23  A.      I found that with respect to the Grand Slam 3, that

24  that was --

25            MISS GAY:  Objection; foundation, Your Honor.  Could

1    we have a quick sidebar, please?

2            (Sidebar conference was held on the record:

3            MISS GAY:  Can we have a proffer on what her answer

4    would be?  Because she's not to testify as to the state of the

5    industry here.

6            MR. McELHINNY:  I don't think that's the Court's

7    ruling, No. 1.

8            No. 2, she's going to talk about the business

9    situation in terms of what she discerned from Marvell's files

10   regarding who the competitors were, what the -- what the time

11   line looked like, and what the results were.  I mean, it's all

12   based on the documents that she's read from Marvell's own

13   files.

14           MISS GAY:  Your Honor, the Court specifically ruled,

15   in granting in part and denying in part Marvell's motion on

16   Miss Lawton's, the breadth of her testimony, that she cannot

17   testify as to anything in the industry, any state of the art,

18   anything relating to must-have, unless she is basing that on

19   Dr. Bajorek's testimony, who -- Dr. Bajorek has not been

20   recalled here, nor requested to be in rebuttal.  She cannot

21   comment on what she thinks the state of the industry is.

22   Absolutely, that's the --

23           MR. McELHINNY:  It's not the state of the industry,

24   it's the state of this particular business relationship.  And

25   it's clearly based on Marvell's files.

1              MISS GAY:  Bit she's not an expert in that, Your

2    Honor.

3              THE COURT:  She can certainly --

4              MR. McELHINNY:  She testified for six hours on the

5    subject.

6              MISS GAY:  Excuse me?

7              MR. McELHINNY:  She testified for six hours on the

8    subject.

9              MISS GAY:  Yes, she did, and that's another point.

10   And it was, it was heavily objected to by us, but --

11             THE COURT:  Yes, it was.  And to that end, she's

12   allowed to talk about the business relationship.

13             If you want me to remind her she's not a technical

14   expert, I can do it.

15             MR. McELHINNY:  Sure.

16             MISS GAY:  But --

17             MR. GREENSWAG:  Thank you, Your Honor.

18             (Sidebar conference concluded.)

19             THE COURT:  Miss Lawton, just let me remind you that

20   you're being offered relative to your expertise in the

21   business realm.  You're not a technical expert.  And so, to

22   that end, to the extent that Mr. McElhinny's questions might

23   raise for you issues concerning the technology involved, just

24   let me remind you that your focus is in the business realm.

25   BY MR. McELHINNY:

1   Q.      Okay.  Miss Lawton, I think the pending question was,

2   what did your investigation regarding the business situation

3   at the time reveal?

4   A.      My investigation revealed that at the time Marvell was

5   competing with other suppliers for Western Digital's business,

6   and those other suppliers included Agere,

7   ST Micro-electronics, and IBM.  And Marvell was competing with

8   those suppliers all the way through the time from mid-2001

9   through to the latter part of 2002.

10  Q.      Okay.  And what did it -- were there -- was Marvell

11  competing with Cirrus Logic?

12  A.      At that point in time, Cirrus Logic had been the

13  supplier of read channels to Western Digital from 1996 until

14  late -- early 2001, when Cirrus Logic withdraw from.

15          MISS GAY:  Your Honor, objection; foundation.

16          THE COURT:  Sustained.  Mr. McElhinny, you want to

17  back-up a little bit and lay a little foundation.

18          MR. McELHINNY:  Your Honor, why don't I move to

19  another area.  We'll jump straight to Dr. Sutardja's

20  testimony.

21  Q.      Miss Lawton, did you hear the testimony of Dr. Sutardja

22  regarding the role of the SoC's in Marvell's success?

23  A.      Yes, I did.

24  Q.      Is that a subject you addressed in your repot?

25  A.      Yes, extensively.

1  Q.      Did you prepare a Chart 8 in your second supplemental

2  report?

3  A.      I did, yes.

4  Q.      What, and what is that chart based on?

5  A.      That chart is based on Marvell's internal accounting

6  records, which show its shipments of the of SoC's.

7  Q.      And would that chart help explain your testimony to the

8  jury?

9  A.      It would, yes.

10         MR. McELHINNY:  Your Honor, may I display Chart 8,

11  please?

12         THE COURT:  You may.

13  A.      Yes.

14  Q.      Miss Lawton, Chart 8 is P Demo.  It's been marked as

15  P Demo 21, for the record.  What does this chart reflect?

16  A.      This chart reflects all of Marvell's shipments of read

17  channels during the period, January of 2000 through December

18  of 2002.

19  Q.      Let me stop you.  You said, read channel?

20  A.      I'm sorry, SoC's.

21  Q.      So what, now what does P Demo 21 reflect?

22  A.      It reflects all of Marvell's shipments of units of

23  SoC's shipped to Hitachi, Fujitsu, Samsung, Toshiba, and

24  Western Digital, from January, 2002 to December of 2002.

25  Q.      And what conclusions, if any, did you draw from this

1   chart?

2   A.      The conclusions that I drew from this chart were that

3   Marvell started working on SoC's, in terms of its actual

4   shipments, in September of 2000 was when Marvell began

5   shipping its first shipments of SoC's.  And that was only 600

6   units.  And that was well after the first company in the world

7   introduced an SoC, which was Cirrus Logic, in June of 1998.

8           MISS GAY:  Objection; foundation, to the last part.

9           THE COURT:  Sustained.

10          MISS GAY:  And I move that that be stricken, please.

11          THE COURT:  Granted.

12  Q.      It's unclear to me what is on the record.  So,

13  Miss Lawton, let's talk about the shipments in 2000.  What did

14  you conclude regarding those shipments in 2000?

15  A.      That Marvell's shipments were relatively low, relative

16  to other competitors, in the marketplace, particularly.

17          MISS GAY:  Again, Your Honor, objection, foundation.

18          THE COURT:  Sustained.  If you want,

19  Mr. McElhinny --

20  Q.      Miss Lawton, what investigation did you do regarding

21  the state of the industry at the time?

22  A.      I did an extensive investigation --

23          MISS GAY:  Again, Your Honor, objection.

24          MR. McELHINNY:  Let me rephrase.

25  Q.      What investigation did you do regarding the business

1   situation in the industry at the time?

2   A.      I did an extensive investigation as to what the

3   situation was with SoC's and --

4               MISS GAY:  Again, Your Honor; objection.  Sidebar,

5   please.

6               (Sidebar conference was held on the record:

7               THE COURT:  Okay.  Miss Gay.

8               MISS GAY:  Your Honor, it's, again, an industry

9   investigation, which the Court has clearly ruled that, to the

10  extent she has anything to talk about here about the

11  comparative state of players in the industry at this time

12  period, or any time period, she must rely on the technical

13  expert, that would have been Bajorek here.  And again, he

14  hasn't been recalled, nor has he commented on any of these

15  specific issues raised in the rebuttal testimony.

16              THE COURT:  Okay.  Mr. McElhinny.

17              MR. McELHINNY:  That's just a misstatement of the

18  Court's ruling, and it's utterly inconsistent with what she

19  was allowed to testimony to at length in her direct.  She's

20  talking about the business situation.  She did exactly what

21  anyone else in this situation does.  She looked at all the

22  records of Marvell, it's internal business records, and the

23  records of others in the industry.

24              She has plenty of foundation for this.  There's like

25  40 pages in her report on the subject.  She's well within the

1    scope of her expertise.  It's all about the business.  And

2    there's no -- she doesn't need to know anything about the

3    technology.

4            THE COURT:  Well, to that end, she needs to direct

5    her answers to Marvell's situation, not the industry as a

6    whole, No. 1.

7            And the more you tell me this is already covered in

8    her report, then, it's not true rebuttal.

9            MR. McELHINNY:  It's covered in -- the background is

10   covered in her report.

11           THE COURT:  I know she covered the background in the

12   report.  And she also relied on Bajorek.  And Bajorek was

13   your, quote, industry expert, who talked about must-have.  So

14   she needs to say, and if the objection is going to continue,

15   foundation, then, she's going to say that in this time period

16   she looked at X, Y, Z document, and this told her that Marvell

17   felt, or Marvell recognized "X" was its competitor, if that's

18   what you want out of this.

19           I thought we were going to just talk about the fact

20   that she disagrees with what Sutardja said on the stand.

21           MR. McELHINNY:  That's where we're trying to get to.

22           THE COURT:  We're going far afield.

23           MR. McELHINNY:  We're trying to demonstrate what

24   she's going to talk about, what she knew in the business

25   situation.  In order to demonstrate that --

1          THE COURT:  What is the proffer?

2          MR. McELHINNY:  The proffer is that these SoC's,

3     Marvell was shipping SoC's well before --

4          THE COURT:  Which is what the chart shows.

5          MR. McELHINNY:  Well, before it experienced success.

6     That Marvell was not the first person to ship SoC's.

7          MR. JOHNSON:  She can't say that.

8          THE COURT:  You already tried that, and I sustained

9     the objection.  And she's already blurted out, it was Cirrus,

10    it's IBM.  Bajorek should have been talking about that.

