**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CARNEGIE MELLON UNIVERSITY,   )
              )
     Plaintiff,     )
  v.           )  Civil Action No. 2:09-cv-00290-NBF
              )
MARVELL TECHNOLOGY GROUP, LTD., )
and MARVELL SEMICONDUCTOR, INC.,  )
              )
     Defendants.    )

---

**PLAINTIFF CARNEGIE MELLON UNIVERSITY'S MEMORANDUM IN
OPPOSITION TO MARVELL'S MOTION FOR A MISTRIAL OR REBUTTAL
CLOSING ARGUMENT**

---

## I.   __INTRODUCTION__

Desperate to derail this case from a final adjudication by the jury (and eventually the Federal Circuit) despite the enormous resources brought to bear on it by the Court and the parties, Marvell now seeks extraordinary relief on the basis of ordinary, zealous closing argument—and on the basis of an order of this Court that **granted** CMU's motion in part and **did not preclude CMU from making any argument**.  Dkt. 756 (Marvell Br.) at 9-12 (citing Dkt. 753).  To the contrary, the Court's order confirmed the relevance of Marvell's failure to obtain advice of counsel.  Dkt. 753 at 4 (citing 2012 AIPLA Model Patent Jury Instructions, § 12.2 (2012)).

It is axiomatic that during closing statements, counsel may make arguments based on record evidence and inferences supported by record evidence.  *See*, *e.g.*, *Brescia v. Ireland Coffee-Tea, Inc.*, 73 F.R.D. 673, 677 (3d Cir. 1977).  Moreover, even where counsel's argument unequivocally exceeds the bounds of legitimate advocacy (which CMU's counsel did not), mistrials are only rarely an appropriate response to "an attorney's inappropriate remarks" because "our system of justice… 'relies upon the ability of a jury to follow instructions'" given by the Court.  *Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 148 (3d Cir. 2002) (affirming denial of plaintiff's motion for mistrial where defendant's counsel improperly referred, in his opening statement, to the inadmissible fact that the school district employee accused of sexual abuse had not been arrested despite the civil plaintiff's report of abuse to police) (internal cite omitted).  "Even in the criminal context, exceptions to this general presumption are rare, made only when there is an 'overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect… would be devastating to the defendant." *Id.*

Nonetheless, Marvell complains that certain remarks in CMU's 76-minute-long closing were too prejudicial and demands the proverbial kitchen sink of sanctions–from special rebuttal

argument in an amount representing some 25% of the time ordered by this Court, to striking

CMU's willfulness claim from the case (even though the Court already has ruled that sufficient

evidence exists for it to go to the jury), to a mistrial requiring the parties to retry the entire case.

Neither the facts nor the law support any sanction here, let alone the draconian sanctions sought

by Marvell.  Indeed, the Court already struck from the record and instructed the jury not to

consider two of the statements about which Marvell now complains.  The third statement, *i.e.* the

one related to attorney opinions, is entirely consistent with the statements made in the opening,

the evidence in this case and the Court's orders.  Individually or collectively, Marvell's

complaints simply do not constitute the kind of conduct that justifies sanctions of any sort, let

alone the serious sanctions that Marvell seeks here.

 ***First***, Marvell's complaints that CMU somehow overstepped the bounds of proper

argument with respect to the evidence regarding opinions of counsel are meritless.  CMU made

an identical argument in its opening--without objection -- and the admitted evidence supports the

closing argument.  It is a fact that Dr. Armstrong testified that Marvell had a policy of obtaining

an analysis and determination (*i.e.*, an opinion) from its legal department when it became aware

of a potential patent issue.  The record does not reflect that Marvell ever obtained such an

opinion regarding the patents at issue in this case.  Marvell may have communicated orally with

counsel on the subject of the CMU patents, but it has chosen to keep those communications

secret and specifically disclaimed any reliance upon counsel defense.  *See*, *e.g.*, 8/27/2010 Tr. at

77:8-17 ("we will not be asserting the advice of counsel defense").

 Despite that, Marvell has repeatedly and improperly sought to imply that it had obtained

the blessing of counsel to proceed after counsel studied the CMU patents, even though Marvell

denied CMU any discovery on that subject and justified the denial of discovery by unequivocally

representing that it would not assert a reliance upon counsel defense.  CMU is well within its rights under the law to argue the opposite.  *See*, *e.g.*, *Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 699 (Fed. Cir. 2008) (evidence of whether an accused infringer obtained an opinion of counsel is "relevant to the second prong" of the inducement analysis); *In re Seagate Tech., LLC*, 497 F.3d 1360, 1369 (Fed. Cir. 2007) (holding such evidence is relevant, and indeed "crucial," to the willfulness analysis); *Parker-Hannifin Corp. v. Wix Filtration Corp.*, No. 1:07-cv-1374, 2011 WL 976559 at *11-12 (N.D. Ohio March 17, 2011) (denying motion for new trial on willfulness where plaintiff's argued in the closing that defendant "has not presented evidence of advice of a lawyer with regard to infringement and has failed to present a legal opinion as a defense to [plaintiff's] claim of willful infringement").

