**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CARNEGIE MELLON UNIVERSITY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 09-290 |
| | ) Judge Nora Barry Fischer |
| MARVELL TECHNOLOGY GROUP, LTD. | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |

## OPINION

### I.   INTRODUCTION

This is a patent infringement case brought by Plaintiff, Carnegie Mellon University ("CMU"), against Defendants Marvell Technology Group, Ltd. and Marvell Semiconductor, Inc. (collectively "Marvell"), alleging that Marvell has infringed two of its patents, for which the Court conducted a four-week jury trial from November to December of 2012. (Docket No. 760).[1] The jury rendered its verdict on December 26, 2012 in favor of CMU on infringement, validity and willfulness, and awarded damages in the amount of $1,169,140,271.00. (Docket No. 762).

Presently before the Court are several post-trial motions, one of which is Marvell's Motion for "Judgment as a Matter of Law or, in the Alternative, New Trial on Non-Damages Issues." (Docket No. 805). Included in this Motion is a (renewed) motion for a mistrial based on CMU's counsel's alleged misconduct during closing arguments and throughout the trial. (*Id.*).

---

[1] The trial ran from 9:00 a.m. to 5:30 p.m. Monday through Friday, with counsel and the Court arguing objections and motions most days starting at 7:30 a.m. and after trial until 7:00 p.m., sometimes 9:00 p.m.. The trial included 3 hours of openings, 3 hours of closing arguments, 171 exhibits, 20 witnesses, 1,100 slides, over 130 sidebars, and nearly 4,000 pages of trial transcript. (Docket Nos. 666-765, 770, 771). There were 9 jurors, each of whom were given a binder containing a copy of the patents, the Court's claim construction, initial instructions, a glossary of terms, and pages for notes. (Docket No. 671). Each juror also received a notepad to take notes, which all of them used, with one juror actually filling 3 such notepads by the end of the trial.

This motion has been fully briefed. (Docket Nos. 805, 806, 827, 851, 857).   The Court has decided to rule on the issues raised by Marvel's request for a mistrial separately from the other requests for a new trial on non-damages issues.   Upon consideration of the parties' submissions, oral argument, (Docket Nos. 880,881), and for the following reasons, Defendants' Motion for "Judgment as a Matter of Law or, in the Alternative, New Trial on Non-Damages Issues," (Docket No. 805), is denied to the extent it is predicated on CMU's alleged misconduct during the trial.

## II.   LEGAL STANDARD

### A.  Motions for  a New Trial

As the matter of whether to grant a new trial is a purely procedural question not pertaining to patent law, the laws of the Circuit where the trial occurs are controlling. *August Tech. Corp. v. Camtek, Ltd.,* 655 F.3d 1278, 1281 (Fed. Cir. 2011).   Accordingly, this Court looks to the Court of Appeals for the Third Circuit precedent.   A motion for a new trial pursuant to Federal Rule of Civil Procedure 59 can be granted "to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury." FED. R. CIV. P. 59(a). The Court is also "empowered to order a new trial on its own initiative 'for any reason that would justify granting one on a party's motion.'" *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir. 2001) (quoting FED. R. CIV. P. 59(d)). A new trial is most commonly granted in select situations, including: (1) when the jury's verdict is against the clear weight of the evidence; (2) when new evidence surfaces that would have altered the outcome of the trial; (3) when improper conduct on the part of an attorney or the court unfairly influenced the verdict; or (4) where the jury's verdict was facially inconsistent. *Davis v. Mountaire Farms, Inc.*, 598 F. Supp. 2d 582, 587 (D. Del. 2009).

The Court's level of discretion varies. *Moussa v. Commonwealth of Penn. Dep't of Pub. Welfare*, 289 F. Supp. 2d 639, 648 (W.D. Pa. 2003) (citing *Klein v. Hollings*, 992 F.2d 1285, 1289-90 (3d Cir. 1993)). "Generally, a party is not entitled to receive a new trial for objections to evidence that he did not make at or prior to the initial trial, even if they may have been successful." *Ashford v. Bartz*, Civ. No. 04-00642, 2010 WL 272009, at *4 (M.D. Pa. 2010) (citations omitted); *see also Kiewit Eastern Co., Inc. v. L & R Constr. Co., Inc.*, 44 F.3d 1194, 1204 (3d Cir. 1995) ("Courts often take a dim view of issues raised for the first time in post-judgment motions.  Generally, this is a decision within the sound discretion of the district court.").  Where a party requests a new trial based on an allegation of improper remarks by counsel, the test is "whether the improper assertions have made it 'reasonably probable' that the verdict was influenced by prejudicial statements." *Richmond v. Price,* Civ. No. 99-192, 2006 WL 3760535 (W.D. Pa. Dec. 18, 2006) (McLaughlin, J.)  (citing *Waldorf v. Shuta,* 142 F.3d 601, 628 (3rd Cir. 1998)).  Such statements must be viewed in light of the argument as a whole, and considering whether the curative instruction given by the Court was sufficient to remove the probability of prejudice.  *Draper v. Airco, Inc.,* 580 F.2d 91, 97 (3d Cir. 1978); *see also Johnson v. Elk Lake Sch. Dist.*, 283 F.3d 138, 148 (3d Cir. 2002) (new trial should only be granted when curative instruction is intrinsically ineffective at wiping the inadmissible declaration from the minds of the jurors, as our "system of justice, particularly in the civil context, where the consequences of jury error are not as grave as in the criminal setting, relies upon the ability of the jury to follow instructions")(internal quotation omitted).

### B.  Closing Arguments

The fundamental duty of counsel in closing arguments is to argue the evidence.  88 C.J.S. Trial § 291.  Counsel are permitted wide latitude in closing argument to comment and argue on

the evidence and draw any reasonable inferences and conclusions from the evidence at trial. *See United States v. Hernandez,* 306 F. App'x 719, 723 (3d Cir. 2009); *see also* 75A AM. JUR. 2D TRIAL § 532.  They are entitled to expound any theory which is reasonably supported by the evidence, present their interpretations of the evidence, and suggest that the jury draw certain inferences or conclusions from that evidence. 4 BUS. & COM. LITIG. FED. CTS. § 42:2 (3d ed.).  "Where the evidence conflicts—as it often does—a lawyer may ask the jury to resolve the conflict in favor of his client."  *Id.*  For example, counsel can argue the truthfulness of his own witnesses and attack the credibility of opposing witnesses who testified at trial. *United States v. Rivas,* 493 F.3d 131, 137-138 (3d Cir. 2007).[2]  At closing arguments, "parties are free to use hypothetical analogies to make their points; to comment on the credibility of the witnesses, to discuss how they believe the various pieces of the puzzle fit into a compelling whole, and to advocate why jurors should decide the case in their favor."[3]  *See* United States Courts, *Differences Between Opening Statements and Closing Arguments, available at:* http://www.uscourts.gov/educational-resources/get-informed/federal-court-resources/opening-statements-closing-arguments.aspx (last visited Aug. 23, 2013).  "[A]ttacks on the opposing advocate's arguments and tactics are acceptable, and indeed [] attacking and exposing flaws in one's opponent's arguments is a major purpose of closing argument." *Rivas,* 493 F.3d at 139.

---

[2]      *See also Spahr v. Ferber Resorts, LLC*, 686 F. Supp. 2d 1214, 1225 (D. Utah 2010), *aff'd*, 419 Fed. App'x. 796 (10th Cir. 2011) ("[T]he court is baffled by [defendant's] apparent contention that it is improper for counsel to make arguments about witness' credibility. That is exactly a purpose of closing. Calling his clients decent and honest, saying his expert is honest, and asserting that an opposing witness' testimony is not worth a hill of beans are precisely what [plaintiff's] counsel was expected to do at closing.").

[3]      Indeed, the American College of Trial Lawyers counsel that "it is both the right and duty of the lawyer to present the client's cause fully and properly, to insist on an opportunity to do so and to see to it that a  complete accurate case record is made without being deterred by any fear of judicial displeasure  or punishment." Annotated Code of Trial Conduct at 17(c) (2005) *available at* http://www.actl.com/AM/Template.cfm?Section=All_Publications&Template=/CM/ContentDisplay.cfm&ContentFileID=198 (last visited Aug. 23, 2013).

The scope of closing arguments is within the trial judge's sound discretion.[4] *See Herring v. New York,* 422 U.S. 853, 862, 95 S. Ct. 2550, 2555, 45 L. Ed. 2d 593 (1975); *see also* 88 C.J.S. Trial § 291.