11         MR. McELHINNY:  Well, based on her study of that SEC

12    documents that reflect exactly that.

13         MR. JOHNSON:  Bajorek is the --

14         THE COURT:  We haven't heard anything about SEC

15    documents.

16         MR. JOHNSON:  Bajorek is the industry expert, not --

17         THE COURT:  Why can't she just focus on this chart

18    and interpret the numbers on this chart; right?

19         MR. GREENSWAG:  Because it's the context, Your

20    Honor.  Because this is their new damage theory, which was in,

21    in Mr. Hoffman's report, and didn't pop out in anybody's mouth

22    in the case until Dr. Sutardja said, our success is a result

23    of the, the introduction of the SoC.

24         What she is entitled to do, and wasn't in your

25    witness proffers, it was never in the witness proffers that

1   were submitted to the Court in pretrial statement, the first

2   time this theory came up was in -- when Dr. Sutardja

3   testified.  And it's been repeated by everybody, and it was

4   never in Mr. Hoffman's report.  She looked at public records

5   and found out what was really going on with the SoC situation.

6   That is true rebuttal.

7          MR. JOHNSON:  She's not an expert in the industry.

8   She can't come in and talk about the testers.

9          MR. GREENSWAG:  She can read SEC statements.  She's

10  got experience; her finance, and background, and her expertise

11  in this field.  And what she can rely on, these are perfectly

12  reliable documents.  She can look at other people's public

13  financial records and see what they said about their sales.

14         But if she says she looked at them, then, she should

15  get that in.

16         MR. JOHNSON:  This is missing a step.  Dr. Bajorek

17  is not here, the industry expert.  She was proffered, the

18  Court accepted her as an expert on IP damages.

19         THE COURT:  Intellectual property damages; correct.

20         MR. JOHNSON:  Not the business.

21         THE COURT:  Not the industry, industry cycle.

22         MISS GAY:  Just --

23         THE COURT:  Seems to me that she could get to the

24  point, and in some fashion she, she's going to be drawn to the

25  attention of this.  She's got this SoC.  Why does she call it,

1    SoC?  What documents did she look at that were from Marvell

2    that reflected SOC's?  How did she generate these numbers?

3    That's, I think, all we need to do with that.

4              MR. McELHINNY:  All right.  Thank you.

5              MISS GAY:  I need this to be clear, because -- just

6    because it was in her report, the Court struck that part of

7    her testimony and said she wasn't qualified to go that far.

8    Just to completely say, over and over again, it was in her

9    report, is not a sufficient basis.  I just want to make that

10   clear.

11             MR. JOHNSON:  It's not rebuttal if it's in the

12   report.

13             THE COURT:  Okay.

14             (Sidebar conference concluded.)

15   BY MR. McELHINNY:

16   Q.    Miss Lawton, just focusing your attention on Chart 8, I

17   think Dr. Sutardja testified about the impact of the SoC's on

18   Marvell's success.

19   A.    Yes.

20   Q.    And what does this chart show with respect to when

21   SoC's were first shipped?

22   A.    The chart shows that the first shipments occurred

23   beginning in September of 2000.

24   Q.    And what does the chart show with respect to when

25   Marvell experienced success?

1    A.      Marvell's success in the SoC shipments came

2    significantly after this point in time.

3    Q.      And how does that chart -- how does that time line

4    relate to the implementation of the MNP?

5                MISS GAY:  Objection, Your Honor; foundation.

6                THE COURT:  Sustained.

7    Q.      Did you look at business records, Miss Lawton,

8    regarding when the MNP was implemented?

9    A.      Yes, I did.

10   Q.      And in fact, Schedule 24 showed those dates; correct?

11   A.      Yes.

12               MISS GAY:  Objection; leading, Your Honor.

13               THE COURT:  Sustained.

14   Q.      What did Schedule 24 show with respect to those dates,

15   Miss Lawton?

16   A.      Schedule 24 shows the dates of the design wins for the

17   program that is included the MNP.

18   Q.      And can we put that up briefly?  Well, actually, and

19   what does it reflect vis-a-vis the Marvell's success here?

20               MISS GAY:  Objection, Your Honor; foundation as to

21   Marvell's success.

22               MR. McELHINNY:  Let me rephrase.

23               THE COURT:  Good idea, Mr. McELhinny.

24   Q.      What is the time line regarding the installation of the

25   MNP shown vis-a-vis the chart that is Chart 8?

1    A.     It shows that there was significantly greater volume of

2    SoC's that were sold on the programs that are on Schedule 24.

3    The total chips that are reflected here, I think the number is

4    through August of 2002.  Marvell's total shipments of SoC's

5    were only two-million.

6    Q.     And how about after that?

7    A.     After that, Marvell's shipments of SoC's that include

8    the MNP and the NLV are 1.4 billion, I think the number is.

9    Q.     And so, the .4 billion is the SoC's.  And then, on top

10   of that is the read channel chips; correct?

11   A.     Yes.

12   Q.     That's how you get to the 2.34 billion?

13   A.     Yes.

14          MR. McELHINNY:  No further questions.

15          THE COURT:  Cross, Miss Gay?

16          MISS GAY:  Your Honor, may I have just a moment?

17          THE COURT:  Certainly.

18          MISS GAY:  Thank you, Your Honor.

19                        CROSS EXAMINATION

20   BY MISS GAY:

21   Q.     I was hoping it would be good morning, Miss Lawton.  I

22   think it's just about, we're about to switch over.  But good

23   afternoon.

24   A.     Good afternoon.

25   Q.     Now, Miss Lawton, you are CMU's last witness in this

1    case; is that right?

2            MR. McELHINNY:  Objection.  Relevance.

3    Q.     Okay.  Let me just withdraw that.

4            CMU called you twice in this case; is that right?

5            MR. McELHINNY:  Same objection.

6            THE COURT:  Sustained.

7    Q.     Okay.  You've never worked at CMU?

8    A.     That's correct.

9    Q.     And you never worked at Marvell?

10   A.     That's correct.

11   Q.     Never worked at Western Digital?

12           MR. McELHINNY:  Not within the scope, Your Honor,

13   and asked and answered.

14           THE COURT:  Sustained.

15   Q.     Now, you heard Mr. Baqai's testimony that the MNP and

16   NLV were never factors, never factors in Western Digital's

17   purchase of chips from Marvell.  Were you here for that?

18   A.     I was, yes.

19   Q.     Okay.  And you heard Mr. Baqai testify that he was

20   certainly not willing to pay anything for the MNP; is that

21   right?

22   A.     I heard that testimony, yes.

23   Q.     And that it was not a must-have feature for Western

24   Digital; is that right?

25   A.     I heard that.

1    Q.      You heard that?

2    A.      I heard that testimony, yes.

3    Q.      And you agree that Mr. Baqai works for Western Digital,

4    worked for -- and that you have never worked for them; right?

5    Is that right?

6    A.      Yes.

7    Q.      Okay.  And you also agree that Western Digital accounts

8    for about 50 percent of Marvell's sales, according to the

9    chart you put up this morning?

10   A.      Absolutely.

11   Q.      Okay.  Now, you also -- in your report you said that

12   you've based many -- much of your analysis in this case on the

13   approach described by Dr. Armstrong of Marvell, is that

14   correct, in terms of how you priced this?

15           MR. McELHINNY:  Objection; scope.

16           THE COURT:  Sustained.

17   Q.      Okay.  Well, would you agree that pricing is on a

18   customer by customer basis?

19   A.      Yes.

20   Q.      Now, let's put up P Demo 13, please.  Okay.  And maybe

21   we can make that just a little bit bigger.

22           And you were here for the testimony that, when

23   Marvell's senior management said that the biggest technical

24   achievement for the company was the SoC.  Were you here for

25   that?

1    A.      I was here for all the testimony.

2    Q.      Okay.  And you were here when Dr. Sutardja said that

3    Marvell was the first company to build the SoC chips

4    internally; is that right?

5    A.      My recollection is, he said that Marvell was the first

6    to build an SoC in the world.  And that's just factually not

7    correct.

8    Q.      You were here to hear it was the first company to build

9    the SoC internally; is that right?

10   A.      He said, in the world, and that is not correct,

11   according to my investigation.

12   Q.      Okay.

13          MISS GAY:  Now, Your Honor, I need to get the

14   transcript.

15          THE COURT:  Okay.

16   Q.      Okay.  I'm referring to December 12, 2012, Line --

17   starting with Line 10.  Question:  I'm going to read it to

18   you.  Who was the first company that integrated these

19   different functionalities into an SoC, or system on a chip?

20   Answer:  We were the first company in the business that were

21   able to build these chips, okay, internally.

22          Were you here when he testified to that?

23   A.      Yes, I was.  And that's factually inaccurate.

24   Q.      Now, let me ask you also, with regard to that --

25          MISS GAY:  Actually, Your Honor, I would move that

1    answer be stricken, because it's based on technical expertise.