*Second*, Marvell's complaints that CMU violated the Court's order at Dkt. 608 are likewise meritless.  This Court specifically denied Marvell's motion in limine "to the extent that it seeks a pretrial order precluding all evidence of the economic circumstances of CMU and the DSSC at the time of the hypothetical negotiation," and found that "the state of economic affairs at CMU and the DSSC at the time of the negotiation may be relevant to CMU's position during the hypothetical negotiation."  Dkt. 608 at 5, 8.  Marvell proffered the DSSC Associates Agreements as probative of CMU's position during the hypothetical negotiation; indeed, that is a major basis for Marvell's damages argument.  CMU is entitled to point out other provisions in those same agreements that fly in the face of Marvell's assertions and to argue the fair inferences therefrom.  In any event, the Court struck the argument, thereby addressing the issue as it believed was most appropriate at the time.

*Third*, the Court promptly struck the reference to the "identity theft" analogy before counsel for CMU could even fully formulate it, so it cannot serve as the basis for the type of

sanctions sought by Marvell.

*Finally*, the statements about which Marvell complains simply do not meet the high bar for the sanctions it now seeks.

## II.   FACTUAL BACKGROUND

### A.   Closing Arguments

During CMU's one hour and 16 minute closing argument CMU's counsel, Mr. Greenswag, mentioned Marvell's failure to get an opinion of counsel three times, constituting a total of 25 lines in the 46 pages transcript. Mr. Greenswag first mentioned Marvell's failure to obtain an opinion at page 32 (Tr. 12/20/12) in connection with Mr. Greg Burd's first email to his bosses about the CMU patents in early January 2002. *See* Ex. P-280. Mr. Greenswag argued:

> After Marvell learns about this patent, they begin violating a real policy that they really do have, which is when there's a possibility that you are infringing, a possibility that you are infringing on a patented invention, you're supposed to get an opinion from legal counsel to see if they're okay. You never saw such an opinion in this case. You can go through all the exhibits; you won't find an opinion from anybody either inside of Marvell or outside of Marvell saying: Don't worry, you don't infringe.
>
> Here's the policy from Alan Armstrong, who was Marvell's designee on this topic. He said send it to legal to determine what the appropriate next steps would be. They never did this.

Tr. 12/20/12 at 32. Marvell did not object.

Later, CMU's counsel described Marvell's response to the 2003 letter from CMU to Mr. Pantas Sutardja, CTO of Marvell:

> So what does Marvell do? They ignore this letter. They simply ignore it. They don't write back and say: We don't infringe or we made a mistake and we have your invention in our chips and let us show you our lab notebooks. They do nothing. They also don't get an opinion of counsel. They don't do what their company policy says they should do. Again, they don't get an opinion of counsel. They just ignore it.

*Id.* at 34. Marvell's counsel objected "based on the court's order"; the Court sustained the objection and struck "[t]hose last comments." *Id.* However, as set forth below, the Court's order

did not preclude CMU from making this statement.

Subsequently, CMU's counsel described Marvell's response to receiving the 2004 Fujitsu

letter, stating:

> This next letter, this is 2004. Fujitsu specifically asks for an opinion from Marvell about these exact patents. There's no evidence of any response whatsoever.

*Id.* at 34-35.  Marvell's counsel did not object.  It was not until page 54 of the transcript, at a

sidebar on a different subject, where Marvell's counsel complained that CMU's counsel "now

three times claimed that we never got an opinion from a lawyer."  *Id*. at 54.[1]

### B.       Opening Arguments

Mr. Greenswag's closing arguments were consistent with the opening he gave on

November 28, 2012.  In the opening, CMU's counsel stated:

> So, what did Marvell do after it learned of the CMU patent? Well, the evidence in this case is going to show that Marvell actually has a policy about what to do in these circumstances, and that policy requires it to consult with an attorney, and say, to determine whether what they are about to build is going to violate this patent that they have now been given notice of. The evidence will show that Marvell violated this policy, not just once, but at least twice, including with a letter from one of its customers saying, asking specifically, asking Marvell for an opinion, specifically identifying the CMU patents, and specifically identifying two of the accused chips, and saying, please give us an opinion that this is okay. Marvell ignored its own rules, and they never bothered to ask a lawyer whether it could build the MNP and NLD circuits into billions of chips without infringing on CMU's patents.

Tr. 11/28/12 at 116-17.  Marvell did not object to this statement at the time, nor did it move to

strike it at any time.  Accordingly, counsel for CMU had no reason to believe that a similar

argument would be objectionable, let alone the alleged basis for a mistrial.

### C.       Marvell's Policy and Pre-Suit Communications

#### 1.       Dr. Alan Armstrong's Testimony

On Day 8 (December 5), Marvell's VP of Marketing and Rule 30(b)(6) corporate

---

[1] Indeed, the Court characterized the Fujitsu letter as a "different story."  *Id.* at 56.

designee, Dr. Alan Armstrong, testified by video deposition about Marvell's policies related to

third party intellectual property.  He stated:

> 14 Q. Does Marvell have a policy with respect
> 15 to how it deals with information about patents that
> 16 may cover some of its products?
> 17 A. Can you be more specific?
> 18 Q. Well, when Marvell identifies a patent
> 19 that may be relevant to some of its products, for
> 20 example, it's storage products, does it have a
> 21 policy as to how it addresses that issue?
>
> 24 THE WITNESS: Any information we might
> 25 get about patents, either externally or internally,
> **01 the policy would be to send that to legal and to**
> **02 have legal analyze the patent and determine what the**
> **03 appropriate next step would be.**