## III.   DISCUSSION

Marvell renews its Rule 59(a)(1) motion for a new trial on the grounds set forth in its December 20, 2012 motion for a mistrial, (Docket No. 755), arguing that CMU's counsel made improper, misleading, and prejudicial comments during closing arguments that inflamed the jury, to the point where curative instructions would have made matters worse.  (Docket No. 806 at 11). Marvell also raises new arguments asserting that CMU's counsel engaged in a broad pattern of misconduct during the course of trial which prejudiced Marvell. (*Id.* at 17).

### A.  Closing Argument Overview

The jurors heard closing arguments on December 20, 2012, wherein the Court allowed each party to speak for approximately an hour and a half.[5]  (Docket No. 759).  Both parties used slide presentations of over one hundred slides each.  (Docket Nos. 770, 771).  In this Court's estimation, the jurors gave each attorney their full attention throughout the arguments.  The next morning, December 21, 2012, the Court instructed the jury and they began their deliberations, (Docket No. 764), which continued on the morning of December 26, 2012, arriving at a verdict that day. (Docket No. 765).

---

[4]     During case management conferences and pretrial conferences, this Court counsels parties to avoid repeating jury instructions as the Court will provide each juror with a copy of the instructions to utilize during deliberations.  *See Practices and Procedures of Hon. Nora Barry Fischer*, III. E. 17, 18, available at: http://www.pawd.uscourts.gov/Documents/Judge/fischer_pp.pdf  (effective Mar. 23, 2010).

[5]     Under the Court's Practices and Procedures, the Court usually suggests counsel take 30 minutes for openings and closings, but given the nature of the case and the length of the trial, the Court allowed each party an hour.  *See Practices and Procedures of Hon. Nora Barry Fischer*, III. E. 9. available at: http://www.pawd.uscourts.gov/Documents/Judge/fischer_pp.pdf   (effective Mar. 23, 2010).   After counsel (particularly Defendants') bargained for more time, the Court approved the parties each taking over an hour. (Docket No. 759).

### B.   Challenged Portions of CMU's Closing Argument

#### 1.  Advice of Counsel

Marvell's first line of objection is to CMU's counsel's discussion of Marvell's lack of advice of counsel. (Docket No. 806 at 19).  To obtain an understanding of the issues, the Court turns first to the pertinent parts of the evidentiary record.

#### i.   Factual Background

Dr. Armstrong, Vice President of Marketing, Storage Business Group, one of Marvell's 30(b)(6) witnesses, testified regarding Marvell's IP Policy:

> Q. Does Marvell have a policy with respect to how it deals with information about patents that may cover some of its products?
> A. Can you be more specific?
> Q. Well, when Marvell identifies a patent that may be relevant to some of its products, for example, it's storage products, does it have a policy as to how it addresses that issue?
> A: Any information we might get about patents, either externally or internally, the policy would be to send that to legal and to have legal analyze the patent and determine what the appropriate next step would be.
> …
> Q. And if someone at Marvell becomes aware of a patent that may cover the technology that Marvell is employing, is it Marvell policy that that information has to be forwarded to legal?
> A. Yes.
> Q. And it's your understanding that the obligation of Marvell employees with respect to patents is to respect them and to communicate with legal any time someone becomes aware of technology that -- or a patent that may cover technology that Marvell is employing?
> A. Yes.

(Docket No. 761 at Jt. Ex. C at 9-10).

CMU also presented evidence that Gregory Burd, Marvell's engineer who developed the accused technology, alerted his superiors to the existence of the CMU Patents in 2002. (Pl. Ex. 280, 283).  Mr. Burd testified:

> Q. In January, 2002, you kept going with your MNP development;
> isn't that true, sir?
> A. Yes, this is correct.
> Q. And you hadn't read the claims [of the CMU patents]?
> A. I have submitted this report to my, to my superiors, and you
> know, we also forwarded the --
> Q. Just a minute.
> A. -- the application and the references to Kavcic patent to our
> counsel, internal patent counsel, right, with clear evidence --
> Q: Your Honor. Sidebar, Your Honor.
> A. -- that the patent was cited.

(Docket No. 726 at 170).  However, Burd's then boss, Toai Doan, testified that "[i]n fact, I don't recall trying to do anything" in response to being alerted to the CMU Patents.  (Docket No. 761 at Jt. Ex. D).  Dr. Wu who subsequently became Burd's boss and worked to develop the accused technology testified that he had communicated with in-house counsel regarding the patents-in-suit:

> Q. Okay. Back in 2002 when you became aware of Dr. Kavcic's
> patent, did you review the patent at that time?
> A. I reviewed the patent with our internal patent attorney.
> Q. At Marvell?
> A. At Marvell.
> Q. And who was that?
> THE COURT: Dr. Wu, let me instruct you, to the extent that you
> talked to the attorney about the patent, anything that relates to your
> communications with the attorney, or his or her to you, is
> privileged, and you can't talk about it.
> Q. So, you can provide the name of the person?
> A. Mr. Eric Janofsky.[6]

(Docket No. 707 at 323-324).  Dr. Wu did not testify further regarding this communication.

---

[6]    Mr. Janofsky was not deposed in this case by either party and not called as a witness to testify.  As of 2010, he was no longer with Marvell.  (Docket No. 858-1).  He was involved in the well-known *Jasmine v. Marvell* case in which Marvell prevailed.  *See* http://www.law.com/jsp/article.jsp?id=1202437318351&The_Case_That_Wont_Die_Jasmine_v_Marvell (a trade secret dispute arising from an incident where former general counsel Matthew Gloss failed to hang up the phone after leaving a message for Jasmine's legal chief and allegedly continued to talk with two colleagues, including Mr. Janofsky, on speakerphone about appropriating trade secrets from Jasmine.).

The record also shows that CMU sent two letters in 2003 to Dr. Pantas Sutardja, Marvell's CTO, and Matthew Gloss,[7] its then General Counsel, enclosing copies of the patents and inquiring if there was an interest in the patents. (Pl. Ex. 422, Pl. Ex. 431).  Marvell did not respond to these letters.  (Docket No. 682 at 149-152). Later, Fujitsu, "a customer of Marvell's read channel i.e. 5575M, 7500M," wrote to Marvell in November 2004, that it had received a license offer for the CMU patents-in suit. (Pl. Ex. 477).  Fujitsu wrote that "since it seems that these patents might be related to read channel, we would like to know, by the end of November, your opinion regarding relationship between CMU's Patents and the above Marvell lead [*sic*] channel and the specific grounds/reasons for such opinion."  (*Id.*).  In this regard, Dr. Armstrong stated "[t]he response to a letter like this would have been to forward it to legal and have legal determine the appropriate action." (Docket No. 761 at Jt. Ex. C).  Lead counsel, at the time,[8] Dr. Radulescu then stated during Dr. Armstrong's deposition:

> Mr. RADULESCU: And by the way, your question regarding did we search for documents in response to this letter, the answer is yes.
> MR. McELHINNY (CMU): Okay. Did you find any?
> Mr. RADULESCU: I don't believe so.

(*Id.* at 535).   Subsequently, during a telephone discovery conference with the Court, Dr. Radulescu stated that "we will not be asserting the advice of counsel defense in part because the issues they have been getting into happened five years ago or six years.  We don't got people."

---

[7]      Mr. Gloss is no longer with Marvell.  He was deposed in this case but his testimony was limited by invocation of attorney-client privilege.  (Docket No. 858-1).

[8]      Dr. Radulescu acted as lead counsel for Marvell for the majority of this matter's four year history.  It was only in the last weeks before trial that the Court met Marvell's trial team. On October 11, 2013, six days before the Court heard argument on motions in limine, five attorneys entered their appearance in the matter, including co-lead trial counsel, Edward DeFranco.  (Docket No. 552).  Another lead trial counsel, Mr. Steven Madison, who argued opening and closings for Marvell, and Faith Gay, the lead attorney on damages, entered their appearances three weeks before the start of November 26, 2012 trial.  (Docket Nos. 599, 600).  Ms. Gay, Mr. Madison, and co-lead trial counsel, Kevin Johnson, appeared for the first time before this Court at the Final Pretrial Conference held on November 15, 2012.

(Docket No. 174-1 at 77-78). Further, Marvell asserted attorney-client privilege and work product protection every time that CMU inquired about any potential opinion of counsel relating to the patents-in-suit.  (Docket No. 858-1 at 17-20).

As part of its opening statement[9] on November 28, 2012, CMU's counsel highlighted these factual circumstances:

> So, what did Marvell do after it learned of the CMU patent? Well, the evidence in this case is going to show that Marvell actually has a policy about what to do in these circumstances, and that policy requires it to consult with an attorney, and say, to determine whether what they are about to build is going to violate this patent that they have now been given notice of. The evidence will show that Marvell violated this policy, not just once, but at least twice, including with a letter from one of its customers saying, asking specifically, asking Marvell for an opinion, specifically identifying the CMU patents, and specifically identifying two of the accused chips, and saying, please give us an opinion that this is okay. Marvell ignored its own rules, and they never bothered to ask a lawyer whether it could build the MNP and NLD circuits into billions of chips without infringing on CMU's patents.