2              MR. McELHINNY:  Your Honor, she elicited it.

3              THE COURT:  Overruled.

4              MISS GAY:  Okay.

5    Q.    Now, let me show you -- let's put up what Mr. McElhinny

6    just displayed as Chart 8, if we could.  Okay.

7              Now, MNP chips were first sold, according to your

8    testimony, in 2003; is that correct?

9    A.    The first design was in 2003; yes.

10   Q.    So, I'm right on that.  MNP chips were first sold,

11   first designed in 2003?

12   A.    Well, you have to get back into engineering samples.

13   I'm not exactly sure what date you're looking for.  But all

14   the dates are on Schedule 24.

15   Q.    Okay.  And, but with regard to that, again, let me just

16   ask you.  You've done all this analysis.  MNP chips were first

17   sold in what year, around 2003?  They went into -- the design

18   went to run around that period?

19   A.    Yes, absolutely.

20   Q.    So, this chart shows that SoC's were successful

21   starting in -- you have up here.  This is your chart; correct?

22   A.    Yes.

23   Q.    SoC's were being sold in 2001, 2002; right?

24   A.    There were low volume programs that Marvell had in

25   those earlier time periods.  Marvell's first three programs,

1  SoC programs did not make it to volume production.

2  Q.    Okay.  But nevertheless, this, again, is your chart;

3  correct?

4  A.    Yes.

5  Q.    And you've shown here in big red, and green, and purple

6  bars, a bump up of the SoC sales.  They start to go up

7  starting right around January, 2001, and they get bigger, and

8  bigger, and bigger, up through 2002; correct?

9  A.    Beginning in January, 2001, there's approximately

10  200,000 units of total SoC's to two customers; to Toshiba and

11  Hitachi.

12  Q.    Okay.  Right.  So again, just to be clear, again, this

13  is not a chart that Marvell made; correct?

14  A.    No.  This is my chart.

15  Q.    Okay.  It says, Marvell SoC unit shipments to one, two,

16  three, four, five customers, 2000/2002.  Am I reading that

17  correctly?

18  A.    Yes.

19  Q.    Okay.  Thank you.

20      Now, you also heard Mr. Baqai testify here about a

21  number of factors that lead Western Digital to choose

22  Marvell's chips.  Were you here for that?

23  A.    I was, yes.

24  Q.    Okay.  And it was clear from Mr. Baqai's testimony, at

25  least, did you hear, that MNP was not one of those factors; is

1   that correct?

2   A.      Well --

3   Q.      That's what he said?

4   A.      Again, that's --

5   Q.      I'm asking for a, yes, or, no, answer.  Did you hear

6   that testimony?

7   A.      He elicited a number of factors, and his testimony is

8   inconsistent with the testimony of Marvell's witnesses.

9           MISS GAY:  Your Honor, I would ask that that answer

10  be stricken.

11          THE COURT:  Sustained.

12  Q.      Let me ask you again, Miss Lawton, and see if you can

13  give me a, yes, or, no, answer.

14      Dr. Baqai testified to a number of factors that

15  persuaded Western Digital to buy Marvell's chips.  MNP was not

16  one of those factors.  Did you hear that testimony?

17  A.      I heard that testimony, yes.

18  Q.      Thank you.

19          MISS GAY:  No further questions.

20          THE COURT:  Anything further, Mr. McElhinny?

21          MR. McELHINNY:  Yes, Your Honor.

22          Would you put Chart 8 up?

23          THE COURT:  I'm sorry.

24          MR. McELHINNY:  Can I put Chart 8 up?

25          THE COURT:  Chart 8.

REDIRECT EXAMINATION

BY MR. McELHINNY:

Q.      Miss Lawton, I think when Miss Gay was asking you about Chart 8, you said something to the effect of, Marvell didn't get to volume production on the SoC's.

        What did you mean by that?

A.      Marvell did not ship an SoC in volume until July of 2001.  And as of December of 2002, Marvell's total shipments of SoC's to Western Digital was 700 units.

Q.      By what date?

A.      December of 2002.

Q.      Okay.  And this chart, the scale on the side is, shows up to like 1.8 million; is that right?

A.      The scales goes up to two million, yes.

Q.      What's the design win?

A.      One million units, for a program.

Q.      For a program?

A.      Yeah.

Q.      Does this chart reflect design wins for any particular program?

A.      No.

Q.      Can you explain that?

A.      Yes.  The programs are individual part numbers.  You'll see those listed on Schedule 24.  So, a design win is one million units for a part number or program.

1          This reflects all of the volume that Marvell was doing
2    with, for example, the red bars are Hitachi.  So there were a
3    number of different part numbers that Marvell was working on
4    at this time for them.  And as I said, Marvell's first
5    shipment in volume of an SoC to any customer was Hitachi in
6    July of 2001.
7    Q.     So, the volume numbers would be off the chart here to
8    the right?
9    A.     Yes.
10          MISS GAY:  Objection to the leading, Your Honor.
11          THE COURT:  Sustained.
12   Q.     Well then, let's take a look at P Demo 13, Slide 3.
13   Miss Lawton, what does this chart show vis-a-vis when the
14   design wins were for the SoC chips for Marvell?
15   A.     Again, this showed that the design win for Marvell
16   occurred in the later period of time when you get to
17   One million units per chip.  And the dates of those design
18   wins are all on Schedule 24.
19   Q.     Did you give me a little indicator on that?
20   A.     I didn't.  I don't know how that happened.
21   Q.     When it's a touch screen, you touched the top
22   right-hand corner.
23   A.     I don't think I touched the screen.
24   Q.     All right.  In any event, give --
25   A.     The date of the first design win was June of 2003.

1    Q.      Okay.  Now, Miss Lawton, just couple more questions

2    regarding the basis for your testimony, or the basis for your

3    answer to Miss Gay's questions regarding the accuracy of

4    Dr. Sutardja's testimony.

5           What is the basis for your -- for your testimony that

6    Dr. Sutardja gave inaccurate testimony on the timing of

7    whether it was the first SoC company?

8    A.      Several things.  First, the testimony of --

9              MISS GAY:  Objection Your Honor; foundation.

10             Sidebar, please.

11             (Sidebar conference was held on the record:

12             MISS GAY:  May we have a proffer of what the answer

13   is; if it's going into more technological?

14             MR. McELHINNY:  It's her investigation.  It's laid

15   out in her report.  It's the SEC files and other things she

16   looked at.  I was not permitted to go there.  I don't know why

17   Miss Gay did, but she did.  I should be permitted to

18   follow-up.

19             MR. JOHNSON:  She didn't.  I don't know what you're

20   talking about.  But this witness is not, should not be

21   permitted to come in now and testify about industry, who was

22   first, who was second, who was third.  I mean, that has no

23   bearing on what her expertise is.

24             THE COURT:  The answer is going to be, she saw it in

25   the SEC filings of your client.  If that's the answer, it's

1  going to stand.

2          MR. JOHNSON:  It's not going to be the answer, I

3  don't think, Your Honor.

4          THE COURT:  Then once you here --

5          MR. GREENSWAG:  SEC, statements of the competitors.

6          MR. JOHNSON:  So there we go.

7          THE COURT:  Hum.

8          MR. GREENSWAG:  What she looked at.

9          THE COURT:  I thought you were telling me earlier

10  this was the SEC files of Marvell?

11          MISS GAY:  Let's take a look at the filing, then.

12          THE COURT:  Let's hear.

13          MR. JOHNSON:  Are the filings in her report

14  anywhere?

15          MR. McELHINNY:  Yes, absolutely.

16          THE COURT:  No.  There's a lot in her report.

17          MR. McELHINNY:  There's a whole description.  Cirrus

18  Logic filings.  There's a description of the --

19          MISS GAY:  Keep your voice down.

20          MR. McELHINNY:  A section of the Marvell files and

21  the press releases.  I think they also say that Mr. Brennan

22  testified exactly to that.  In fact, I know that she will

23  actually --

24          MR. JOHNSON:  This is completely improper testimony

25  from a expert on IP damages.  To come in now an talk about --

1          MR. McELHINNY:  You elicited it.

2          MR. JOHNSON:  No, we didn't.  They cannot come in

3    now and talk about who's first, second.  I want to go back to

4    what Dr. Sutardja testified.  These questions are completely

5    misleading.  Dr. Sutardja testified Marvell was the first SoC

6    in the read channel business.  Now she's coming in and talking

7    about SoC's in general.  System on chips are used in all kinds

8    of semiconductor companies.

9          MISS GAY:  Just to be clear for the record, I did

10   not mention Dr. Sutardja's name in my cross.

11         MR. GREENSWAG:  Yes, you did.

12         THE COURT:  You read his testimony out loud.  So,

13   objection overruled.  He's going to be able to ask it.

14         (Sidebar conference concluded.)