Armstrong Tr. at 294:14-21; 294:24-295:3 (emphasis added).  Although Marvell has argued that

this policy does not require it to get an opinion of counsel, it is fair argument that the policy

requires exactly that.[2]

He then testified to his knowledge about whether that policy was followed with respect to

the CMU patents:

> 05 Q. Okay. And do you know whether that
> 06 happened here in connection with the Carnegie Mellon
> 07 patents that are at issue?
>
> 12 THE WITNESS: I do not know.
>
> 16 Q. Did you ever have any internal
> 17 discussions at Marvell regarding whether or not to
> 18 obtain a license to the CMU patent at issue?
>
> 21 THE WITNESS: So the answer is I'm not
> 22 aware of any discussions that were had internally
> 23 about licensing the CMU.

*Id.* at 295:5-7, 12, 16-18, 21-23.

### 2.   Dr. Zining Wu's Testimony

At trial on December 11, 2012, Dr. Zining Wu was questioned on direct about what he

did in response to becoming aware of the CMU patents.  He testified that he reviewed them with

---

[2] *See* Ex. A (Merriam-Webster online dictionary, accessed 12/20/12) at 1 (defining "determination" as "an opinion arrived at through a process of reasoning").  Given this definition, it is fair for counsel to argue that the "policy" that Dr. Armstrong described requires an opinion from counsel.

Marvell's internal patent attorney, Eric Janofsky.  *See* Tr. 12/11/12 at 323:9-24.

He did ***not*** testify that Marvell followed its policy to "have legal analyze the patent and analyze what the appropriate next step would be."  Instead, he then testified that in connection with his "own patent" (presumably DX-266) on the MNP, he disclosed the CMU patents to the Patent Office.  *See id*. at 323:25 – 324:6.  His testimony included commentary that the Patent Office granted Marvell's patent, at which point CMU's counsel objected and the Court granted CMU's motion to strike Dr. Wu's testimony.  *Id* at 324:7-10.  Through this testimony, Marvell clearly attempts to imply, inappropriately, that consulting with counsel regarding the patentability of his alleged own invention is somehow consistent with the policy described by Dr. Armstrong or has some legal bearing on whether Marvell was infringing valid CMU patents.[3]

Later in the trial, Dr. Wu was examined *in camera*.  Among other things he testified that he never read the file history of the CMU patents.  *See* Tr. 12/13/12 at 73.  He also testified in response to questions from Marvell's counsel that he came to a conclusion about the CMU patents with Marvell's in-house patent lawyer.  *Id.*  And that he reviewed the CMU patents under the supervision of Marvell's in-house patent lawyer, Eric Janofsky.  *Id.* at 74.  At that point, CMU's counsel interjected that Marvell asserted privilege with respect to advice of counsel.  *Id.* Marvell's counsel did not ask any further questions.  *Id.*

### 3.   Mr. Greg Burd's Testimony

At trial, Mr. Burd admitted to having at least one of the CMU patents in early January 2002.  *See* Tr. 12/17/12 at 169.  In response to a question about whether he had read the claims of the patent, Mr. Burd sidestepped and volunteered that he had forwarded the references to the CMU patent "to our counsel, internal patent counsel…."  *Id.* at 170.  CMU's counsel called for a sidebar (*id.*) and the Court struck Mr. Burd's answer.  *Id.* at 174.

### 4.   Marvell's Litigation Position on Asserting Advice of Counsel

During deposition after deposition of Marvell employees in this case – including Dr. Alan

---

[3] Notably, the Court struck similar testimony volunteered by Mr. Burd.

Armstrong, Dr. Zining Wu, and Greg Burd – Marvell's counsel asserted privilege and instructed the witness not to answer straightforward "yes" or "no" questions about Marvell's consultations with in-house or outside counsel, if any, relating to the CMU patents. *See, e.g.*, Dkt. 723 at Ex. 1 (A. Armstrong dep.) at 295:16-302:1; Dkt. 723 at Ex. 2 (Z. Wu dep.) at 23:24-24:12; 337:10-339:21; Dkt. 723 at Ex. 3 (G. Burd dep.) at 674:5-680:21; 1095:24-1101:2.

When confronted with Marvell's repeated assertion of privilege during an August 2010 status conference, Marvell indicated that it would not assert an advice of counsel defense. During a telephone status conference held August 27, 2010, Marvell's counsel, Mr. Radulescu, first told the Court and CMU that there were no written communications or oral communications with outside counsel:

> The issue of trying to drill down and get this knowledge regarding validity or infringement, and drilling down to what we consider the more privileged area of commenting about our power points, none of that stuff exists, in the sense, not only are there not written communications, but with respect to oral communications with outside counsel, straightforward questions like that, right, have there been any written or oral communications with outside counsel prior to suit regarding the CMU patent, that type of question, I think, is going to be answered, no. And then, again, it's something that we're more than happy to try to work this out, if that's what they are getting at.