(Docket No. 671 at 116-117).  Marvell did not object to this statement.[10]

---

[9]  "The purpose of an opening statement is to preview the evidence and make the trial easier for the jury to follow." *Holmes v. McGuigan,* 184 F. App'x 149, 152 (3d Cir. 2006) (citing *United States v. Dinitz,* 424 U.S. 600, 612, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976) (Burger, C.J., concurring)).  To that end:

> [t]his is each party's opportunity to set the basic scene for the jurors, introduce them to the core disputes in the case, and provide a general road map of how the trial is expected to unfold. Absent strategic reasons not to do so, parties should lay out for the jurors who their witnesses are, how they are related to the parties and to each other, and what each is expected to say on the witness stand. … Although opening statements should be as persuasive as possible, they should not include arguments.

United States Courts, *Differences between Opening Statements and Closing Arguments,* available at http://www.uscourts.gov/educational-resources/get-informed/federal-court-resources/opening-statements-closing-arguments.aspx (last visited Aug. 23, 2013).

Additionally, the Court notes it counseled jurors that:

> The first step in the trial will be the opening statements. The Plaintiff's attorney will first have an opportunity to make an opening statement. The Defendants' attorney will make an opening statement immediately after the Plaintiff's opening statement. Defendants can also reserve the right to open once Plaintiff puts on its evidence. You should be aware that the opening statements are not evidence. Their only purpose is to help you understand what the evidence will be and what the parties will try to prove. They are like a table of contents or an index to a book which can guide you as you hear this case.

(Docket No. 671 at 15); *see also* Third Circuit Civil Model Instruction 1.12.

During trial, given Dr. Wu's[11] and Mr. Burd's referenced testimony regarding consultation with in-house attorneys, CMU brought a "Motion in Limine to Strike Testimony and to Preclude Argument Relating to Marvell's Pre-Suit Communications with Counsel" on December 17, 2013. (Docket No. 722).  On December 20, 2013 the Court granted, in part and denied, in part said motion.  (Docket No. 753).  The Court denied the motion to the extent that CMU sought to strike testimony of Dr. Wu regarding his discussions with in-house attorneys. (*Id.*). The Court, however, granted the motion precluding Marvell from arguing that it sought an opinion of counsel and obtained a favorable opinion of counsel with respect to whether Marvell was infringing the patented methods through its NLD-type and MNP-type chips and simulators and its Kavcic-Viterbi simulator. (*Id.*).

The issue of advice of counsel was also addressed in the context of final jury instructions. The Court's October 2012, Pretrial Order had required the parties to submit "joint jury instructions."[12]  (Docket No. 315).  Yet, throughout the trial, disputes on instructions remained,

---

[10]      It is well-settled that a party may waive an objection by failing to timely raise the objection at trial. *See* FED. R. EVID. 103.  "The requirement of a timely objection promotes judicial economy by enhancing the trial court's ability to remedy the asserted error. If a party fails to object in a timely fashion, the objection is waived." *Gov't of Virgin Islands v. Archibald*, 987 F.2d 180, 184 (3d Cir. 1993) (citations omitted).

[11]      To the extent that Dr. Wu testified that he ran the CMU Patents by an in-house attorney, "assessing witness credibility is the sole province of the jury." *United States v. Basheer,* 07-3537, 2010 WL 4948960 (3d Cir. Dec. 7, 2010).  On this and all other areas of inquiry, the jury was charged to weigh witness testimony and give appropriate weight it deserved or discredit the testimony completely.  *See e.g. Barber v. CSX Distribution Servs.,* 68 F.3d 694, 700 (3d Cir. 1995).  Dr. Wu is very familiar with the patent system, being the inventor or co-inventor for over 150 patents.  (Docket No. 707 at 219).  During his testimony, the Court noted that Dr. Wu clenched his jaw, drank an entire pitcher of water, appeared generally uncomfortable, and continuously looked at Dr. Sutardja in the back of the courtroom throughout his appearance as a witness.  In this Court's estimation, the jury could have easily found Dr. Wu was not credible given his demeanor on the stand.

[12]      The Court struck the parties' initial instructions because only 12, out of a total 37, proposed jury instructions were agreed upon, with few actually relating to the substantive law in the case, making it clear the parties had not made any real effort to resolve their disputes and provide the Court a solid set of proposed instructions.  (Docket No. 627); (Docket No. 315) ("Counsel shall meet in an attempt to agree on a joint set of proposed substantive jury instructions regarding plaintiff(s)' claims and their elements, any defenses and their elements, and any evidentiary or other matters particular or unique to this case.… The Court will not accept separate proposed jury instructions from the parties.").

with the Court receiving the last "joint" draft of proposed jury instructions at 10:17 p.m. the night before the start of the charge conference.  The Court held an extensive charge conference over nearly three days.  (Docket Nos. 752, 759, 764).  Over the course of these three days the Court went through several drafts of the instructions and granted the parties multiple opportunities to argue anything and everything, including the issues surrounding advice of counsel. (Docket Nos. 752, 759, 764).

The Federal Circuit directs that while a failure to obtain an opinion of counsel no longer provides a presumption that such opinion would have been unfavorable, a failure to proffer favorable advice is crucial to the willfulness analysis.  *See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.,* 383 F.3d 1337, 1345 (Fed. Cir. 2004); *In re Seagate Tech., LLC,* 497 F.3d 1360, 1369 (Fed. Cir. 2007).[13]  Thus, the Court suggested using the 2012 AIPLA Model Patent Jury Instruction in this regard:

> In considering under the totality of the circumstances whether Marvell acted willfully, you may consider as one factor the lack of evidence that Marvell obtained a competent legal opinion. However, you may not assume that merely because Marvell did not obtain a legal opinion, the opinion would have been unfavorable. The absence of a lawyer's opinion, by itself, is insufficient to support a finding of willfulness.

---

[13]  The Court is mindful that under the America Invents Act, "the failure of an infringer to obtain the advice of counsel with respect to any allegedly infringed patent, or the failure of the infringer to present such advice to the court or jury, may not be used to prove that the accused infringer willfully infringed the patent or that the infringer intended to induce infringement of the patent." 35 U.S.C. § 298.  However, this provision only applies to any law suit commenced on or after January 14, 2013 without regard to the issue date of the asserted patent. Leahy Smith American Invents Technical Corrections, Pub. L. No. 112-274, 126 Stat. 2456 (2013) at § 1(a) ("Advice Of Counsel.—Notwithstanding section 35 of the Leahy-Smith America Invents Act (35 U.S.C. 1 note), section 298 of title 35, United States Code, shall apply to any civil action commenced on or after the date of the enactment of this Act."); § 1(n) ("Effective Date—Except as otherwise provided in this Act, the amendments made by this Act shall take effect on [January 14, 2013], and shall apply to proceedings commenced on or after such date of enactment.").

2012 AIPLA Model Patent Jury Instructions, § 12.2 (2012).   Yet, after closing arguments,

Marvell, through lead counsel, Mr. Johnson, requested that the Court <u>not</u> include this instruction

as part of the final instructions. (Docket No. 759 at 209, 210, 234-235; Docket No. at 761 at Ct.

Ex. F).

      In closing, Marvell, itself, argued about its policy to review patents, saying:

> And what does the Patent Office do? They issue us a patent. And
> as Her Honor has instructed you and will again, that in and itself
> does not mean that we're not infringing; but it's powerful evidence
> that we're not stealing, we're not thieves. We're not copiests.
> We're not infringers. We're proud of our work. Here's Dr. Wu.
> Remember we heard about this policy? We never saw anything in
> writing, but we'd heard about a policy where you're supposed to
> let the lawyers know. What does Dr. Wu testify to in the trial?
> When he became aware of the patent -- remember at the time Dr.
> Wu is supervising Mr. Burd -- I reviewed the patent with our
> internal patent attorney.
> MR. GREENSWAG: Objection, Your Honor….
> THE COURT: Okay. So the objection is overruled. You're going
> to continue, but you're not going to spend a lot of time on this
> issue. Move on, Mr. Madison.