15   BY MR. McELHINNY:

16   Q.    Miss Lawton, what was the basis of your answer that

17   Dr. Sutardja's testimony regarding Marvell's being the first

18   SOC -- company to develop the SoC was incorrect?

19   A.    The deposition testimony of Marvell's vice-president of

20   sales, Mr. Brennan, testified that the first company to

21   develop SoC was Cirrus Logic.  I also looked at press

22   releases, and after Dr. Sutardja testified, I checked again,

23   just to verify one more time.  And I looked at the Cirrus

24   Logic 10-K's, and they reported the same thing; that in fact,

25   Cirrus Logic was the first company in the world to introduce

1  an SoC.  And that was in June of 1998.

2  Q.     And when you say, 10-K, that's a filing with the

3  government, the Securities and Exchange Commission?

4  A.     It is, yes.

5         MR. McELHINNY:  No further question, Your Honor.

6         THE COURT:  Recross?

7         MISS GAY:  Yes.  Very briefly, Your Honor.  May I do

8  it just from here?

9         THE COURT:  Certainly.

10                      RECROSS EXAMINATION

11 BY MISS GAY:

12 Q.     Put up Chart 8 again.

13        THE COURT:  Chart 8.

14 Q.     Miss Lawton, with regard to your Chart 8 here, the top

15 unit is two million units; is that right?

16 A.     That's correct.

17 Q.     And that your listing that for five separate Marvell

18 clients; is that correct?

19 A.     There are five different customers listed there.  The

20 colors correspond to the segments of the bar that they

21 constitute.

22 Q.     And with regard to that, you're not an expert here

23 today on read channels; are you?

24        MR. McELHINNY:  Objection; asked and answered.

25 Beyond the scope.

1          THE COURT:  Sustained.

2  Q.     Okay.  And you're not in a position, are you, to tell

3  us whether Cirrus itself made an SoC internally; are you?

4  A.     I don't have specific details regarding the activities

5  at Cirrus Logic.  The scope of my investigation has been

6  explained to what I relied on.

7  Q.     So you don't know if Cirrus made internally a read

8  channel and a control chip together.  You don't have any

9  expertise in that; do you?

10 A.     I'm not here as a technical expert, no.

11 Q.     Thank you very much.

12         THE COURT:  Anything else from Miss Lawton?

13         MR. McELHINNY:  No, Your Honor.  Thankfully.

14         THE COURT:  Miss Lawton, then, you may step down.

15 Thank you very much.

16         May Miss Lawton be excused?

17         MR. McELHINNY:  Yes, Your Honor.

18         THE COURT:  Okay.  Miss Lawton, you can also be

19 excused.

20         Now Mr. McElhinny, do you have any further witnesses

21 that you want to call in rebuttal?

22         MR. McELHINNY:  We do not, Your Honor.

23         THE COURT:  Do you have any exhibits you want to

24 enter at this time referencing these two witnesses?

25         MR. McELHINNY:  Your Honor, I think we'll just rely

1    on our demonstratives which we marked, and we understand that

2    they are going to be lodged, so there will be a complete

3    record.

4              THE COURT:  All right.  Any surrebuttal from

5    Marvell?

6              MR. JOHNSON:  No, Your Honor, not given the total.

7    At this point, we would renew --

8              THE COURT:  The entire case has rested.

9              MR. JOHNSON:  I do think there's some exhibit issues

10   that we can deal with outside the presence of the jury, just

11   from an efficiency standpoint.

12             THE COURT:  Okay.  Now, ladies and gentlemen of the

13   jury, we're at that stage of the case where both sides have

14   rested in terms of the evidence that's going to be presented

15   to the jury.  And at this time it's important for the Court to

16   work with the attorneys on some motions, as well as

17   instructions.

18             And so to that end, rather than take up your time

19   this afternoon, we're going to permit you to leave this

20   afternoon, and enjoy the rest of the afternoon.  Do some

21   holiday shopping, whatever you want to do.

22             And to that end, lots will depend on the progress we

23   make this afternoon, whether you come back tomorrow or whether

24   you come back on Thursday morning.  And so, to that end, it's

25   going to be very important that Mr. Galovich can remain in

1    touch with all of you.  And I know that you've already given

2    him your telephone contact information.

3            So, like we have done with other recesses, you're

4    going to leave all of your materials behind.  Mr. Galovich and

5    Miss Sharkey are going to gather those up.  Let me instruct

6    you that during this recess, and any other recess to be, don't

7    discuss this case with anyone, including your fellow jurors,

8    other people involved in the trial, members of your family,

9    friends, or anyone else.  Don't speak with the parties, the

10   witnesses, attorneys, or consultants.

11           Don't permit anyone to approach you to discuss this

12   case with you.  If anyone tries to approach you, tries to talk

13   to you or e-mail you, or in any way contact you about this

14   case, please immediately report that to me through

15   Mr. Galovich and/or Miss Sharkey.

16           While once again, I don't know if there is or isn't any

17   news coverage about this case, don't watch or listen to any

18   news reports concerning this trial, whether they be on TV,

19   radio, or on the Internet.  In addition, don't do any research

20   about the issues in this case, the witnesses, any of the

21   attorneys, the lawyers, even the Judge.

22           Once again, the only information you're permitted to

23   consider in this case, once you deliberate, is what you heard

24   here in this courtroom, the opening statements, and the

25   arguments by the attorneys, and then, ultimately, the

1    instructions that the Court will give you.

2         Remember, keep an open mind.  It's important that you

3    don't make up your mind, even though the evidence is concluded

4    in this case, until you've heard the closing arguments and the

5    final instructions.  At that point in time you'll have the

6    opportunity to meet with your fellow jurors and to discuss

7    this case at length.

8         Now, at this time, once again, you're going to leave

9    your materials there.  And Mr. Galovich will give you further

10   instructions when you retire to our jury room.

11        Thank you for your service thus far.

12        JOHN GALOVICH, Deputy Clerk:  All rise.

13        THE COURT:  Okay.  Miss Sharkey, you'll gather up

14   those binders, then, and we'll put those under lock and key.

15        (Jury recesses.)

16        THE COURT:  When Mr. Galovich returns, I will

17   address these issues related to the exhibits.  Then, it would

18   be my intention to take a lunch break.  We need to pick up

19   with all of these motions that have been filed, and then,

20   we'll start talking about jury instructions.

21        And to that end, everybody could make this process a

22   lot more streamlined if, for example, while we discuss

23   motions, another team sit down and takes a hard look at the

24   instructions and sees whether or not they can come to further

25   agreements, rather than everybody sit here in the courtroom.

1  That's why we have attorney conference rooms and the like, so

2  we can divide up in teams, and we can move faster, if we do

3  that.

4          The other thing is, and I told everybody this, one

5  of the trained mediators in this Courthouse has volunteered to

6  try to mediate this case.  Once again, unfortunately,

7  Dr. Sutardja has not been able to join us thus far, but he is

8  supposedly going to be here tomorrow.  And so, to that end, it

9  would also seem to me that Dr. Sutardja and the folks from CMU

10  could also use the time to see whether they can or can't

11  resolve this case.  It's unfortunate Dr. Sutardja hasn't been

12  here the entire time.  But to that end, that's another thing

13  that I suggest to you, that people think seriously about that

14  and act in good faith.

15          So we're going to take a ten-minute recess, and

16  then, whoever has exhibit issues, you're going to bring those

17  to the floor, so that Mr. Galovich and I can make sure the

18  exhibits are properly addressed.  Then, once that is done, if

19  each of you have a paralegal assigned to your teams that can

20  meet with Mr. Galovich to go through the exhibits one by one,

21  to make sure that all exhibits are properly lodged, so that we

22  know what exhibits are going to go to the jury.  That needs to

23  happen.  Okay?

24          And by the way, we're only going 'til 5:00 tonight.

25  All right.

1            And as I told you earlier, there's one juror who has

2    to be somewhere tomorrow at 4:00, so whatever proceedings

3    involving jurors, tomorrow we're going to be done by 3:30.

4    The next two days, we have a different juror who has church

5    commitments, and that juror needs to be at his church at 4:30.

6    So similarly, we're going to be guided by that.  This

7    Courthouse is closed the 24th and the 25th.  If we need to,

8    we'll back here the 26th.

9            MR. JOHNSON:  Your Honor, just should we plan on,

10   then, trying to plan for opening -- or sorry, closings on

11   Thursday morning?

12           THE COURT:  Well, I think that much depends on you

13   all.  All right?  We got an update on the verdict slip.  I

14   don't know where you are in your negotiations on instructions.

15   Mr. DeFranco told me a week ago that the ball was back in my

16   court.  Fine.  You know, if it's still in my court, then, we

17   may need a whole day to get this done, okay, given all the

18   numbers of motions and everything else.  All right.

19           MISS SHARKEY:  This Honorable Court will recess

20   until 12:40.

21           THE COURT:  Okay.  And let's be ready with these

22   exhibit issues, so we can move.

23           (Court recessed.)