Tr. 8/27/10 at 76-77. When pressed by CMU's counsel about communications with in-house counsel, Mr. Radulescu responded that Marvell would not be asserting an advice of counsel defense:

> … we will not be asserting the advice of counsel defense and the further communication, Your Honor, and I'll just be pretty straightforward about it. The reason why we've been careful is, I think this is correct, that if you go back five years and ask who was in the legal department, I think none of those people are around. So, you met Miss Jin Pin Chang at the tutorial. She has the longest tenure. She doesn't go back to that time period. So, with respect to back in the early days, we don't have the  -- we don't have anyone at the company who was in that office. And so, we have a file. And to the extent that the file contains privileged communications, they have been logged. I think in this case it probably was copies of the patent, or something like that that we would not. If it is logged, we would simply just produce them.

The issues they have been getting into happened five years ago or six years. We
don't got people. It's sort of hard. We're trying to work through these very sort
of strange issues, when you don't have the people around.

*Id*. at 77-78. Notably, Dr. Wu and Mr. Burd were and are still with Marvell. If Marvell had

intended to rely upon them to assert a reliance on counsel defense based upon oral

communications, it could have done so. It did not. Instead, it chose to assert the privilege and

***waive*** an advice of counsel defense.

> 5.  The Court's Opinion on CMU's Motion in Limine re Pre-Suit
>     Communications with Counsel

CMU filed a Motion in Limine to Strike Testimony and Preclude Argument Relating to

Marvell's Pre-Suit Communications with Counsel (Dkt. 722). In its December 20, 2012 Order

granting in part and denying in part CMU's motion, the Court noted that Marvell "has expressly

stated throughout this litigation that it is not raising advice of counsel as a defense to the

willfulness claims…." Dkt. 753 at 2. The Court denied CMU's motion to strike Dr. Wu's

testimony about pre-suit communications with counsel about the CMU patents on the basis that

striking evidence was an "extreme" sanction and that CMU had waived its objection. *Id.* at 1-2.

However, the Court ***granted CMU's motion "to the extent that CMU seeks to preclude***

***Marvell*** from arguing that it sought an opinion of counsel and obtained a favorable opinion of

counsel with respect to whether Marvel was infringing the patented methods …." *Id.* (emphasis

added). The Court determined that ***"the facts presented at trial through the testimony of Dr.***

***Wu do not establish that he received an opinion of counsel, favorable or unfavorable, with***

***respect to these issues."*** *Id.* at 2-3 (emphasis added). "These issues" refer to issues relating to

infringement by Marvell of the CMU patents. *See id.* at 2. Instead the Court found that Dr. Wu

"merely testified that the 'prior art,' i.e., the '180 Patent and the '839 Patent, was given to

Marvel's patent counsel and that he later obtained his own patents…." *Id.* at 3. CMU's closing

argument is entirely consistent with this finding by the Court.

The Court also held that "Marvell cannot now… argue that its receipt of a patent ***implies***

***or suggests*** that Marvell's counsel returned a favorable opinion that Marvell's NLD-type and

MNP-type chips and simulators and the Kavcic Viterbi simulator do not practice the patented methods of the asserted claims…." Dkt. 753 at 3 (emphasis added). However, the Court made no mention of precluding CMU from making arguments on that issue; indeed, the Court actually provided the instruction it will give to the jury on this issue. Dkt. 753 at 4 (citing 2012 AIPLA Model Patent Jury Instructions, § 12.2 (2012)).

Critically, despite Marvell's characterization that CMU's argument "directly violated the Court's order issued just this morning," Br. at 11, *the order did not preclude CMU from making any argument*. *See* Dkt. 753 at 1-4.

### D.   Arguments and Evidence on DSSC Agreements

Later in the closing, CMU's counsel was explaining the DSSC to the jury. He said that "what Marvell did was they broke the chain of innovation by not paying the royalties that they now owe." Tr. 12/20/12 at 41. He then described the 1983 IBM Associates Agreement with the CMU Magnetics Technology Center (the forerunner to the DSSC). *See* Exhibit DX-17. CMU's counsel explained how this agreement provides that, in the event CMU decides to offer licenses to the DSSC inventions to third parties, the licenses shall be royalty bearing, and "said royalty income shall be utilized at the Center [i.e., the MTC, later the DSSC] to sponsor further research." DX-17 at 4-5; Tr. 12/20/12 at 41. The 1992 Seagate Associates Agreement as well as the 1993 3M Associates Agreement have similar provisions. *See* DX-39 at 2-3; DX-40 at 8-9.

CMU's counsel then argued that the jury should not "allow Marvell to break that chain." Tr. 12/20/12 at 41. Marvell's counsel then objected on the basis of the Court's motion *in limine* ruling (Dkt. 608). That ruling, however, permitted CMU to argue the economic circumstances of the DSSC at the time of the hypothetical negotiation. *See* Dkt. 608 at 8. CMU believes that its argument was consistent with that ruling, especially because *Marvell* is using the same DSSC Agreements—which the Court admitted—as evidence of CMU's views going into the hypothetical negotiation.[4]

---

[4]  Marvell's damages expert testified extensively regarding the DSSC Agreements and what they purportedly revealed to him about CMU's views as to the value of the patents. *See*, *e.g.*, Tr. (12/12/12) at

This notion of feeding licensing revenue back into the DSSC, however, is consistent with the testimony of Dr. Cohon, President of CMU.  Dr. Cohon testified that CMU loses money on "everything we do," including research.  Tr. 11/28/12 at 192.  To fill the gap, the university relies on private gifts and licensing income.  *See id.* at 192-93.