 (Docket No. 759 at 79-80).   Then in CMU's closing, Mr. Greenswag argued the following,

which Marvell now maintains was prejudicial:

> After Marvell learns about this patent, they begin violating a real
> policy that they really do have, which is when there's a possibility
> that you are infringing, a possibility that you are infringing on a
> patented invention, you're supposed to get an opinion from legal
> counsel to see if they're okay. You never saw such an opinion in
> this case.  You can go through all the exhibits; you won't find an
> opinion from anybody either inside of Marvell or outside of
> Marvell saying: Don't worry, you don't infringe. Here's the policy
> from Alan Armstrong, who was Marvell's designee on this topic.
> He said send it to legal to determine what the appropriate next
> steps would be. They never did this…

(Docket No. 759 at 140).  And then shortly thereafter:

> CMU writes to Pantas Sutardja, the company's chief technical
> officer, and we also write to the vice-president of business affairs

and general counsel and said: Do you want to take a license? So what does Marvell do? They ignore this letter. …They do nothing. They also don't get an opinion of counsel. They don't do what their company policy says they should do. Again, they don't get an opinion of counsel. They just ignore it.

MR. MADISON: Your Honor, I object based on the court's order.

THE COURT: Sustained.

MR. MADISON: Ask the Court to strike Mr. Greenswag's comments.

THE COURT: Those last comments are stricken.

(Docket No. 759 at 142).  Marvell believes that these two statements were prejudicial as they allegedly misstated evidence which Marvell could not rebut.  (Docket No. 806 at 14).[14]

## ii.   Discussion

Turning first to CMU's counsel's initial comments at page 140 cited above, "failure to object precludes [a party] from seeking a new trial on the grounds of the impropriety of opposing counsel's closing remarks." *Drozdowski v. Northland Lincoln Mercury,* Civ. No. 04-756, 2007 WL 4563520 (W.D. Pa. Dec. 21, 2007), *aff'd,* 321 F. App'x 181 (3d Cir. 2009).  Marvell's counsel only objected to same at a later sidebar during argument directed to a different objection when Mr. Greenswag was discussing the 1983 DSSC agreements.[15]  (Docket No. 759 at 149-166); *see also infra* section III.B.2.  In any event, CMU's argument on this point does not warrant a new trial because it is neither improper, nor prejudicial for the following reasons.

There is no impropriety because the Court's order, (Docket No. 753), did not preclude CMU from arguing that Dr. Wu or Mr. Burd never received an opinion of counsel.  (Docket No.

---

[14]     Despite Marvell's contention that it could not rebut CMU's statements, Dr. Armstrong's testimony was of record and Mr. Madison could have argued any inference from this testimony during his closings.  (Docket No. 761 at Jt. Ex. C).  Marvell's counsel did ask for rebuttal closing arguments on these and other grounds, but the Court denied this request, given that the closings had already lasted approximately three (3) hours.  (Docket Nos. 759, 764); *see Fernandez v. Corporacion Insular De Seguros*, 79 F.3d 207, 209 (1st Cir. 1996) (the decision to permit rebuttal in closing arguments is within the sound discretion of the trial judge).

[15]     A lack of objection cannot be attributed to any gun-shyness by Marvell, as it was no stranger to objecting throughout this trial.  The Court ruled on hundreds of objections and heard argument at over 130 sidebars during trial.

759 at 140).  As Marvell had claimed attorney-client privilege over such communications and any related documents, the Court ruled on CMU's motion *in limine* that Marvell could not argue that the opinion of counsel was favorable because they had received a subsequent patent, without producing those communications.  (Docket No. 753).  Nor did the Court preclude Marvell from arguing at trial and in closing that the CMU patents were brought to the attention of the legal team at Marvell.  Indeed, the Court overruled CMU's objection to this line of argument during Marvell's closings.  (Docket No. 759 at 79).  Likewise, nothing in the Court's order precluded CMU from arguing that Marvell did not obtain an opinion of counsel.  (Docket No. 753).

The Court held that the parties were limited to relying on the non-privileged facts, i.e. that Dr. Wu spoke with counsel and that no written opinion of counsel was proffered by Marvell. (Docket No. 753).  The Court did not allow either party to argue that an opinion of counsel was likely favorable or unfavorable.  (Docket No. 759 at 205, 227).  Neither party breached this ruling, as CMU only spoke to the lack of an opinion, which was a proper inference from the evidence presented at trial.  *Telcordia Technologies, Inc. v. Lucent Technologies, Inc.*, Civ. No. 04-875, 2007 WL 7076662 (D. Del. Apr. 27, 2007) (holding it proper for "the plaintiff to tell the jury that the defendant did not obtain an opinion of counsel [as it] may indicate to the jury that the defendant did not act properly").  It is undisputed, that at closing arguments counsel can and should argue from the evidence and any inference that may be fairly drawn from that evidence. S*ee United States v. Hernandez,* 306 F. App'x 719, 723 (3d Cir. 2009); *see also* 75A AM. JUR. 2D TRIAL § 532.

Further, it was Marvell who spoke first touching directly on the topic of Dr. Wu's consultation with an attorney.[16]  (Docket No. 759 at 79-80).  Since Marvell argued that Dr. Wu

---

[16]     While Marvell argued vis-a-vis Dr. Wu's testimony that this meeting was somehow an attorney review of non-infringement, no advice of counsel exists in the record.  Further, it appears to this Court that the scope of any

consulted with a lawyer, it is hardly prejudicial that CMU argued a legitimate inference given the lack of written, or any other, confirming evidence related to said meeting.  Also, if Marvell believed that such argument should have been precluded it could have sought a ruling from the Court once CMU set forth these facts during its opening statement twenty-two days earlier.[17] (Docket No. 671 at 116-117).  It did not.

The second argument that Marvell finds objectionable, relates to Marvell's lack of response to CMU's letters. (Docket No. 759 at 142).  In this Court's estimation, it is likewise insufficient to support a new trial.  Most importantly, the Court upheld Marvell's objection at the time to this line of argument and struck the remarks from the record.  (*Id.*). Throughout the trial and in its final instructions, the Court instructed the jury that anything stricken from the record is not evidence, and must not be considered in its determinations employing the Third Circuit

---

discussion between in house counsel and Dr. Wu may have been related to obtaining his own patents.  (Docket No. 759 at 79; 707 at 323).

[17]     This Court notes that the Court's Pretrial Order (jointly proposed by the parties) set forth that all motion *in limine* were due no later than September 24, 2013. (Docket No. 315). However, the Court was extremely generous in entertaining motions and objections throughout this trial, in fact probably more than it should have been.  Not only were briefs filed throughout the night on various objections, but the parties also lodged their disputes to demonstrative slides via email to the Court's law clerk at all hours of the day.  It was not unusual for the Court to wake up each morning of the trial to stacks of written briefing and numerous emails of objections.  For example, the Court ruled on the following motions submitted by the parties during the trial: Marvell's Emergency Motion to Strike CMU's Attempt to Include Non-infringing Sales of Chips that are Never Used in the U.S. in the Damages Case it Intends to Present to the Jury (filed the Saturday after Thanksgiving, 2 days before the start of trial); Marvell's Motion for Extension of Time for trial (opposition filed at 10:46 p.m.); CMU's Motion For Leave to Recall Dr. Kryder (filed at 8:30 p.m.); Marvell's Motion to Exclude the Testimony of Catherine Lawton (filed at 2:50 a.m.); Marvell's "Motion for Reconsideration re: Court's Order Sustaining CMU's Objections to Disputed Defendants' Exhibit DX-189"(filed at 8:41p.m. the  Saturday after Thanksgiving); Marvell's Oral Motion to "Strike Slide 19 of Plaintiff's Demonstrative and Associated Testimony" (Response filed at 11:22 p.m.); CMU's Rebuttal Witness List/Offers of Proof; CMU's Motion to Strike Testimony of Marvell Expert Creighton Hoffman (Response filed at 9:43 p.m.); Plaintiff's Motion to Strike Testimony of Marvell Expert Richard Blahut and Enter Judgment of Infringement for Accused MNP Chips and Simulators (Marvell's Response filed at 5:00a.m.); Marvell's Motion to Strike Certain Testimony of Catharine M. Lawton (filed at 2:02a.m.); CMU's "Motion in Limine to Strike Testimony and to Preclude Argument Relating to Marvell's Pre-Suit Communications with Counsel" (Response filed 7:34 a.m.); and Marvell's Motion for Mistrial (filed at 9:30 p.m., Response filed at 11:57 p.m.). (Docket Nos. 656, 660, 672, 679-681, 683- 685; 687-698, 705, 712-720, 722-724, 727, 728, 730, 733, 735, 737, 744-746, 751, 753, 755-757).

standard charge regarding same.[18] (Docket No. 764 at 55).  Hence, this Court presumes, as does both the Supreme Court and the Third Circuit, "that juries act in accordance with instructions given them." *City of Los Angeles v. Heller*, 475 U.S. 796, 798, 106 S. Ct. 1571, 1573, 89 L. Ed. 2d 806 (1986); *Hill v. Reederei F. Laeisz G.M.B.H., Rostock,* 435 F.3d 404, 425 (3d Cir. 2006).