24           (In open court.)

25           THE COURT:  All right.  Mr. Johnson, we're looking

1    at DX-350, and you're saying something about Mr. Wooldridge.

2    What else do you have to say, sir?

3              MR. JOHNSON:  Your Honor, this was referenced in

4    Mr. Wooldridge's cross.  It's at Page 191 of the trial

5    transcript.  And this is the CMU admission statement.  And

6    this was just inadvertently left off the list of exhibits that

7    Mr. Madison moved in.

8              MISS SHARKEY:  What day?

9              THE COURT:  Mr. McElhinny.

10             Mr. Galovich, we're looking at PX-350, and

11   Mr. Johnson is telling that this was inadvertently left out.

12             MR. JOHNSON:  December 5th.

13             MR. McELHINNY:  Your Honor, I'm not sure that Mr. --

14   we're looking to see what Mr. Wooldridge said on the subject.

15   It's not the University admission statement.  It's looks like

16   a draft slide deck by someone who is --

17             THE COURT:  Mr. Falconi.

18             MR. McELHINNY:  So we need to look to see what he

19   said on the subject.

20             JOHN GALOVICH, Deputy Clerk:  It was referenced,

21   Your Honor, but it was not entered.

22             THE COURT:  That's what Mr. Johnson is seeing.  It

23   was referenced, and nobody moved to admit it.  Now people are

24   trying to pick up the pieces.

25             MR. JOHNSON:  It was discussed for a few pages, 192

1   and 193.

2           THE COURT:  Mr. Johnson, want to keep your voice up?

3           MR. JOHNSON:  Sorry.  It was discussed at Pages 192

4   and 193 as well, of the trial transcript; some of 194.

5           MR. McELHINNY:  I don't think he laid any foundation

6   as to what this is, except that it's a document, and it has

7   Mr. Falconi's name on it.  So, I don't think it comes in.

8           THE COURT:  Mr. McElhinny, I didn't hear what you

9   last said.

10          MR. McELHINNY:  Oh, I'm sorry, Your Honor.  I moved

11  away from the mic.  I think, my very quick review of the

12  testimony, suggests that Mr. Madison didn't lay any foundation

13  for what this is.  I mean, he asked him whether it's a

14  document produced by CMU, and whether Mr. Falconi's name is on

15  it.  He asked him whether it might refresh his recollection.

16  And there was really no other testimony about it.  So there's

17  no reason to move it in.  And there's no basis to move it in

18  either.

19          THE COURT:  Okay.  I'm looking at the portion of

20  Document 682, Pages 191, 192, and 193.  And Mr. Madison does

21  walk the witness through the document, but he never moves for

22  its admission.

23          MR. JOHNSON:  Your Honor, it's a CMU document.  It's

24  authentic, admissible, there's no question.  It was referred

25  to in the transcript.  So, it should be part of the record.

1    It was simply an oversight.  And if Your Honor may recall, it

2    was an undisputed exhibit, actually, in the pretrial.

3            MR. McELHINNY:  Well, Your Honor, that -- that

4    standard hasn't gotten us very far in this case.  At Marvell's

5    insistence, and I'm, you know, the Court has pointed out on

6    numerous occasions, things could have been a lot more

7    streamlined, and regrettably that's not what they chose to do

8    with the exhibits that we tried to proffer that were

9    undisputed exhibits, were Marvell files that were -- as to

10   which there were no outstanding objections, we had to fight

11   tooth and nail to get them in, and consume lots and lots of

12   time.  So, they didn't lay the foundation that they insisted

13   on repeatedly here.  So, we're going to stand on our

14   objection.

15           THE COURT:  All right.  The Court has now had an

16   opportunity to read the referenced testimony, as well as to

17   look over DX-350, much of which was not used during the course

18   of the cross examination of the witness.  Admittedly, it was

19   produced by CMU.  It could have been entered into evidence as

20   a potential business record, but much of what is contained

21   here is totaling irrelevant to this case, No. 1.

22           No. 2, Mr. Madison drew the point concerning fair

23   market value.  On Page 13, along beyond the fair market value

24   box that he drew, looking to the top of Page 13 of CMU's

25   00144425, he looked at the issue of fair market value.  He

1    also drew out the tax status, either 1C3.  But the rest of

2    this deals with equity deals, preemptive rights, piggy bank

3    registration rights, co-sale rights and the like.  So, the

4    Court is not going to enter this document into evidence in the

5    case.  And I'll cite 403.  And in terms of Mr. Madison's

6    argument, I mean, he can certainly make the argument, if he

7    wants, if he cross examined a certain witness about fair

8    market value, and you, the jury, will recall we demonstrated a

9    CMU slide that said something about that, if he wants to do

10   that.  But this entire document is not going out to the jury,

11   DX-350.

12              MR. JOHNSON:  Your Honor, at least for purposes of

13   the record, can we --

14              THE COURT:  You can mark it for the record, and the

15   proffer has been made.  But it's not going out to the jury.

16              MR. JOHNSON:  Understood.  Thank you.

17              THE COURT:  Okay.  Here is a copy, Miss Sharkey.  So

18   let Mr. Johnson mark it how he wants.  But it's not going out

19   to the jury.

20              Any other exhibit issues?

21              MR. JOHNSON:  No other exhibit issues from our side.

22              MR. DeFRANCO:  Your Honor, just --

23              THE COURT:  Mr. DeFranco.

24              MR. DeFRANCO:  Excuse me, Your Honor.  We're

25   marking -- I think both sides are doing this, but we're

1     marking the demonstrative exhibits, numbering them, to make

2     sure it's clear for the record.

3              THE COURT:  In addition to that, I want you to sit

4     down with Mr. Galovich and his list of exhibits, and somebody

5     on each team should make sure that all of the exhibits that

6     were entered into evidence are logged, so that we know this,

7     and we have an accurate record.  And both sides have to sign

8     off.

9              MR. DeFRANCO:  Yes, Your Honor.

10              THE COURT:  All right.  Mr. McElhinny, now, we had

11     this inadvertent failure to admit into evidence on the Marvell

12     side.

13              What about on the CMU side, is there anything that

14     you need to bring to the Court's attention?

15              MR. McELHINNY:  My understanding is, there is

16     nothing.

17              THE COURT:  Okay.  But we are done with exhibits?

18              MR. McELHINNY:  That is correct, Your Honor.

19              THE COURT:  All right.  So, we're going to take a

20     lunch break now, and we'll start again at 1:15, with whatever

21     the motions are.

22              MR. JOHNSON:  Your Honor, we have one quick issue.

23              THE COURT:  Sure.

24              MR. JOHNSON:  I said that, when you asked Your

25     Honor, when you asked me if we had any surrebuttal.

1          THE COURT:  Right.

2          MR. JOHNSON:  I said at the time that we didn't.  I

3    mean, the issue that we have is, the last witness is here,

4    basically that come on now, has talked about SoC's, and

5    basically calling our CEO, essentially, a liar.  And you know,

6    thinking more about that --

7          THE COURT:  Another witness may have done that, too;

8    a Marvell witness.

9          MR. JOHNSON:  Thinking more about this, we would

10   like brief surrebuttal, to have the opportunity for

11   Dr. Sutardja to address the points that Miss Lawton made.

12         MR. DeFRANCO:  Your Honor, particularly when we

13   have -- we have a damages witness who admittedly was relying

14   on an industry expert for an analysis of industry data and

15   information, and we had a short period of testimony time-wise,

16   but it was predicated on a technical analysis and information

17   she conceded at the close of direct.  Obviously, she's not a

18   technical person.

19         THE COURT:  Obviously, she's not a technical person.

20   And for much of her testimony, she relied on Bajorek.  But in

21   terms of the question that was asked of her, and in terms of

22   her, quote, investigation, end quote, part of what she did in

23   her investigation was to look at all the Marvell records, all

24   the Marvell sales documents.  She looked at all your SEC

25   filings.  Then, in addition to that, she looked at the SEC

1    filings of others.  And frankly, the door was opened a bit.

2              And you know, back to Dr. Sutardja and his

3    credibility, as I sit here, there was another witness, a

4    Marvell witness, who equally challenged his credibility.

5              MR. DeFRANCO:  Was that on the weekly status

6    reports, Your Honor?

7              THE COURT:  Absolutely.

8              MR. DeFRANCO:  I haven't had a chance to look back

9    at his testimony exactly.  There was a discussion, I'll tell

10   you, with Mr. Laufman about that.  First of all, we were

11   talking about 2004 versus, you know.  I meant to look back at

12   the time frame for what he was asked.  That's the point No. 1.