### E.     Identity Theft Analogy

Later in the closing, CMU's counsel started to make an analogy to identity theft.  Before he could complete the analogy, Marvell's counsel objected; the objection was sustained at side bar; and CMU's counsel did not further pursue the analogy.  CMU's counsel started the analogy by stating:

> So, I think I've got an analogy to help you as you deliberate. The invention in this case is like your electronic identity, your credit card numbers, your Social Security number. It's that which are very personal and valuable to you. You devote years to building up your reputation, your credit rating, your standing. One day Marvell sneaks in --

Tr. 12/20/12 at 59.  At that point Marvell's counsel objected.  *See id.*  After a sidebar the Court sustained the objection, stuck the statement and CMU's counsel immediately dropped the analogy.  *See id.* at 61.

---

283 ("Q. I asked you, or you answered, I've tried to do – I've not tried to do an apportionment because my opinion is based on a lump sum, which I thought would be appropriate.  So I've not undertaken to do that.  **Question, the lump sum, $250,000 from the DSSC agreement"  That's correct**.  That was your testimony; correct?  A. Yes"); *id.* at 195:  "Q. And just to be – just to be clear, what particular documents at CMU were of critical importance to your opinion?  A. Of critical importance were the – you know, the policy set up by CMU as to what it was trying to do as an institution, the licenses that it already granted – Q. Let just me stop you there.  Which were what?  A. which were the three -- . . . Yes, to Seagate, to IBM, and to 3M.  I looked at other correspondence where CMU had encouraged the people that I believe already had licenses to use it.  I looked at other correspondence where CMU wrote to the industry and said we have this technology; we would encourage you to talk to us to consider commercializing it.  I looked at the Intel agreement and all the correspondence that surrounded that, involving the head of Mr. Wooldridge and his office and his staff and the inventors and the Deans and department heads as everyone put together, **what they thought was the fair market value of these to be offered**.  So I looked at all that.  And I'm sure there were other CMU documents that I saw; but, you know, there was a reasonable body of documentation that I reviewed.").

### III.   ARGUMENT

#### A.   A Mistrial Is Not Warranted Here

1.   Mistrials Should Be Granted Only When There Have Been Egregious Misstatements and Misconduct That Pervades the Trial and Were Not Corrected When They Occurred

"The Supreme Court has long held that a litigant is 'entitled to a fair trial but not a perfect one.'" *Kelley v. Wegman's Food Markets, Inc.*, 98 Fed. Appx. 102, 104 (3d Cir. 2004) (quoting *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 553, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984)).  To an even greater extent than in criminal trials, "for civil trials, ... improper comments during closing arguments rarely rise to the level of reversible error." *Dunn v. HOVIC*, 1 F.3d 1371, 1377 (3d Cir. 1993) (finding no abuse of discretion where district court neither issued a curative instruction nor granted motion for mistrial after plaintiff's counsel, in closing argument regarding punitive damages, made remarks about "corporate lies" and analogized defendant to corporate fraudster Michael Milken) (citing *Littlefield v. McGuffey,* 954 F.2d 1337, 1346 (7th Cir. 1992)).  The Third Circuit has held that attorney misconduct warrants a new trial only when—after considering the case as a whole—the Court determines it is "***more than*** reasonably ***probable***" that the verdict was influenced by the misconduct. *Vandenbraak v. Alfiere*, 20 Fed. Appx. 185, 189 (3d Cir. 2006) (citing *Draper v. Airco*, 580 F.2d 91, 96-97 (3d Cir. 1978)) (emphasis added).  That standard has not been met here.

In applying the "more than reasonably probable" standard, courts within the Third Circuit grant new trials only when the attorney misconduct is egregiously bad and goes well beyond any alleged misconduct here.  In *Draper*, for example, the court granted a new trial because counsel made repeated and outrageous statements about the defendants' relative wealth and the importance of "tumbl[ing] the magnificent big companies here."  580 F.3d at 95.  Counsel also asserted his personal opinion of the righteousness of his client's case, and he speculated that the

victim allegedly killed due to the defendant's misconduct had taken certain actions only to feed his now orphaned children.  *Id.* at 95-96 & n.6.  He repeatedly made prejudicial references to facts not in evidence.  *Id.* at 95-6.  Finally, he made a long series of "vituperative and insulting references to the defendants and defendants' counsel."  *Id.*  at 96.  For instance, counsel said that the lead engineer on the project "was in an evil league" and a "gang."  *Id.*  He also accused opposing counsel of deliberately destroying evidence.  *Id.*

The same was true in *Fineman v. Armstrong World Indus., Ind.*, 980 F.2d 171, 207 (3d Cir. 1992).  There, the misconduct "pervaded the trial."  *Id.* at 206.  In particular, Fineman's counsel "testified to his own truthfulness and trustworthiness, supplied 'facts' not in evidence about the credibility of [defendant's] witnesses, accused [defendant's] witnesses of being 'liars' and 'perjurers,' and levied 'an unadorned, disparaging attack' upon defense counsel throughout his summation."  *Id.* at 206-07.