Moreover, CMU's contention is based on facts of record. (Pl. Ex. 422, 431).[19]  All parties agree that there was <u>no</u> response to these letters.  (Docket No. 759 at 85) ("Dr. Sutardja says we didn't respond; why? Because we're not using – we're not interested in using that."). Just because certain evidence or inferences are unfavorable to one party, does not make same prejudicial.  By definition, all relevant evidence will be prejudicial to one of the parties.  *See e.g. McQueeney v. Wilmington Trust Co.,* 779 F.2d 916, 923 (3d Cir. 1985) ("Virtually all evidence is prejudicial or it isn't material"); *United States v. Gross,* Crim. No. 91-00068, 1991 WL 83103 (E.D. Pa. May 13, 1991) ("all of the government's evidence is prejudicial, that is it tends to incriminate the defendant").  As much as Marvell may dislike these facts or want to distance themselves from them, they are what they are.  Hence, argument directed to same is appropriate.[20]  The motion for a new trial on the basis of advice of counsel arguments in Plaintiff's closing is denied.

### 2.  Damages Beyond a Reasonable Royalty

---

[18]      *See* Third Circuit Civil Model Instruction 2.9 ("I have ordered that [describe the evidence] be struck from the record and I am instructing you  that you must disregard that information [testimony]. That means that when you are deciding the case, you must not consider that information [testimony] in any way.")

[19]      Likewise, in a letter from Fujistu, the company asked for Marvell's opinion on the CMU patents.  (Pl. Ex. 477). Marvell has admitted that there is no known response to this letter by anyone at Marvell, and no indication any attorney-client protected documents existed on same. (Docket No. 761 Jt. Ex. C at 13 ¶ 14) (Dr. Armstrong of Marvell and Marvell's counsel and stating there were no documents in response to this letter, and not asserting attorney-client privilege in regards to any response).

[20]      In fact, in retrospect, the Court believes it should have overruled the objection, (Docket No. 759 at 142), and let the argument stand.

Marvell next objects to CMU's counsel's reference to Marvell "breaking the chain of innovation" in its closing.  (Docket No. 802 at 14).  The statement was:

> At the bottom of the -- in the associate's agreement it says: In the event the university decides to offer licenses – it's only talking about the university's right to offer licenses to third parties -- said licenses shall be royalty-bearing as decided by the university and the royalty income shall be utilized at the Center to sponsor further research. That is what was supposed to happen. And what Marvell did was they broke the chain of innovation by not paying the royalties that they now owe. All these years CMU should have been getting royalties, as the -- for the purpose as shown in this 1983 agreement, to fund further research, to lead to further innovation, to fund further research, to lead to further innovation. This is why CMU has been damaged by Marvell's infringement. Don't allow Marvell to break that chain. The actions of Marvell and the steps they took can be summed up –
> MR. MADISON: Excuse me, Mr. Greenswag; side bar.

(Docket No. 759 at 149).  After argument, at sidebar, the Court gave the following instruction:

> THE COURT: Thank you, Mr. Galovich and Ms. Hall. Ladies and gentlemen of the jury, this past argument that you've just heard from Mr. Greenswag about breaking the chain of innovation, that is stricken by the Court. You are to disregard that argument.

(*Id.* at 167).

Now, Marvell argues that this portion of CMU's closing was not only prejudicial but also violated the Court's Memorandum Order (Docket No. 608) on Marvell's "Motion *in Limine* No. D12 to Preclude CMU From Introducing Evidence and Argument Regarding Any Compensatory Damages Beyond a Reasonably Royalty." (Docket No. 523).

In relevant part, the abovementioned Memorandum Order addressed the opinions of CMU's damages expert, Ms. Catherine Lawton,[21] specifically her ultimate opinion that the

---

[21]     Ms. Lawton is a damages consultant with Berkeley Research Group.  She has a degree in finance and has been working in the field of damages calculation for 27 years, testifying and working on several cases.  (Docket No. 713).  The Court was impressed by the magnitude and thoroughness of her expert analysis with an initial report  of 541 pages, 3378 footnotes, 62 Schedules; 2 Updates totaling 78 pages; and, a Supplement of 51 pages.  (Docket

parties would have agreed to license the patent for $0.50 a chip.  (Docket No. 523).  Through this

motion, Marvell sought to bar CMU from presenting evidence and argument regarding any

purported harms other than the loss of the reasonable royalty that would have resulted from the

hypothetical negotiation for a license to the patents-in-suit.[22]  (Docket No. 523-1).  As the Court

read that motion, it revolved around the disputed factual predicate concerning the calculation of a

reasonable royalty and whether such harms were relevant to Ms. Lawton's calculation of the

$0.50 royalty.[23]  On this issue, the Court held that:

> Marvell's motion is granted to the extent that CMU is precluded
> from introducing evidence or argument at trial of the prospective
> harms to CMU (as set forth in pages 377-79 of Ms. Lawton's
> expert report) as a result of the alleged failure of Marvell to enter
> into a license for the patents-in-suit; and, … Marvell's Motion is
> denied to the extent that it seeks a pretrial order precluding all
> evidence of the economic circumstances of CMU and the DSSC at
> the time of the hypothetical negotiation.

---

Nos. 367, 488, 633, 634).  Having said that, in an abundance of caution, the Court took the unusual step of
permitting an *in camera* review of Ms. Lawton's testimony during trial.  (Docket No. 706).  Ms. Lawton gave her
entire anticipated testimony outside the presence of the jury to the Court and opposing counsel using approximately
200 PowerPoint slides she had prepared to aid in her testimony.  (Docket No. 706).  Given CMU's proffer and this
testimony, the Court accepted her as an expert in IP damages.  (Docket No. 686 at 29).  During her testimony before
the jury the next day, the Court opted not to allow Ms. Lawton to use most of her slides in order to avoid objections
and argument on each slide.  (Docket No. 686 at 20).  After 30 years of trial practice and nearly 7 years on the
bench, the Court found Ms. Lawton to be a remarkable witness.  She had an exceptional command of the facts, and
an uncanny memory of data, especially considering that the Court decided to prohibit her slides 10 minutes before
her testimony.  (*Id.*).  In her questioning, she was direct and clear; she managed to act as a teacher to the jury;  and
overall provided very convincing testimony.  Her proficiency as a damages expert in the case was particularly
evident in comparison to Marvell's Mr. Hoffman, who seemed to lack both clear explanations and an ability to stay
on topic.

[22]    These harms included "Independence to Pursue Exploratory Research Projects, Access the Money &
Resources, Ability to Build and Maintain State of the Art Facilities, Ability to Attract and Retain Top Faculty
Scientist, Ability to Attract and Retain the 'Best and Brightest' Students, Contribution to Society and Industry,
Administrative Burden of Litigation, Delay in Receiving Licensing Revenue," and so on.  *See* Catherine Lawton
Report (Docket No. 367-2 at 377-379).

[23]    In the earlier motion, briefing and argument, Marvell objected to Ms. Lawton's use of prospective harms,
urging they were irrelevant because in their view Ms. Lawton's testimony was pure speculation.  (Docket No. 524).
Marvell did not object on the basis of "hometown bias," as they do now.  (*Id.*).  As will be seen below, the Court
does not find that any mention of these alleged harms arouses "hometown prejudice. *See infra* Section III.C.1.

(Docket No. 608 at 2, 8).   Under this order, either party could base an argument on evidence of

the economic circumstances at CMU and the DSSC.[24]

Thus, Mr. Greenswag, CMU's counsel, in closing, read from page 4 the 1983 DSSC-IBM

Associates Agreement, (Def. Ex. 17), introduced by Marvell at trial, that said:

> In the event that the university decides to offer licenses under said
> inventions to third parties, said licenses shall be royalty bearing as
> decided by the university, and said royalty income <u>shall be utilized
> at the Center to sponsor further research</u>.

(Def. Ex. 17) (emphasis added).   In light of this evidence against which the Court considers

counsel's argument, it does not appear that he crossed the Court's line. (*Id.*).

Moreover, the parties are reminded that a ruling *in limine* "is preliminary in nature and

subject to change depending on the development of evidence at trial, on cross-examination and

rebuttal." *United States v. Curran*, Cr. No. 09-0325, 2011 WL 3421409 (W.D. Pa. Aug. 4, 2011).