13             Point No. 2, there's a hierarchy there, where

14   sometimes people come into meetings.  His testimony was about

15   regularly attending meetings.  There is, you know -- judging

16   credibility, Your Honor, respectfully, if the Court is

17   commenting on the CEO's credibility, it just would be

18   surprising that he would intentionally, a man in that

19   position, would make a statement that would be contrary to

20   facts about his attendance at a meeting?  We all took note of

21   Your Honor's concern with that issue when the testimony was

22   given.  But that is at a level that we often see in cases when

23   we're talking about issues over a ten-year period.  For them

24   to suggest that somehow he intentionally misrepresented, or

25   was untruthful on that issue, it is --

1          THE COURT:  I don't know that they are suggesting

2     that.  I'm just saying, there was a discrepancy between his

3     testimony and another witness' testimony.  And frankly, other

4     Marvell deposition testimony, there is a discrepancy.

5          MR. JOHNSON:  But the question was whether it was

6     his meeting.  And this is the language, as you pointed out

7     with respect to people, this is the language he used.  He

8     said, it's not my meeting.  It's the meeting of the executive

9     staff.  It's their -- it's the people who report up.  And so,

10    the question was not, didn't line up in terms of time.  And it

11    also, the question was --

12         THE COURT:  Well, that's why we have juries.

13         MR. JOHNSON:  Right.

14         MR. DeFRANCO:  But in any case, Your Honor, we would

15    ask to have, allow Dr. Sutardja to come back for five minutes

16    and respond to that.

17         THE COURT:  Well, if Dr. Sutardja had wanted to be

18    here, Dr. Sutardja should have been here.

19         MR. JOHNSON:  Your Honor, that --

20         MR. DeFRANCO:  Your Honor, that's another issue.

21         THE COURT:  But here we are in the middle of the

22    trial, and I just said on the record, to this jury, not once,

23    but twice, that the case is rested, and the case is closed,

24    and the evidence is over.  All right?  And now you want me, a

25    day later, to permit this man to come in here and make a cameo

1    appearance.  I'm not going to do it.

2            MR. DeFRANCO:  Your Honor, for the record,

3    Dr. Sutardja's absence from this trial has been for instances

4    and company issues that we've been told are unavoidable; a

5    company-wide meeting.

6            MR. JOHNSON:  And the board meeting --

7            MR. DeFRANCO:  -- he's attending today.  And he's

8    flown back and forth at every --

9            THE COURT:  He wasn't here yesterday, either.  And

10   admittedly, there are things, such as company-wide meetings

11   and the like.  But this particular trial was scheduled with

12   both attorneys back in 2011.  I'm sure Dr. Sutardja was told

13   the dates, No. 1.

14           No. 2, we're in a technology case.  Lots of people

15   attend meetings by video conference.  Eckert Seamans has video

16   conference.  KL Gates has video conference.  This Court has

17   video conference.

18           In addition, there are other people equally, highly

19   placed, or close to highly placed in that company.  None of

20   them, likewise, have been here as well.

21           MR. DeFRANCO:  Your Honor, for the record, please,

22   let me respond.  I'm not arguing with Your Honor.  I just need

23   to make my record.  First --

24           THE COURT:  Go ahead.

25           MR. DeFRANCO:  First, from my estimation,

1    Dr. Sutardja has been here ten times the amount of time that

2    Dr. Cohon has been here.  So their comments about his

3    attendance or lack of attendance --

4            THE COURT:  They are not making the comments to me.

5            MR. DeFRANCO:  -- are way off the mark, because

6    those are the two folks at the opposite sides of the table,

7    No. 1.

8            THE COURT:  Dr. Cohon had indicated he would have

9    been here all day yesterday, and today, if Dr. Sutardja had

10   been here.  And you sent an e-mail that you were going to

11   check with Mr. Laufman, who was flying back, and we never

12   heard anything more.

13           MR. DeFRANCO:  But Your Honor, on the first issue,

14   so your comment about long-standing trials.  In every step of

15   the way, for example, for opening, he was supposed to be at an

16   inventors conference in Phoenix, and he skipped that and came

17   directly here.  That's not something that is easy to undo.

18   Your Honor knows full well how complicated those conferences

19   are to set up.  What inventors expect; they expect the CEO to

20   be there.  And he changed, literally changed his plans on a

21   dime.  That's the first point.

22           The second point is, this company-wide meeting, yes.

23   He worked for days on the conversations to see if there's any

24   way that that could be moved or changed.  And it was something

25   that was offsite, it was company-wide, that he's speaking also

1    to the company people directly.  And we heard, I want to

2    say -- I don't want to get my facts here wrong -- but I

3    believe by video conference.  It was not an unimportant event

4    in the milestone of his company.

5             THE COURT:  I understand it's not an unimportant

6    event.  And I think, frankly, I suggested to you all that he

7    would be sending a bad signal if your CEO wasn't sitting here

8    for the openings.  And then suddenly, somebody said, oh, good

9    idea.  And then, he came.

10            MR. DeFRANCO:  Absolutely.  And he was here, Your

11   Honor.  And last week he had a board meeting.  We were going

12   to move a long-standing board meeting, which is not something,

13   you know, a quarterly event or monthly event.  That's not

14   something that's easy to move.

15            First, I do not want this Court to have the

16   impression we have taken his presence here lightly.  We

17   haven't, and he hasn't, and the company hasn't.  We've done

18   everything humanly possible to move and shift other things

19   around so he could be here.

20            THE COURT:  You also recall, in the settlement

21   conference I suggested that his brother, Pantas, and/or his

22   wife, could have equally attended.

23            MR. DeFRANCO:  Yes, Your Honor.

24            THE COURT:  Um-hum.

25            MR. DeFRANCO:  I remember that suggestion.  But I

1   think, as you've seen from the record in this case, and from

2   the testimony, he is the man.  The buck stops with him.

3            THE COURT:  That's why, then, the buck stops here,

4   we need him here, so we can try in good faith to resolve this

5   case.

6            MR. DeFRANCO:  I understand, Your Honor.  And he's

7   on, he's on the way back.  Mr. Laufman has been here the

8   entire time.

9            THE COURT:  I know Mr. Laufman.

10            MR. DeFRANCO:  Mr. Laufman is his general counsel.

11            THE COURT:  I know Mr. Laufman, and he's been here,

12   and he's been right behind you, often looking at me.

13   Sometimes he's not happy with my rulings, I can see that.

14            MR. DeFRANCO:  He is the right person to have here,

15   Your Honor.

16            But back to the point, so I can make my record,

17   we're asking for five minutes for Dr. Sutardja to respond to

18   this direct and pointed attack on his credibility relating to

19   technical issues in this case.

20            The Court has been very careful and has listened to

21   our objections throughout about cabining witnesses in terms of

22   what is proper testimony and what is going over the line.  And

23   to have this trial end with a non-technical witness commenting

24   and saying that the CEO of this company, who has lived and

25   breathed this since the mid-1990's, made a factually incorrect

1    statement, based on the technology, when that is flat out

2    incorrect, is highly prejudicial.  I need to say that for the

3    record.  We're asking for five minutes tomorrow to complete

4    that testimony.

5                THE COURT:  All right.  Mr. Greenswag has risen to

6    the occasion.

7                MR. GREENSWAG:  Your Honor, the theme -- I mean, the

8    rules don't appear to apply to them, like the clock doesn't

9    apply to them.  Right.  They wanted five more minutes for

10   Dr. McLaughlin to ask about the slides that they were so

11   concerned about.  They did nothing, notwithstanding their

12   statement to the contrary.

13               They got -- they wanted Miss -- their cross

14   examination of Miss Lawton off their clock.  I don't think

15   that's fair either, because they -- the rebuttal is the

16   rebuttal.  They could have saved that time.

17               Now what they, after having stood here, in open

18   court and rested, they want to say, just kidding.  At some

19   point the rules have to apply.  And they simply just refuse to

20   say they ever apply.  They rested, end of story.  It was --

21   it's just --

22               MR. McELHINNY:  They elicited the testimony.

23               MR. GREENSWAG:  They did this to themselves, again.

24   This is their making.

25               THE COURT:  They did elicit the testimony.  They did

1    comment.

2            MR. GREENSWAG:  The rules have to apply.

3            THE COURT:  Then, they did permit the witness to get

4    into more detail than the Court would have liked.

5            MR. DeFRANCO:  Your Honor, Your Honor, she's an

6    experienced witness; right?  She came in and she had very well

7    prepared testimony on some pinpointed issues, and she was

8    asked some general questions, and she gave very specific

9    testimony.

10           She was shown the SoC slide, and she said, Marvell

11   was not the first.  This is not a door opening by us.  She

12   raised that issue, specifically.  That's why she was brought

13   in here, to respond to Mr. Sutardja -- Dr. Sutardja's

14   testimony.  And now we're hearing that it is our fault?

15           THE COURT:  Well, it would have been helpful if

16   Dr. Sutardja had made himself available for deposition during

17   the discovery period, then, we wouldn't have had these issues.

18           MR. DeFRANCO:  Your Honor, we're at where we're at

19   because of Miss Lawton's testimony, respectfully, and not

20   because he wasn't deposed during the period.  Who knows if

21   that question would have been asked at that point in time.