Likewise, in *Lucent Technologies, Inc. v. Extreme Networks, Inc.*, 229 F.R.D. 459 (D. Del. 2005), there were countless instances of the same misconduct, which occurred even after defendant Extreme was warned that additional violations of the court's orders would result in a new trial.  *Id.* at 462-63.  In particular, Extreme made improper damages arguments during voir dire and opening statement, and the court admonished Extreme and instructed that such conduct should not continue. *Id.* at 462.  During trial, however, Extreme repeatedly continued the same misconduct.  *Id.*  Each time, the Court admonished Extreme and instructed that such conduct stop, but Extreme was unrepentant.  *Id.* ("Despite the Court's admonishment and its reiteration of its ruling throughout the trial, Extreme persisted in its course of conduct . . . .").  The court noted that it had "rejected Extreme's arguments [in support of its misconduct] multiple times at trial," but Extreme persisted.  *Id.*  The court then specifically warned Extreme that "it would face a new

trial if it continued with this strategy, and Extreme continued, at its own peril . . . ." *Id.*

Accordingly, the court ordered a new trial.[5]

Here, in contrast, there was not repeated, flagrant misconduct throughout the trial or even

throughout the closing argument.  Instead, there were two, or at most three, ***alleged***

misstatements, and they constituted a small minority of CMU's closing arguments.  Moreover,

the alleged misstatements were brought to the Court's attention and the Court took immediate

steps to address them.  The Third Circuit has held that, in such circumstances, the prejudice to

the other party is dispelled.  For instance, in *Vandenbraak*, the Third Circuit explained that "not

all improper remarks will engender sufficient prejudice to mandate the granting of a new trial."

The Court clarified that "where there is a misstatement in closing argument and it is brought to

the attention of the trial judge," prejudice can be, and is, eliminated through jury instructions.  *Id.*

at 190 (citing *Edwards v. City of Phila.*, 860 F.2d 568, 575 (3d Cir. 1988)).

Indeed, the Third Circuit has cautioned against granting motions for mistrial based on

small portions of opening and closing arguments:

> Our awareness of the nature of opening and closing arguments in an
> adversary proceeding and our concern for judicial administration preclude
> us from setting aside a verdict and ordering a new trial every time an
> advocate is verbally indiscreet unless his remarks are obviously
> prejudicial. . . . The prosecutor's questionable comment constituted two

---

[5] *See also Waddington N. Am., Inc. v. Sabert Corp.*, 2011 WL 3444150 (D.N.J. Aug. 5, 2011) (granting a
new trial when the violations permeated the trial and reasoning that "[t]he violations were egregious and
they were made far worse by the fact that in committing these violations Mr. Sutton repeatedly ignored
the Court's rulings"); *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 275-78 (5th Cir. 1998)
(ordering new trial because of egregious and repeated violations of court order regarding references to
particularly inflammatory evidence).  Courts outside the Third Circuit apply the same standard.  For
example, in *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749 (6th Cir. 1980), the court reversed
a denial of a motion for new trial because trial counsel made "deliberate and persistent appeals to passion
and prejudice" throughout trial and repeatedly and improperly injected the issue of the defendant's
insurance policy into the case.  *Id.* at 750.  There, objections to the misconduct "were repeatedly made
and sustained and the court continually admonished and finally reprimanded counsel but he paid not
attention . . . ."  *Id.*  Accordingly, when he "made the same prejudicial remarks in his closing argument to
the jury," the court of appeals held that the misconduct had reached the level that a new trial was
necessary.  *Id.*

> small paragraphs in the sixty pages of his closing argument . . . under
> these circumstances, the remarks of the prosecutor were not so pervasive,
> gross, or inflammatory as to constitute prejudicial error.

*United States v. Homer*, 545 F.2d 864, 868 (3d Cir. 1976).  The Ninth Circuit applied the same

reasoning in *Kehr v. Smith Barney*, 736 F.2d 1283 (9th Cir. 1984).  There, the court affirmed the

district court's ruling denying a new trial, and it reasoned that "the offending remarks occurred

principally during opening statement and closing argument, rather than throughout the course of

trial."  *Id.* at 1286.  Here, the challenged comments constitute only about one page of the forty-

six pages of transcript of the closing argument.

 This Court has discretion in determining whether to award a new trial, but the Third

Circuit has cautioned that in assessing prejudice, the Court should look to "the entire argument

'within the context of the court's rulings on objections, the jury charge, and any corrective

measures applied by the trial court.'"  *Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, Inc.*, 848

F.2d 613, 619 (3d Cir. 1988) (quoting *Westbrook v. General Tire & Rubber Co.*, 754 F.2d 1233,

1238 (5th Cir. 1985) (per curiam)).  Here, the Court already has sustained objections and issued

curative instructions.  The Court has issued similar instructions throughout the trial in response

to actions of both parties, when attorney argument or questioning was improper or elicited

testimony that is potentially misleading.  The jury is familiar with and presumptively follows

such instructions, and there is no substantial prejudice to Marvell.

 2. The Specific Arguments Marvell Challenges Are Not Grounds for a New
  Trial, and Courts Have Denied Mistrials in Analogous Cases

 Even in the criminal context, where a prosecutor's overzealousness may deprive

defendants of far more than their property, attorneys have "'considerable latitude' during closing

arguments to argue the evidence and to suggest that the jury may draw permissible inferences."