"Indeed, even if nothing unexpected happens at trial, the district judge is free, in the exercise of

sound judicial discretion, to alter a previous *in limine* ruling." *Luce v. United States,* 469 U.S. 38,

41, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984).   To that end, the Court continuously counseled that

the parties make their record, and preserve their objections, as proffered evidence may change

the underpinnings of the Court's motion *in limine* rulings.   The Court's ruling on the motion *in

limine* stated that *at that time* CMU had not "established any factual predicate" to support any

comments or conclusions on CMU and the DSSC's mission.   (Docket No. 608 at 4-5) (emphasis

added).   However, at trial, CMU presented through its witnesses, especially Dr. Cohon and Dr.

Kryder, substantial testimony about the creation, mission and goals of CMU and the DSSC.   Dr.

Cohon initially recounted the history, goals and objectives of CMU and the DSSC, saying that

---

[24]      DSSC stands for the Data Storage Systems Center, the interdisciplinary center at CMU that funded long
term research and development of the patents-in-suit through federal grants, university investments, and corporate
sponsorship. (Docket No. 682 at 41-42).

"the Data Storage Systems Center is one of the very successful collaborative research centers that Carnegie Mellon has ever created. In fact, that anybody has ever created" and "[a]t one time it was estimated and it may still be the case that half of all the Ph.D's produced in that field [] came out of the Data Storage Systems Center at CMU." (Docket No. 671 at 193-194). Similarly, Dr. Kryder outlined how he originally set up the DSSC, the investments industry partners made, the investments CMU made, and the comprehensive work the Center accomplished. (Docket No. 682 at 27-42). Likewise, Dr. Moura discussed how he was one of the experts called in by Dr. Kryder to form a team with industry partners to write the funding proposal to the National Science Foundation. (Docket No. 673 at 42).[25] Marvell then elicited testimony about the goals and objectives of CMU, during its cross examination of Mr. Wooldridge, head of CMU's tech transfer office. (Docket No. 682 at 176). Specifically, Mr. Wooldridge testified that CMU prides itself on its computer science school, robotics and other departments.[26]

---

[25] Dr. Moura testified in full that:

> The DSSC is the Data Storage System Center, and Dr. Kryder, as I mentioned, an expert in the media, and in components of the disk drive. He understood, with his industrial partners, that the recording, recording industry was going to experience, in a few years, a very fast growth, in terms of the recording density. They were going to accelerate. And he, with his vision, he said, well, what we need is a group of people working together with industry, from different expertise, working closely with industry, to address the main challenges that the disk drive industry is going to experience. So, he called experts like me, and others. We formed a team. We wrote the big proposal, together with our industrial partners, since the very beginning, to the National Science Foundation. And companies like IBM, Seagate, and 3M, and so forth, were part of our proposal since the very beginning. And the NSF, the National Science Foundation, awarded us a very large fund, funding, and we formed the Data Storage and System Center

(Docket No. 673 at 42).

[26] Indeed, Marvell's counsel went to the CMU campus and bought a shirt that it proffered to the jury as a demonstrative, printed with:

> Top Ten Reasons to be a Tartan
> 10. Notre Dame? No problem: 19-0, 27-7, 7-0, 9-7
> 9. We Build Better Buggies
> 8. Work Hard, Cheer Harder
> 7. Friday Night Lights = Game Time!
> 6. SCOTTIE DOG
> 5. Karaoke at the Tartan Olympics

"[B]reaking the chain of innovation" was a partial quote from Marvell's own exhibits: the 1983 IBM-DSSC Agreement, (Def. Ex. 17); the Seagate-DSSC Agreement, (Def. Ex. 39); and the Minnesota Mining and Manufacturing Company (3M)-DSSC Agreement, (Def. Ex. 40), all of which were admitted into evidence.[27]   These agreements went out with the jury as exhibits and they were free to read these agreements in full during deliberations.   As extensive evidence had been entered onto the record regarding the DSSC, its function and its goals, from its founding in 1983 to the present, CMU's counsel were not out of bounds in making reference to same in its closing argument.

To the extent that Marvell maintains that the "breaking the chain" argument was improper, irrelevant and speculative, (Docket No. 806), it is not reasonably probable that the jury was inflamed by the statement.   *See Johnson*, 283 F.3d 138 at 148.   This commentary was brief, approximately seven (7) lines of a forty-six (46) page closing argument transcript, after a four (4) week trial of almost 4,000 pages of transcript.   (Docket No. 759).

Moreover, the comments were stricken and the jury was instructed multiple times to disregard any comments struck by the judge. (Docket No. 764 at 167; 54-55); *Hill,* 435 F.3d at

---

4. Everything Goes with Plaid
3. The Kiltie Band – 100 Years of Pantslessness  (sic)
2. 500 Football Wins….And Counting
1. <u>Our Robots Will Beat Your Robots</u>
(Def. Demo. 2) (emphasis added).

[27]     The DSSC Associates Agreement between CMU and Seagate Technology states:
> In the event that the University decides to offer licenses under said Inventions to third parties, said licenses shall be royalty bearing, as decided by the University, and said royalty shall be utilized at the Center to sponsor further research

(Def. Ex. 39 at ¶ 2(c)).  The CMU and Minnesota Mining and Manufacturing Company (now 3M) DSSC Agreement likewise memorializes:
> The University may grant, on reasonable terms and conditions, non-sublicensable, non-exclusive licenses with entities not having an Associate Member Status.   Such licenses may be royalty bearing, and royalties derived therefrom shall be utilized to sponsor further research at the Center.

(Def. Ex. 40 at Ex. A¶10).

425 ("we presume that juries follow instructions"). Further, these comments were made during closing argument and the jury was also told that closing arguments by the attorneys are not evidence. (*Id.*); (Docket No. 764 at 167; 54-55).[28] In light of the Court's instructions and upon review of the record as a whole, these statements about breaking the chain of innovation simply do not rise to the level of prejudice requiring a new trial. *Drozdowski,* 2007 WL 4563520. ("the jury was instructed that neither counsel's opening or closing remarks are evidence and should not be considered by them as such and that they are charged with remembering the evidence presented and to apply the law as instructed by the Court … Because it is presumed that a jury will follow the instructions that they are given, it may be presumed here that the jury applied the law as instructed by the Court and disregarded any contrary statements made by counsel.").

### 3. Identity Theft

Marvell next challenges CMU counsel's reference to infringement being like "identify theft" asserting it warrants a new trial. (Docket No. 806 at 16). The "offending" statement was:

> MR. GREENSWAG: Thank you, Your Honor. So, I think I've got an analogy to help you as you deliberate. The invention in this case is like your electronic identity, your credit card numbers, your Social Security number. It's that which are very personal and valuable to you. You devote years to building up your reputation, your credit rating, your standing. One day Marvell sneaks in --
> MR. MADISON: Objection
> ….
> THE COURT: The objection is sustained. Ladies and gentlemen, you'll disregard that last argument, it is stricken.

(Docket No. 759 at 167-169).

---

[28] Additionally, after closings and before the final instructions, the Court proposed instructing the jury an additional time that closings arguments were not evidence, but Marvell believed that such an instruction was not enough and opposed this further instruction. (Docket No. 761 at Ct. Ex. N); (Docket No. 764 at 37-42).

The Third Circuit has recognized "that the propriety of put yourself in the [parties']²⁹ shoes' argument, as a tool of advocacy, is doubtful because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." *Edwards v. City of Phila.*, 860 F.2d 568, 574 (3d Cir. 1988) (internal quotation omitted). This line of argument is sometimes called the "Golden Rule." (*Id.* at 573). However, the Third Circuit has also held "that a clear and complete jury instruction on the elements of the claim asserted and on the allocation of the burdens of proof, whenever given, is sufficient to cure harm caused by a 'Golden Rule' argument." *Id.* at 574; *In re Bayside Prison Litig.*, 331 F. App'x 987, n. 7 (3d Cir. 2009). Here, the testimony in question was stricken; the jurors were instructed to disregard stricken statements; and the jurors received clear and complete instructions on the elements of the claims and the allocations of the burden of proof.   (Docket No. 764). Accordingly, to the extent such a statement is prejudicial,³⁰ under the "Golden Rule" or similar theory, in this Court's estimation, the Court's instruction as a whole has cured any potential harm, and a new trial is not required on this basis.

### 4. Closing Argument in Sum

Upon review of the record against CMU's closing argument, it is clear to the Court that none of its counsel's statements singularly nor taken together, made it reasonably probable that the verdict was influenced by any resultant prejudice. *Forrest v. Beloit Corp.,* 424 F.3d 344, 351 (3rd Cir. 2005). In so ruling, the Court has considered the closings in light of the entire trial, the nature of the statements, and the amount of energy extended by both counsel and the Court

---

²⁹      Usually this rule is in the context of putting one's self in the shoes of the defendant or victim in a criminal matter. *Edwards*, 860 F.2d 547.  The fact that the Circuit finds no harm in such situations with proper instructions in the criminal context, where the stakes are higher than a civil case, further reinforces the Court's decision here.