22           But this is the way trial works, as we all know.

23   They, if they -- they didn't present that testimony during

24   their case in chief from her, after four and a half, five

25   hours, they decided they needed to, to have her come in here

1    and respond to his testimony, and the testimony from

2    Mr. Baqai.  And all we're asking for is for the man to be

3    allowed to come in and set the record straight on a factual

4    issue, so this jury does not go into deliberating over a

5    billion dollar claim that the CEO of the company was

6    untruthful in his testimony.  Because that's where it's left

7    right now.

8              MR. GREENSWAG:  That's their fault.  They, for the

9    first time in any point in this case from the filing of their

10    answer until Dr. Sutardja got up on the witness stand, and

11    never said they were going -- and it's nowhere in

12    Dr. Hoffman's report, they -- they finally said, oh, well,

13    this ain't working so well.  So we're going to have somebody

14    get up and say we were the first with the SoC, and that was

15    the basis of it.

16              And they absolutely knew that Miss Lawton was going

17    to get up on the witness and respond to that.  They knew that

18    last weekend, when we proffered.  Well, guess what, she did

19    what we proffered, within the scope of the Court's order.

20    Miss Gay opened the door.  She did this to herself, and now

21    they want -- then, they rested.

22              MR. DeFRANCO:  Your Honor, sometimes the louder --

23    the louder the argument, it really suggests what is underneath

24    it all.

25              MR. GREENSWAG:  Yeah, a demand that the rules be

1    adhered to.

2            MR. DeFRANCO:  My point is, Your Honor, again, in a

3    case of this magnitude, the last testimony should not be from

4    a damages expert opining, and she did, getting into technical

5    issues and going --

6            THE COURT:  She didn't get into technical issues.

7    She read financial documents.

8            MR. GREENSWAG:  Right.  And in a case of this

9    magnitude, they should have had their CEO here.

10           MR. DeFRANCO:  Your Honor, she absolutely got into

11   technical issues.  She is talking about who is first with

12   certain technology.  That's not even her area.  That's

13   Dr. Blahut.  But we all know that Miss Lawton is their, is

14   their -- Bajorek, excuse me.

15           THE COURT:  Bajorek.

16           MR. DeFRANCO:  Excuse me, is this a preferred

17   witness.  That's what this is all about.  She called the man,

18   the man's testimony incorrect.  And certainly the

19   implementaion was it was unfruitful.  That's absolutely not

20   the case.  Absolutely not the case.

21           And we're asking this.  I can not express how

22   important this issue is to our case to not have the jury walk

23   out with that being the last bit of testimony.

24           Now, they say, we know, we should have known.  You

25   know, we hear the same arguments all over again.  We don't

1    follow the rules.  We do things our own way.  We come in here

2    expecting this, that, and the other thing.  You know, those

3    arguments, beyond getting tiring, are simply incorrect.

4           We were expecting -- we were expecting a fight over

5    a custodian of records deposition.  And they made the

6    strategic decision to pull that last night, after extensive

7    argument, showing that that was inaccurate.  So to say that we

8    certainly had every expectation and knowledge that Miss Lawton

9    would be allowed to testify in these two specific issues, and

10   that when prompted, she would give this testimony straight out

11   and straight to the point that we were not first with SoC, and

12   we should have known full well that was coming; not the case,

13   Your Honor.  I don't know what else to say.  It's absolutely

14   not the case.

15          And what we're asking for is five minutes for

16   Dr. Sutardja to come in and tell this jury that any

17   accusations that he was unfruitful or incorrect on his

18   statements regarding the technology are not accurate.  And how

19   can that not be fair, under all of the circumstances here?

20   How can they say that that's inappropriate and unfair, to

21   allow the CEO of this company, who's going to have to write

22   whatever check is written here, if at all, to come in and say

23   that the testimony from his damages expert about what I said

24   in terms of the technology is not correct.  And then, let the

25   jury decide.

1          But right now, they are left with the damages expert

2     coming in and saying, I looked at the records, and they are

3     not the first in SoC.  After all we've been through here with

4     the damages expert, how can they credibly say that's

5     appropriate under the circumstances here?  How can they

6     appropriately say that it's fair to leave this record where it

7     is, and let the jury deliberate a billion dollar claim with

8     that being the last word that they hear?

9          THE COURT:  I asked for surrebuttal.

10         MR. McELHINNY:  You did, and they said there was

11    none.  And frankly, you know, now we're at the point where the

12    argument that they made to having Miss Lawton's rebuttal,

13    cabin all of her rebuttal, including Miss Greico, they are

14    going to come back to haunt them, because what we have is

15    Dr. Sutardja coming in to repeat his testimony and say, no, I

16    really -- we really were first.  He's already said that.

17         There's -- that's not proper rebuttal to come in and

18    say, basically, that's wrong.  I mean, he's already said what

19    he said.  And we had facts that demonstrated to the contrary.

20    Now he's going to come in and say the same thing again, just

21    because he wants the last word.

22         They rested.  It's not proper surrebuttal.  You

23    know, we've -- we're done.  We've told the jury we're done.

24    To put him on now would highlight the significance of this in

25    ways that would be prejudicial to Carnegie Mellon.  And it's

1  inappropriate, and it isn't proper rebuttal at this point,

2  because he's not going to testify to anything new, except what

3  he's already said, and he said, I really meant it.  I don't

4  know what that -- that could be his testimony.  It just

5  doesn't make sense, so.

6  MR. DeFRANCO:  Your Honor, you know, again,

7  Miss Lawton is a skilled witness.  She plainly and directly

8  came in here with the intent of going after Mr. Sutardja and

9  commenting on his credibility.

10  THE COURT:  Dr. Sutardja.

11  MR. DeFRANCO:  Dr. Sutardja.  I called him

12  Dr. Sehat.  I'm sorry.  She -- if anything is clear, that was

13  the plan of her testimony, and she went straight for the

14  jugular with it.  And we're entitled to respond to that

15  specific testimony, just as the Court found that they were

16  entitled to put her on to respond to Dr. Sutardja's testimony.

17  THE COURT:  But Mr. McElhinny has stated, and the

18  record does reflect, he has already stated what his opinion

19  is; that he was the first.

20  MR. DeFRANCO:  First of all, Your Honor, she, she

21  summarized his testimony.  I don't think the summary was

22  accurate.  She said --

23  THE COURT:  No, she did not.  Your counsel, your

24  colleague read it into the record.

25  MR. McELHINNY:  Right.

1              THE COURT:  So, I think what I'm going to do is read

2     over the transcript.  I think we all need some lunch.  And I

3     think we'll start again at 1:30, and we'll deal with motions.

4              MR. DeFRANCO:  Could you tell us which motions you

5     would like first?

6              THE COURT:  Well, you tell me.  They have been

7     flying at me left and right.  So, we are done with Hoffman.

8     We've heard Blahut.  We've heard argument on the attorney

9     issue.  I heard I was going to get something from Mr. Milowic,

10    perhaps, in response, because it was in the writings from the

11    Marvell team on the attorney issue.  Then, we have multiple

12    JMOL's, this way and that way.

13             So, it's going to make for a long afternoon, and

14    probably a long day tomorrow.

15             And then, we also have the jury instructions and the

16    verdict slip that you all haven't agreed on.

17             MR. DeFRANCO:  Your Honor, we're going to confer on

18    all these issues, and we'll get you a report.

19             THE COURT:  So at 1:30, we're going to start, and

20    we'll start listening to these arguments.  And my clerks will

21    be rotating so that they can all try to keep up with the

22    masses beyond me.  Okay?

23             MR. McELHINNY:  Thank you, Your Honor.

24             THE COURT:  Mr. Galovich doesn't normally eat lunch,

25    and he wants to do exhibits now.  So, somebody on the CMU team

1    and somebody on the Marvell team needs to step up.

2            Mr. Verdini, do you -- ubiquitous Mr. Verdini is a

3    good man on the exhibits.

4            I would suggest Mr. Milowic on the Marvell team.  He

5    probably knows more about the exhibits than anybody.

6            MR. MILOWIC:  Yes, Your Honor.

7            (Court recesses.)

8            (In open court at 1:30 p.m.)

9            MISS SHARKEY:  This Honorable Court is now in

10   session.

11           THE COURT:  You may be seated.

12           Miss Sharkey, you may have this.

13           All right.  Now, we're supposed to have motions, and

14   my clerk tells me that after we have engaged in all kinds of

15   work this weekend on behalf of the parties, that counsel have

16   a proposal that we're not going to argue any motion.

17           Is that what counsel are here to tell me?

18           MR. DeFRANCO:  Your Honor, we're willing to do,

19   obviously, whatever the Court would like to do.  I didn't

20   know, you know, there is an argument on JMOL this morning.

21   We're ready, willing, and able to present argument, if the

22   Court wanted to spend the time preparing opinions of that, as

23   to what the Court what going to do, or focus on other issues.

24           We were just -- the parties were just suggesting

25   that that's, you know, that's something that is acceptable to

1    us.  And we were also going to add, by the way, whatever the

2    Court specifically wants argument on, we're happy to present

3    that as well.