*United States v. Hernandez*, 306 Fed. Appx. 719, 723 (3d Cir. 2009) (citing *United States v.*

*Green*, 25 F.3d 206, 210 (3d Cir. 1994)).  Marvell identifies three instances of alleged

misconduct that purportedly support a mistrial here.  The identified arguments do not justify a

mistrial, as courts have held in analogous cases.

### a.   CMU's Statements Regarding the Absence of an Opinion of Counsel Do Not Justify a New Trial

"Although an infringer's reliance on favorable advice of counsel, or conversely his failure

to proffer any favorable advice, is not dispositive of the willfulness inquiry, it is crucial to the

analysis."  *Seagate*, 497 F.3d at 1369; *see also Broadcom*, 543 F.3d at 699 (such evidence is

relevant to inducement).  Accordingly, the proposed jury instructions that were provided to

counsel prior to closing indicated that the jury could consider as one factor in whether Marvell

acted willfully the lack of evidence that Marvell obtained a competent legal opinion.  The Order

issued by the Court on CMU's Motion in *Limine* [Dkt. 753] likewise indicated that **Marvell**, not

CMU, would be precluded from making an argument that implies or suggests that it received a

favorable opinion of counsel.  Dkt. 753 at 3.  And, the Court expressly found that Marvell had

not received such an opinion.

Under these circumstances, CMU was absolutely entitled to argue that Marvell did not

secure an opinion of counsel indicating that Marvell did not infringe the patents-in-suit.  The

Court, however, expressed concern that CMU demonstrated the absence of an opinion of counsel

by referring, in part, to the lack of documents related to such an opinion.  That concern is

misplaced because CMU's arguments are consistent with its opening statement and the evidence

in this case, and they do not violate any of the Court's orders.

Even if the Court's order at Dkt. 753 had precluded CMU from arguing the absence of an

opinion of counsel—which it did not—CMU's closing argument does not justify a new trial.  In

*Parker-Hannifin*, for example, the court held that arguments essentially identical to those CMU

made in its closing argument were not improper.  *Parker-Hannifin*, 2011 WL 976559 at \*12-14.

In *Forrest v. Beloit Corp.*, 424 F.3d 344 (3d Cir. 2005), the appeals court agreed that defense

counsel had "crossed the line," "flout[ing]" the district court's "earlier rulings restricting reliance

on misleading courtroom demonstrations or inadmissible evidence" by "repeatedly" invoking

same during his closing argument.  *Id.* at 352.  However, the court held:  "[W]e do not consider

his conduct so severe as to warrant a new trial."  *Id.* (finding no error in the district court's

refusal to grant new trial on basis of attorney misconduct).

### b.    CMU's Statements Regarding the Chain of Innovation Do Not Justify a New Trial

The Third Circuit only rarely finds that improper closing arguments create the degree of

prejudice necessary to justify a mistrial.  *See*, *e.g.*, *Dunn v. HOVIC*, 1 F.3d at 1377;

*Vandenbraak*, 20 Fed. Appx. at 189.  Courts here and in other circuits have reached the same

result even where counsel's improper comments violate a court order.  *See*, *e.g.*, *Johnson v.

Bowers*, 884 F.2d 1053, 1055-56 (8th Cir. 1989) (affirming denial of new trial in prisoner's civil

rights action where opposing counsel violated a pretrial order by mentioning prisoner's previous

convictions, because "although the convictions did not bear on any issues at trial, counsel's

statement did not clearly prejudice [the prisoner] because the jury already knew he was a

prisoner incarcerated for serious crimes."); *see also Forrest v. Beloit*, 424 F.3d at 352 (counsel's

repeated invocation, during closing argument, of a misleading demonstration and inadmissible

evidence did not warrant new trial even though district court had already issued rulings

restricting reliance on said evidence).

Here, the jury already knew that CMU, as a research university, derived income from

signatories of the DSSC agreements and from patent licensing and that it reinvests that income

into further research and university operations.  *See*, *e.g.*, Tr. 11/28/12 at 192-93 (Dr. Cohon's

testimony regarding CMU's reliance on licensing income to replenish its investments in, *inter alia*, research).

<strong>c.     CMU "Golden Rule" or "Put Yourself In My Client's Shoes" Arguments Do Not Justify a Mistrial</strong>

During closing argument, CMU drew an analogy between patent infringement and to identity theft.  Marvell objected a few seconds into the analogy, and it was stricken from the record.  Thus, even if CMU's analogy could be deemed an improper "golden rule" argument, any prejudice to Marvell was immediately dispelled.  Indeed, the Third Circuit has held that arguments that encourage juries to put themselves into the shoes of one party or another are "***rendered harmless*** either by an immediate curative instruction" or by a "complete final instruction to the jury concerning its proper role in the determination of liability and damages." *Edwards*, 860 F.2d at 574 (emphasis added).  Indeed, in *Edwards*, the Third Circuit held that the district court had eliminated any prejudice through its instruction that statements of counsel are not evidence and the jury must perform its duties without sympathy or prejudice eliminated any prejudice.  *Id.* at 575.  Here, the Court repeatedly has given instructions that attorney statements are not evidence, and the final jury instructions contain an instruction regarding the jury's responsibility to be impartial.  Accordingly, any prejudice to Marvell has been eliminated.