³⁰      The Court notes that Marvell's objection was raised early in this portion of the argument.  (Docket No. 759 at 167).  In this Court's opinion, it is doubtful that any of the jurors even had time to register CMU's argument on this point, in that brief time.

through this four week trial. *See Richmond v. Price,* Civ. No. 99-192 ERIE, 2006 WL 3760535 (W.D. Pa. Dec. 18, 2006) ("Courts have uniformly required misconduct by counsel to be extremely pervasive and egregious before a new trial will be granted.")  The Third Circuit has observed that "at least for civil trials…improper comments during closing arguments rarely rise to the level of reversible error" and this is one of those instances. *Dunn v. HOVIC*, 1 F.3d 1371, 1377 (3d Cir. 1993).  Both sides zealously argued their parties' positions, using the evidence of record and all reasonable inferences therefrom, to present compelling points to the jury. *United States v. Young*, 470 U.S. 1, 10 (1985).  Marvell has offered no evidence or proof of prejudice beyond the mere fact the jury decided in CMU's favor.  Further, the jury awarded damages in the exact amount calculated by Plaintiff's damages expert; they did not levy any damages beyond the scope of those presented and argued by CMU.  Thus, Marvell's motion for a new trial on these grounds is denied.

### C.  Pattern of Prejudice

#### 1. Hometown Bias

As noted, Marvell has raised new arguments in its post-trial motion alleging that CMU's conduct throughout trial resulted in prejudice warranting a new trial.  (Docket No. 806 at 22) Specifically, they argue that the then President of CMU, Dr. Jared Cohon in making hometown references likely "inflamed" the jurors to favor their local institution.  (Docket No. 806 at 23; 881 at 95).  Marvell contends that such statements were part of a larger theme of "[y]ou know, CMU, Pittsburgh, non-profit, givers, job creators, local, Americans. Marvell, out-of-towners, immigrants, not Americans in their view, profiteers, not not-for-profit, not creating any jobs here in Pittsburgh." (Docket No. 881 at 97). CMU counters that it is "frankly … offensive for Marvell to stand before the Court and suggest that CMU tried to prey [on] some sort of racial or national

preference here. It's mind-boggling and certainly the Court would never have permitted it and it's a Hail Mary because they've never said that before." (*Id.* at 101).

Dr. Cohon was CMU's first witness.[31] (Docket No. 761).  He discussed the founding of the university, its goals, objectives, the DSSC, and areas of excellence of CMU.  (Docket No. 671 at 187-190).  At the time, counsel for Marvell objected to only one facet of his testimony, and the Court allowed the questioning to stand, stating:

> THE COURT: First off, he hasn't said anything about what he intends to do with the money. All he's talking about right now is what the university is about, its commitments; and I think those are commitments that Dr. Sutardja would also recognize, and I think he's going to talk about, has talked about the strategic plan, research, globalization, job creation…. we're going to move on…

(*Id.* at 190).

Just as the Court explained then, such discrete references to Pittsburgh or positive views of CMU did not "inflame" the jurors' local bias such that justice would require a new trial. *Bhaya v. Westinghouse Elec. Corp.*, 709 F. Supp. 600, 601 (E.D. Pa. 1989).  It is expected that the counsel and witnesses provide background information on the parties and their dispute to inform the jury of the circumstances that led them to seek relief in this Court.  FED. R. EVID. R. 401 Advisory Note ("Evidence which is essentially background in nature can scarcely be said to involve disputed matter, yet it is universally offered and admitted as an aid to understanding.").  The Court is at a loss how CMU could be expected to present this case to the jury without mentioning "Pittsburgh."[32]   In his testimony, Dr. Cohon was simply giving background

---

[31]      It was the Court's perception of Dr. Cohon, that he was not completely comfortable on the stand, possibly nervous, in that the Courtroom was not his realm.  He appeared as a mild mannered, matter of fact older gentleman, with a long career in education.  Dr. Cohon was humble, yet certainly proud, of both his accomplishments and CMU's achievements during his tenure as President.  His mood and tenor were not inflammatory.

[32]      In fact, Marvell's counsel pointed out that CMU was a global university with campuses in Silicon Valley and Qatar, and programs throughout Asia, Australia, Europe and Latin America.  (Docket No. 671 at 146).

information on the University and the DSSC, which served to establish the facts and circumstances surrounding the invention of the patents in suit. (Docket No. 671). Furthermore, it is a fundamental element of successful trial advocacy to introduce the jury to your client, and when the client is a corporation or university, counsel should endeavor to give a "face" to that entity. CMU did this with Dr. Cohon, and Marvell did this with Dr. Sutardja.[33] To that end, Dr. Sutardja offered similar testimony about his own personal history that led to Marvell's founding and their goals. (Docket No. 707 at 36-45). He also described the secret to Marvell's success was its "people that are smart," who are extremely hard-working, "friendly," and "want to make a difference in the world." (*Id.* at 54-56). Dr. Sutardja expressed that Marvell's most important awards are those from the customers, (including an early award one from Seagate, a first of its kind). (*Id.*). Both presidents of their respective organizations supplied background with obvious pride for the people and the entities they represent. Any different interpretation is contrary to the content and tone of their testimony.

The Court similarly refuses to draw a bright line rule regarding references to Pittsburgh or comment on same. As CMU has noted in argument and briefing, both parties tried to relate to the jurors. (Docket No. 827). Marvell referenced Heinz Field, (Docket No. 671 at 152-153), Evgeni Malkin,[34] (Docket No. 759 at 103), and conversely tried to argue that Dr. Cohon stated "We are Pittsburgh" in an attempt to demonstrate local bias. (Docket no. 759 at 60).

CMU counters that Marvell is trying to suggest that CMU preyed on some racial or national preference. While the Court hopes that Marvell is not actually arguing there was any

---

[33]     Neither Pantas Sutardja, Dr. Sutardja's wife, Weili Dai, nor any other member of the Marvell Board of Directors have appeared before the Court in the last 4 years of this litigation, although Dr. Sutardja, his brother Pantas, and his wife, together own 19% of Marvell. (Docket No. 707 at 146).

[34]     Evgeni Malkin is a center for the Pittsburgh Penguins. Although, counsel for CMU claim that Marvell's counsel mispronounced "Evgeni Malkin" twice, the Court declines to respond to that point. (Docket No. 827 at 17).

anti-immigrant/anti-foreigner bias by the jury, for completeness sake, the Court puts forth its belief that there was no such actual or implied bias by the members of the jury, all of whom followed the trial closely.[35]   Initially, the Court notes that Marvell's proposed *voir dire* did not include any requests for questions exploring jurors "local bias." (Docket No. 621). The agreed upon *voir dire* consisted of 29 questions for each juror, not including follow-ups, probing whether the jurors had any knowledge of or bias against the parties, counsel, witnesses, and the subject matter.[36]   (Docket Nos. 666, 669).   The Court allowed both sides' trial counsel and jury consultants to participate in the jury selection process and was generous in granting challenges for cause. Unsurprisingly, *voir dire* lasted for two full days.[37]   To the extent Marvell thought that any juror was biased, its opportunity to expose those possible biases and challenge a juror, was at *voir dire. McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 554, 104 S. Ct. 845, 849, 78 L. Ed. 2d 663 (1984).   Yet, Marvell did not assert at *voir dire* that any jurors expressed "local bias."   Accordingly, failure to raise such issue acts as a waiver.   *Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 156 (3d Cir. 1995); (Docket Nos. 666, 669).   Not only has Marvell failed to preserve this issue, it has not proffered any evidence of juror bias or prejudice.

---

[35]     Juror bias may be categorized as either (1) actual bias, shown by statements of the jurors or based upon the juror's *voir dire* answers, *United States v. Mitchell*, 690 F.3d 137, 142 (3d Cir. 2012); or (2) implied bias, as in whether an "average person in the position of the juror in controversy would be prejudiced."   *United States v. Todman*, 117 F. App'x 824, 827 (3d Cir. 2004).  A finding of implied bias "is reserved for those extreme situations and exceptional circumstances that leave 'serious question whether the trial court subjected the defendant to manifestly unjust procedures resulting in a miscarriage of justice.'" *Todman*, 117 F. App'x at 827(quoting *Smith v. Phillips*, 455 U.S. 209, 222, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) (O'Connor, J., concurring)).   Marvell has not offered any evidence of actual juror bias for any juror, by either statements or answers in *voir dire*.   Instead they seem to suggest that because every juror was from Western Pennsylvania, and because CMU was successful, there must have been implied juror bias. (Docket No. 881 at 97)

[36]     The Court conducts general *voir dire* in the Courtroom, and then brings each individual prospective juror back to the jury room for individualized and follow up questions. (*Id.*) The last question of *voir dire* is always "Is there any reason why you could not render a fair and impartial verdict in this case?"