4           So, we're ready, willing, and able to argue,

5    obviously, these motions that needed to be resolved in

6    real-time.  I don't think any work has been wasted here.  But

7    that was one thing that we discussed for the first time during

8    the break, and both sides, I think, are ready to argue, if

9    that's how the Court wants to proceed.

10          MR. McELHINNY:  Your Honor, what we had, what we had

11   agreed to propose to the Court, subject, of course, to the

12   Court's views, would be, I think what is outstanding right

13   now, the three Marvell JMOL motions, plus the invalidity

14   motion, and the JMOL motion we filed this morning, to which

15   Marvell has not responded.

16          Marvell was agreeable to submitting their motions on

17   papers, so that the Court could have time with them this

18   afternoon.  They would prepare a response to the invalidity

19   motion, we would spend -- counsel would spend the afternoon

20   trying to narrow the scope of issues on jury instructions.

21          We would come in tomorrow morning at whatever time

22   the Court wished to, A, answer questions that the Court had as

23   a result of its review of the JMOL motions.  The Court may

24   have those already.  And of course, we're prepared to answer

25   them.

1          B, address any issues that are raised in Marvell's

2   response to our validity motion.

3          C, then move hopefully to a narrow set of issues on

4   jury instructions.  And then, we would suggest that we close

5   first thing Thursday morning.

6          Now of course, we made -- we had that discussion

7   without the Court's input on that.  We're happy to argue them,

8   if the Court prefers to deal with them through oral argument.

9   We -- I think both sides were comfortable resting on the

10  papers for the JMOL aspects, for at least Marvell's JMOL's.

11  And we haven't seen Marvell's papers on ours, so I wasn't

12  quite prepared to make that concession, until I see it.  And

13  then, we would move on from there.

14         So, we're prepared to argue them now, should the

15  Court want to hear argument, or we are prepared -- and

16  frankly, Your Honor, at least from my perspective, because I

17  have a damages motion, much of that motion has been argued,

18  and re-argued, and argued again.  A lot of it grows out of the

19  same issues the Court has been addressing over time.  And I

20  thought the Court might want to spend its time this afternoon

21  for working its way through all the paper.  And I -- and we

22  all understand that we've deposited quite a bit of that on the

23  Court in the last couple of days.

24         So, based on where we are in terms of what the

25  motions are that are outstanding, I think we've dealt with all

1    the evidentiary ones, the motions to strike, the sword shield,

2    et cetera, and you're left with these JMOL motions.  And if

3    that is acceptable to the Court, that's what we're going to

4    propose.

5            If the Court is in a position where it has issues or

6    wants to hear argument because that is a better way for us to

7    deal with it, we're certainly -- we've divided them up.  We're

8    certainly ready to go.

9            THE COURT:  All right.  You're going to rest open

10   your papers?  That's the way we'll go.

11           MR. McELHINNY:  Okay.

12           THE COURT:  All right?

13           MR. McELHINNY:  Thank you, Your Honor.

14           THE COURT:  We're done for this afternoon.

15           MR. McELHINNY:  Now, for --

16           THE COURT:  You haven't worked on the instructions,

17   I presume; right?

18           MR. DeFRANCO:  Well, not, not over the lunch hour,

19   Your Honor, but we have, you know, made progress.  But there's

20   more to do.  And we're going to sit here and do that right

21   now.

22           THE COURT:  Time is a-wasting.

23           MR. McELHINNY:  Your Honor, you want us here at 8:30

24   tomorrow.

25           THE COURT:  I'll let you know when I want you here.

1          MR. McELHINNY:  Your Honor, there's one other issue

2     being raised with Mr. DeFranco.  We, not surprisingly, expect

3     to do some slides during closing, and we had intended to put

4     excerpts of transcripts on the slides.  I don't know whether

5     the Court has a view on that.  I've solicited Mr. DeFranco,

6     too.  He's trying to consult with his team on that subject.

7     So that might be one issue that we need to address.

8          MR. DeFRANCO:  We're fine, Your Honor, with

9     discussing or reading deposition testimony.  We -- we're not

10    agreeable to putting up deposition clips in front of the jury.

11         THE COURT:  Why not?

12         MR. DeFRANCO:  Well, for several reasons.  One,

13    that's not something that can be responded to in real-time

14    with a responsive deposition.  Clips that continue the

15    discussion, that's a difference between deposition testimony

16    and video clips that have been played.  That's reason No. 1.

17         THE COURT:  Well, once again, you all need to sit

18    down and meet and confer, per the Court's policies, practices,

19    and procedures, and Federal Rules, No. 1.  And the College of

20    Trial Lawyers Rule of Professionalism.  Back to Mr. Madison's

21    speech on that.  And then, you can come to me with some narrow

22    issues.

23         But it seems to me that some of these things are

24    fair game, and they can be used in closing arguments.

25         MR. DeFRANCO:  Understand, Your Honor.

1          THE COURT:  So you need to sit down and do that.

2     I'm not going to waste any more time trying to referee your

3     mini disputes.

4          MR. DeFRANCO:  Understood, Your Honor.  And on that

5     point, Your Honor, with respect to the last point, with

6     respect to Dr. Sutardja and bringing him back.

7          THE COURT:  We're working on that.  We're working on

8     that.

9          MR. DeFRANCO:  Okay.

10          THE COURT:  He's not here any way; is he?

11          MR. DeFRANCO:  Well, Your Honor, we did close.  The

12     last thing we want --

13          THE COURT:  You did close.  I told the jury you

14     closed.  I offered you surrebuttal.  You got the list of

15     rebuttal witnesses over the weekend.  You've responded with

16     objections at 8:16 PM at night on Sunday.

17          If it were that important, you should have thought

18     to have had him here.  The questions made by your colleague,

19     after consultation with Mr. Johnson, invited the answers that

20     you got.

21          MR. DeFRANCO:  Your Honor, I --

22          THE COURT:  That's my initial thinking.  Now,

23     Miss Sharkey and I are still working on it.  So we're going to

24     look at it in further detail, and I'll explicate my rationale

25     further on the record.

 1          MR. DeFRANCO:  Let me -- I just want to speak to

 2   that point.  I would say, you know, we have worked closely

 3   with Dr. Sutardja, and we know him personally, Your Honor,

 4   spent time with him.  Part of our reaction to that issue, and

 5   in conference with Mr. --

 6          THE COURT:  With Mr. Laufman, who probably raised

 7   it, knowing the personality of Dr. Sutardja the best.

 8          MR. DeFRANCO:  Emotions run high, Your Honor.

 9          THE COURT:  Well, they do run high, in more places

10   than you would think.

11          But in addition to that, back to the outset of this

12   case, and this case was mediated twice, one of the issues was

13   that Dr. Sutardja did not appear at those mediations;

14   Mr. Laufman did.  And similarly, the emotions run high at

15   Carnegie Mellon.

16          MR. DeFRANCO:  Absolutely, Your Honor.  So any way,

17   my point was -- let me finish that, and I'll respond to Your

18   Honor's other point.

19          So that was, in part, an emotional reaction.  And

20   the last thing we wanted to do was have argument later on.

21   Didn't want to allay that testimony.  To simplify things

22   across the board, we're going to withdraw that request, for

23   the record.  We would -- we ask that that motion be stricken.

24          We still think the testimony should be stricken.  We

25   still think it should be stricken, but want the record to be

1   clear that we're withdrawing our request for surrebuttal on

2   that issue.

3             THE COURT:  All right.  That request is withdrawn.

4             MR. DeFRANCO:  You know, I'm happy to respond to the

5   other issues, Your Honor.

6             THE COURT:  As far as everything else goes, we have

7   plenty of work to do on your JMOL motions.  You can all sit

8   and you can work on instructions.  And if you want to get this

9   case out faster to the jury, I would suggest that you get me a

10  set of agreed-upon instructions.

11            MR. DeFRANCO:  Thank you, Your Honor.

12            MR. GREENSWAG:  Thank you, Your Honor.

13            MISS SHARKEY:  We'll be adjourned until 8:30

14  tomorrow.

15            THE COURT:  By the way, Mr. Galovich and your

16  technical teams, exhibit teams, are finding other issues.

17            (Court adjourned.)

18                      * * * * *

19                    I N D E X

20                      * * * * *

21  WITNESS                  DIRECT  CROSS  REDIRECT  RECROSS

22  Steven McLaughlin           48     76      --        --

23  Catharine Lawton            94    108     115       120

24

25                      * * * * *

1

2                         C E R T I F I C A T E

3    We, Shirley Ann Hall and Virginia S. Pease, certify that the

4    foregoing is a correct transcript for the record of

5    proceedings in the above-titled matter.

6

7

8                              s/Shirley Ann Hall
                               Shirley Ann Hall, RDR, CRR
9                              Official Court Reporter

10

11                             s/Virginia S. Pease
                               Virginia S. Pease, RMR
12                             Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25