<strong>B.     <u>Rebuttal Argument By Marvell Is Not Warranted</u></strong>

Marvell's counsel is not entitled to rebuttal closing argument to address CMU's closing argument (or any purported misstatements therein) for at least the following reasons.

***First***, Marvell's request for "rebuttal" closing argument does not satisfy the standards for rebuttal.  In the context of rebuttal evidence, evidence that does nothing more than repeat or restate already admitted evidence is generally not admitted.  *See Bhaya v. Westinghouse Elec. Corp.*, 922 F.2d 184, 190 (3d Cir. 1990); *U.S. v. Wood*, 982 F.2d 1, 4 (1st Cir. 1992) (rebuttal

19

evidence is to be introduced to "explain, repel, contradict or disprove" a statement).  Marvell's counsel already addressed and argued its view of the evidence related to what Marvell did after it learned of the CMU patents.  *See* 12/20/12 Tr. at 25-29; 51-52 (arguing, *inter alia*, Dr. Wu, who is supervising Mr. Burd, reviewed the patent with Marvell's internal patent attorney and thereafter obtained patents that referred to the CMU patents on their face).  Any further argument would do nothing more than repeat or restate what Marvell already has argued.

In addition, the Court struck CMU's closing arguments related to its identity theft analogy (after only one sentence of the analogy), and arguments related to the clause in the DSSC agreements that provides that royalty income "shall be utilized at the Center [DSSC] to sponsor further research."  As the Court struck those statements from the record, Marvell has nothing to rebut on those topics.

***Second***, "the decision to permit rebuttal is a procedural matter which rests within the sound discretion of the trial judge . . . ."  *Fernandez v. Corporacion Insular de Seguros*, 79 F.3d 207, 210 (1st Cir. 1996).  "It is customary for the party bearing the burden of proof to open and close the argument."  *Edgerly v. City and County of San Francisco*, 2011 WL 2110319 at *8 (N.D. Cal. May 26, 2011) (*quoting Moylan v. Meadow Club, Inc.*, 979 F.2d 1246, 1251 (7th Cir. 1992)); *see also Martin v. Chesebrough-Pond's Inc.*, 614 F.2d 498, 501 (5th Cir. 1980).   Here, Marvell wants the Court to ignore this customary practice so that it can have the last word on damages and willfulness – two issues on which CMU bears the burden of proof.  Marvell's request is improper and not supported by the record here.  Indeed, despite the Court's clear order on the record that the practice in this Court is for the plaintiff to have the first and last word, Marvell has tried on multiple occasions to have the last word.  This most recent request is just another in a long line of attempts to get the last word despite long-standing custom and practice.

See, e.g., 12/1012 Tr. at 319-320; 12/19/12 Tr. at 21-22; Marvell 12/19/12 email at 5:44 p.m.

*Third*, Marvell would not be prejudiced if the Court denies it additional time for rebuttal closing argument. As stated above, two of the three alleged misstatements were stricken from the record. Furthermore, the Court's new proposed final instructions make it clear that Marvell's admitted failure to obtain an opinion of counsel is not conclusive of the willfulness analysis and the jury cannot assume that because Marvell did not obtain a legal opinion, the opinion would have been unfavorable. This limiting instruction is more than sufficient to cure any alleged prejudice to Marvell. *See, e.g.*, *Farley v. Country Coach Inc.*, 403 Fed. Appx. 973, 983 (6th Cir. 2010) (affirming district court's denial of a mistrial because moving party did not show that "curative instruction was insufficient to overcome any prejudice resulting from [non-moving party's] attorney's allegedly improper statements.").

*Finally*, CMU would be severely prejudiced if Marvell is permitted to present rebuttal closing argument to the jury on full day after CMU closed. If Marvell is now given an opportunity for a special, extra rebuttal that is utterly at odds with this Court's common practice, it will give the impression that there is special significance to what is going to be argued. Marvell should not be given a platform with the imprimatur of special time from the Court to repeat its prior arguments and/or argue that it in fact had obtained counsel's blessing when Marvell long ago waived the right to make such an argument.

To the extent the Court is considering granting Marvell rebuttal closing argument, CMU respectfully requests that Marvell provide a proffer of what it intends to argue to the jury and that CMU be provided an equal amount of time for sur-rebuttal.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, CMU respectfully requests that the Court deny Marvell's

Motion for Judgment as a Matter of Law of Non-Infringement.


Respectfully submitted,                          Dated: December 20, 2012


/s/ Christopher M. Verdini
Patrick J. McElhinny Pa. I.D. # 53510            Douglas B. Greenswag (admitted *pro hac vice*)
patrick.mcelhinny@klgates.com                    douglas.greenswag@klgates.com
Mark Knedeisen Pa. I.D. #82489                   925 Fourth Avenue, Suite 2900
mark.knedeisen@klgates.com                       K&L Gates LLP
Christopher M. Verdini Pa. I.D. # 93245          Seattle, WA  98104-1158
christopher.verdini@klgates.com                  Phone: 206.623.7580
K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA  15222
Phone: (412) 355-6500                            *Counsel for Plaintiff, Carnegie Mellon University*

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2012 the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Christopher M. Verdini
Christopher M. Verdini, Pa. I.D. # 93245
christopher.verdini@klgates.com
K&L GATES LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA 15222
Phone: 412.355.6500
Fax: 412.355.6501