[37]     CMU eventually agreed that anybody who had any connection to CMU by being a parent, a student, alumnus, former employee and the like, would be immediately stricken for cause in order to speed up the selection process.  (Docket No. 669 at 168).

Both Marvell and CMU had numerous fact witnesses[38] who were foreign born.[39] Besides, Pittsburgh is a city of immigrants[40] and CMU itself has a very diverse student body, particularly a large Asian population.[41]   Accordingly, any argument based on ethnic, racial, or outsider bias is not well taken.

Moreover, there is no indication that the jury was "inflamed" or rushed to judgment, as the Court and counsel repeatedly noticed how attentive and studious the jury was throughout the trial. (Docket No. 764 at 8, 17).   Indeed, the jurors started deliberating on Friday December 21, 2012, did not reach a verdict that day, and instead chose to continue deliberations starting at 9:00 a.m.[42] on December 26, 2012.  (Docket No. 764 at 132).

In any event, the jury was told by the Court in both the initial and final instructions to perform their "duties without bias or prejudice against any party." (Docket No. 764 at 46, 56; Docket No. 671 at 51).   Considering all these facts, the Court finds no grounds to order a new trial on the basis of alleged "hometown bias."

### 2. References to "Billions"

---

[38]       The Court instructed the jury that "if any witness does not speak loudly or clearly enough to be heard by you or you do not hear a question of one of the attorneys, please let me know that by raising your hand."  (Docket No. 671 at 21-22).  No juror ever raised their hand to this effect, and the Court did not observe any jurors having any trouble understanding any of the witnesses' accents.

[39]       For example, Dr. Moura is from Mozambique and Portugal, (Docket No. 673 at 36-37), Dr. Kavcic is from Yugoslavia, (Docket No. 673 at 149), and Mr. Yeo did not identify his particular Asian heritage.  For Marvell, Dr. Sutardja is originally from Indonesia, (Docket No. 707 at 36-40), Dr. Wu is from Beijing, China (Docket No. 707 at 217), and Mr. Burd is originally from Moscow Russia (a point Marvell's counsel emphasized during questioning). (Docket No. 726 at 125 – 130).

[40]       LISA A. ALZO, THE CARNEGIE LIBRARY OF PITTSBURGH, PITTSBURGH'S IMMIGRANTS (2006).

[41]       *See* CMU Common Data Set 2012-2013 at B.2;  http://www.cmu.edu/ira/CDS/pdf/cds_2012_13/b-enrollment-and-persistence.pdf *see also* Anya Sostek and Bill Brink, *CMU vs. Pitt: Some Similarities, Some Differences*, PITTSBURGH POST-GAZETTE (Oct. 3, 2010), http://www.post-gazette.com/stories/local/neighborhoods-city/cmu-vs-pitt-some-similarities-some-differences-266605/.

[42]       In fact, the jurors had originally wanted to start at 8:00 a.m. on December 26, 2012, but agreed to wait until 9:00 a.m. given Marvell's counsel's travel plans.

Last, Marvell asserts that CMU elicited constant references to "billions," which taken together created prejudice to Marvell such that fundamental fairness requires a new trial. (Docket No. 806 at 19).  CMU responds that this argument was not part of Marvell's original mistrial motion and is, therefore, waived.  (Docket No. 827).

CMU rightly contends that it was Marvell who repeatedly mentioned "billions" throughout trial, not CMU.  (*Id.*).  Throughout this trial, it appeared to the Court that Marvell was attempting to ridicule CMU's damages request of 1.1 billion dollars.  (Docket No. 671 at 177) ("would I pay a billion for it in that hypothetical negotiation?").  By the Court's count, Marvell's counsel mentioned "billion dollars" seven times in his opening statements, (Docket No. 671). Accordingly, Marvell and its team opened the "billion dollar" door and are now estopped from claiming any negative repercussion.  *See Kirby v. J.C. Penney Corp., Inc.,* 2009 WL 3651201 (W.D. Pa. Oct. 29, 2009); *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.,* Civ. No. 09-290, 2012 WL 6562413 at fn 13 (W.D. Pa. Dec. 17, 2012).  If Marvell was attempting by argument to cast CMU's request for a billion dollars in a negative light, they cannot legitimately argue that CMU's references to same were prejudicial.  "[T]he size of the award alone [is not] enough to prove prejudice and passion." *Marcus v. PQ Corp.,* 458 F. App'x 207, 213 (3d Cir. 2012) (quoting *Evans v. Port Auth. of New York & New Jersey*, 273 F.3d 346, 352 (3d Cir. 2001)) (internal citations omitted).

At the relevant damages portion of this trial, the Court held (just as it did at summary judgment) that Ms. Lawton should not discuss Marvell's total revenue, total profit or total margin, which is in the billions, in order to avoid any comparative effect that may taint the jury's award. *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.,* Civ. No. 09-290, 2012 WL 3679564 (W.D. Pa. Aug. 24, 2012).  However, it was Mr. Creighton Hoffman, Marvell's damages expert,

29

who needed to be reminded to avoid throwing around other damages awards of billions of dollars to avoid any chance of comparative effect.  (Docket No. 711 at 116).  In fact, at one point, the Court had to have Marvell's counsel tell Mr. Hoffman privately to refrain from references during his testimony to "billion" dollar cases.[43]

CMU's few references to "billion" refer to the number of chips sold by Marvell in the relevant time period, which according to the evidence was approximately 2.34 billion. (Docket No. 759 at 135, 147, 172).  The Court fails to see how the parties could conduct a trial without ever mentioning the total number of accused products.  In regards to the billion dollar damages request, it was Marvell's counsel, during openings, closing and throughout trial, who referred to the billion dollar award.  (*Id.* at 86) ("And now they're telling you in the hypothetical negotiation they would have insisted on billions of dollars. Give me a break.").  CMU states that they have gone through the nearly 4,000 pages of trial transcript and found 61 references to "billion" by Marvell and 51 by CMU.  (Docket No. 827 at 19).  While this Court has neither the time nor resources to check these figures, it is cognizant that references to "billion" were limited and that witnesses and counsel of both parties referenced same at various times.  Upon review of the record, the Court finds no prejudicial effect by any use of the word "billion" and a new trial is not warranted on this basis.

### IV.    CONCLUSION

---

[43]      THE COURT: He also has a tendency, as we mentioned, to say things. So to that end, he
        should be directed to the tab just past DX-1604, and particularly line and page.
        MR. McELHINNY: Okay.
        THE COURT: Okay? And he should be instructed not to get into the details of the case
        again, because he may blurt out, well, this was the billion dollar case.
        MISS GAY: Your Honor, how am I going to do that?
        THE COURT: You're going to walk over there and tell him not to do it.
        MISS GAY: Okay. I will, Your Honor.
(Docket No. 711 at 115).

"The decision whether to grant a mistrial is reserved to the broad discretion of the trial judge" and in this Court's estimation, the circumstances in this case do not warrant any such action.  *Renico v. Lett,* 559 U.S. 766, 130 S. Ct. 1855, 1863, 176 L. Ed. 2d 678 (2010).  Marvell, in throwing old and new grievances at the Court under the guise of prejudice, is trying to do what it could not do at trial: convince the Court to throw out this case and hope that a second time around will be more successful.  The jurors, this Court, and its staff, devoted four weeks of their life around the holidays[44] to pay careful and thorough attention to the merits of the case, and unfounded, broad assertions of "prejudice" or an "inflamed"[45] jury are insufficient to erase that result and mandate a new trial.

Accordingly, Defendants' Motion for "Judgment as a Matter of Law or, in the Alternative, New Trial on Non-Damages Issues" (Docket No. 805) is denied in part, to the extent predicated on CMU's alleged misconduct.  A forthcoming opinion will address the remaining issues of this motion.


*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge


Date:   August 23, 2013
cc:     All counsel of record

---

[44]     This trial date was chosen over a year in advance by the parties.  (Docket No. 315)

[45]     Indeed, the Court cannot begin to fathom how Marvell's attorneys or anyone could think this jury was "inflamed."  This was a jury who asked to read the expert reports of the damages experts during their deliberations. (Docket No. 761 at Ex. 24).  And again, this jury chose to take their time during deliberations and asked to come back the *day after* Christmas at 8:00am, but to suit Marvell's counsel, returned at 9:00am.  (Docket No. 765).