**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CARNEGIE MELLON UNIVERSITY,<br><br>    Plaintiff,<br><br>    v.<br><br>MARVELL TECHNOLOGY GROUP, LTD. and MARVELL SEMICONDUCTOR, INC.,<br><br>    Defendants. | Civil Action No. 2:09-cv-00290-NBF |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR
<u>TELEPHONIC STATUS CONFERENCE</u>**

Pursuant to the Court's January 9, 2014 Order, Marvell respectfully submits this Response to Carnegie Mellon University's Motion for Telephonic Status Conference (Dkt. 919 ("Motion")).

I.  **KKR'S INVESTMENT IN MARVELL SIGNALS MARVELL'S FINANCIAL STRENGTH**

CMU returns (yet again) to portraying third-party investments in Marvell as threatening its ability to collect a final judgment. The purported "new development" that underlies CMU's Motion is acquisition by an investment firm, Kohlberg, Kravis Roberts & Co. ("KKR"), of an additional 1.8% of Marvell's shares and filing of a 13D form with the SEC indicating that it now holds more than 5% of Marvell's stock. Under Rule 13d-1(a) of the Securities and Exchange Act of 1934, "[a]ny person who, after acquiring directly or indirectly the beneficial ownership of any equity security . . . is directly or indirectly the beneficial owner of more than five percent of the class shall, within 10 days after the acquisition, file with the Commission, a statement containing the information required by Schedule 13D." This increased investment by KKR above 5% of Marvell's shares further confirms the financial strength of Marvell, whose "[s]hares have gained nearly 90% year-to-date." (Motion Ex. 2.)

CMU's motions for supplemental relief (Dkt. 908) and to permit execution on the interim judgment (Dkt. 909) were premised in part on KKR's acquisition of less than 5% of Marvell's shares and a rumor by the press that KKR might consider a leveraged buyout. This Court denied CMU's motions without prejudice on December 23, 2013 and January 2, 2014, respectively. (Dkt. 916, 918.) In support of its current Motion, CMU characterizes KKR's acquisition of an additional 1.8% of Marvell's shares as "substantially" increasing the supposed "risk" to CMU's ability to collect. (Motion ¶¶ 2, 3, 5.) CMU mischaracterizes KKR's Form 13D statement as

some sort of telltale sign of an impending "extraordinary corporate transactions that will make it difficult for CMU to collect on its judgment." (*Id.* ¶ 5.)

In fact, Marvell has no present plans for an extraordinary corporate transaction (*e.g.*, buyout, merger, reorganization or liquidation) and has not been in negotiations with KKR concerning such a transaction. (Rashkin Decl. (attached hereto) ¶ 2.)  The misguidance of CMU's speculation is clear from the full text of KKR's statement of purpose that follows.  It states that KKR's acquisition is "for investment purposes" and that it will review its investment on a "continuing basis" and "may, from time to time" do any number of things that any similarly situated investor is entitled to do, such as acquiring more shares, disposing of shares, or helping influence the company's direction through its words or actions (*Id.* Ex. 1 (Item 4) (emphasis added)):

> **Item 4. Purpose of Transaction.**
>
> The information set forth in Items 3 and 6 of this Schedule 13D is hereby incorporated by reference in this Item 4.
>
> The Reporting Persons acquired beneficial ownership of the securities reported herein *for investment purposes* and *intend to review their investments in the Issuer on a continuing basis*. Depending on various factors, including but not limited to the Issuer's financial position and strategic direction, price levels of the Common Stock, conditions in the securities markets, and general economic and industry conditions, *the Reporting Persons may in the future take actions with respect to their investment in the Issuer as they deem appropriate*, including changing their current intentions, with respect to any or all matters required to be disclosed in this Schedule 13D. Without limiting the foregoing, *the Reporting Persons may, from time to time, acquire or cause affiliates to acquire additional shares of Common Stock or other securities of the Issuer, dispose, or cause affiliates to dispose, of some or all of the Common Stock* or other securities of the Issuer or continue to hold, or cause affiliates to hold, Common Stock or other securities of the Issuer (or any combination or derivative thereof).

> In addition, without limitation, the Reporting Persons *may engage in discussions* with management, the board of directors, stockholders of the Issuer and other relevant parties *or take other actions* concerning any extraordinary corporate transaction (including but not limited to a merger, reorganization or liquidation) or the business, operations, assets, strategy, future plans, prospects, corporate structure, board composition, management, capitalization, dividend policy, charter, bylaws, corporate documents, agreements, de-listing or de-registration of the Issuer.
>
> Except as set forth above, or as would occur upon completion of any of the matters discussed herein, the Reporting Persons and, to the best knowledge of the Reporting Persons, each of the other individuals named in Item 2 above, have no present plans, proposals or intentions which would result in or relate to any of the transactions described in subparagraphs (a) through (j) of Item 4 of Schedule 13D. Although the foregoing reflects activities presently contemplated by the Reporting Persons and each other person named in Item 2 with respect to the Issuer, the foregoing is subject to change at any time.

Also overlooked by CMU is the fact that KKR's Form 13D statement contains precisely the same boilerplate language that routinely attends its Form 13D statements for its other investments, including its investments in Amedisys, Inc., RigNet, Inc., Sentio Healthcare Properties, Inc., and China Cord Blood Corporation. (Milowic Decl. (attached hereto) Ex. A at 24; Ex. B at 28-29; Ex. C at 30; Ex. D at 15 (Item 4).) Since KKR submitted its corresponding Form 13D statements for all of these companies, based on a review of publicly available information, none of those companies appear to have been the object of a buy-out, liquidation, or any other "extraordinary" transaction. Further, CMU fails to mention that KKR's total holding of 6.8% of Marvell's shares still falls well short of holdings by another investment firm, Greenlight Capital Management, which holds over 9% of Marvell's shares. (Motion Ex. 2.)

CMU's submission regarding KKR does nothing more than reiterate its speculation regarding Marvell's supposed collection "risk." If anything, however, KKR's recent vote of

confidence, expressed by increasing its investment in Marvell, only provides further testament to Marvell's financial strength.

## II. CMU MISSTATES THE BONDING DISCUSSIONS

CMU's Motion misstates the history and current status of the parties' bonding discussions. As an initial matter, contrary to CMU's assertions (Motion ¶¶ 9 n.1, 13, 19), Marvell has not halted discussions regarding a bond. Before CMU filed the Motion, counsel for Marvell requested that counsel for CMU re-send the latest draft of the supersedeas bond so that the parties might continue their discussions, and counsel for CMU agreed to do so. (Milowic Decl. ¶ 2.) Counsel for CMU sent the draft, and counsel for Marvell promised to get back to them — only to have CMU turn around and file its instant motion claiming that Marvell had abandoned the discussions. (*Id.*)

Further, contrary to CMU's assertion (Motion ¶ 8), Mr. McDonough's December 20, 2013 declaration (Dkt. 915-1) does not misportray the parties' negotiations over a bond. As Mr. McDonough explained, he worked with Marvell and a consortium of sureties, including surety counsel, Mr. Jonathan Bondy, to arrange for a supersedeas bond that might be put in place pending appeal. (McDonough Supp. Decl. (attached hereto) ¶¶ 2, 3; Dkt. 915-1 ¶ 3.) The sureties were ready to post the supersedeas bond after the entry of final judgment without any additional collateral. (McDonough Supp. Decl. ¶ 3.) That understanding changed drastically when CMU demanded an *interim* bond under *revised* terms that would stay in place after final judgment and *leave the sureties subordinated to CMU* for purposes of recovery. (*Id.*; *see also* Bondy Decl. (attached hereto) ¶ 7.) Those are the facts, as Mr. Bondy and Mr. McDonough here confirm.

After CMU demanded an interim bond on terms of its choosing, Marvell continued to work with Mr. McDonough in the hope of still working out a deal with the sureties,[1] which proved to be impossible. (McDonough Supp. Decl. ¶ 4.) One of the main stumbling blocks was that, given the possibility of a significantly enhanced final judgment, the sureties were uncomfortable providing an interim bond unless they could secure 100% cash collateral before the total amount of damages was fixed in a final judgment. (*Id*.) Contrary to CMU's assertion (Motion ¶ 11), Mr. Bondy informed counsel for CMU on their very first telephone call that one of the big issues in securing a bond before final judgment had issued and total damages had been fixed was that the sureties would require substantial collateral from the bond principal – likely as much as 100% cash collateral. (Bondy Decl. ¶ 5.) Further, contrary to CMU's assertions (Motion ¶¶ 10, 12), Mr. Bondy conveyed to CMU's counsel that CMU's proposed terms for the interim bond (as Mr. Bondy understood them) were unacceptable to the sureties.[2] (Bondy Decl. ¶ 6.)

Although an interim bond was not possible under the terms sought by CMU and in view of the uncertainty as to the amount of the final judgment that may be awarded (McDonough Supp. Decl. ¶¶ 4, 5), this was not for lack of effort or good faith. Marvell, Mr. McDonough, and Mr. Bondy considered various possibilities and creative solutions for arranging an interim bond such as making an interim bond contingent on the final judgment coming in above or below a certain number. (*Id.* ¶ 5.) These ideas were under discussion around the time CMU filed its original motions for supplemental relief and to permit execution on the interim judgment. (*Id*.)

---

[1] Contrary to CMU's assertion (Motion ¶ 9), Marvell never "promise[d]" to post a $1.5 billion interim bond on CMU's terms. (Milowic Decl. ¶ 3; *see also* Bondy Decl. ¶ 6.)

[2] The Declaration of Jonathan Bondy provides further information regarding the reasons CMU's terms were not acceptable to the sureties. (Bondy Decl. ¶¶ 8-12.)

5

Further, as set forth in Mr. Bondy's declaration, he worked with CMU's counsel in good faith and had every intention of working out a deal, to the extent one was available on reasonable, workable terms. (Bondy Decl. ¶ 7.)

At this time, Marvell remains engaged with the sureties about a final appeal bond that can issue once the amount of the final judgment is known. (*Id.* ¶ 13.) Marvell respectfully suggests that the parties should meet and confer on a weekly basis to discuss bonding terms until the final judgment is entered. Once the final judgment is entered, one major impediment to bonding will no longer exist (*i.e.*, the uncertainty of the final damages award), and the parties can, just as the Court ordered (Dkt. 916), reasonably negotiate the terms of an appeal bond.

### III. CMU'S DISCOVERY IS PREMATURE, UNNECESSARY, AND UNDULY BURDENSOME

This Court's Orders (Dkt. 916, 918) denying CMU's motions for supplemental relief "in aid of execution" and to permit registration of the interim judgment confirm that CMU's discovery requests also "in aid of execution" are premature. The Court recognized that there is no final judgment at this time and denied, without prejudice, as "premature" CMU's attempt to register the judgment on the verdict. As CMU cannot execute on the interim judgment, CMU's discovery requests "in aid of execution" of the interim judgment under Federal Rule 69 are similarly premature. Marvell set forth these objections in its January 13, 2014 objections and responses to CMU's discovery. (*See* Milowic Decl. Exs. E-H.)

Not only are CMU's discovery requests premature, but they are unnecessary given Marvell's sound financial status. As set forth throughout Marvell's briefing (*see* Dkt. 912 at 2-3, 8-11; Dkt. 915 at 7-8), Marvell is a profitable company with a strong cash position, which is why market participants continue to choose to invest in Marvell. Indeed, CMU's own submissions recognize that Marvell's "[s]hares have gained nearly 90% year-to-date" (Motion Ex. 2) and that

"'[t]he fundamentals at Marvell are some of the best in the semiconductor industry right now'" (Dkt. 908-4, Ex. E).

Further, contrary to CMU's assertion (Motion ¶ 19), Marvell has not abandoned negotiations with CMU regarding a bond. Instead, as set forth *supra*, at the request of Marvell's counsel to continue the discussions, counsel for CMU sent the latest draft to counsel for Marvell, before inexplicably filing the instant motion. (Milowic Decl. ¶ 2.) Further, Marvell is willing to meet and confer with CMU on a weekly basis to discuss bonding terms until the final judgment is entered. (*See supra* at 6.)[3] For CMU to continue pursuing adversarial proceedings of this sort, instead of remaining engaged at the negotiating table, seems not only contrary to this Court's conception but thoroughly counterproductive.

In addition to being premature and unnecessary, CMU's discovery requests are also unduly burdensome. For example, CMU's requests for production seek documents sufficient to show "***all*** fixtures, furniture, furnishings, equipment, machinery, and/or computer software that you own or in which you have an interest and their location and custodian" and documents sufficient to show "***all*** inventory that you own or in which you have an interest and their location and custodian." (*See* Milowic Decl. Ex. E at 9; Ex. G at 8, 9.) Further, CMU's requests for production seek "*[a]ll* intercompany agreements to which you are a party" and "*[a]ll* documents reflecting any contractual obligations and commitments . . . that you have entered into, modified or amended since January 17, 2012." (*See id.* Ex. E at 11, 20; Ex. G at 11, 20.) Similarly, CMU's interrogatories are unduly burdensome in requesting, for example, that Marvell

---

[3]  CMU's assertion that its "concerns about Marvell's ability to post an adequate bond are only exacerbated by Marvell's statements to this Court that it is 'impossible' to obtain a bond that CMU would find to be acceptable" (Motion ¶ 14), is a red herring. Marvell's statements solely referred to an *interim* bond pending final judgment, not a bond after final judgment. (*See* Dkt. 915 at 7; Dkt. 915-1 ¶¶ 4-5.) The major complication with posting an interim bond (the uncertainty of the final judgment) will not exist after final judgment.

"[i]dentify, with specificity, *all* intellectual property that you own or in which you have an interest," "*all* commercial, checking, savings, payroll, or money market accounts that you own or in which you have an interest," and "*all* inter-company loans, debts, receivables, due-to/due-from or any other contract, understanding or arrangement pursuant to which amounts are owed to [Marvell]." (*See id.* Ex. F at 6, 9, 15; Ex. H at 6, 9, 15.)

Rather than engaging in costly discovery, motion practice, and argument on the eve of final judgment, there is every good reason for the parties simply to continue their bonding discussions with the benefit of this Court's recent, on-point instruction: specifically, that they should "reasonably negotiate the terms of any such bond after the final judgment is entered. If disputes remain, the Court will appoint a Special Master to oversee such negotiations, with the costs for same to be shared equally by the parties." (Dkt. 916.)

Dated: January 15, 2014

/s/ John E. Hall

John E. Hall
Timothy P. Ryan
ECKERT SEAMANS CHERIN &
MELLOTT, LLC
U.S. Steel Tower
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
Phone: (412) 566-6000
Fax: (412) 566-6099
jhall@eckertseamans.com
tryan@eckertseamans com

Respectfully submitted,

/s/ Kevin P.B. Johnson

Edward J. DeFranco (*pro hac vice*)
Kathleen M. Sullivan (*pro hac vice)*
Faith Gay (*pro hac vice*)
Raymond Nimrod (*pro hac vice*)
Derek L. Shaffer (*pro hac vice*)
Joseph Milowic III (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Phone: (212) 849-7000
Fax: (212) 849-7100
eddefranco@quinnemanuel.com

Steven G. Madison (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Phone: (213) 443-3000
Fax: (213) 443-3100
stevemadison@quinnemanuel.com

Kevin P.B. Johnson (*pro hac vice*)
Melissa Baily (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
555 Twin Dolphin Drive., 5th Floor
Redwood Shores, California 94065
Phone: (650) 801-5000
Fax: (650) 801-5100
kevinjohnson@quinnemanuel.com

*Attorneys for Defendants, Marvell Technology Group, Ltd. and Marvell Semiconductor, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 15, 2014, the foregoing was filed electronically on ECF. I also hereby certify that on January 15, 2014, this filing will also be served on counsel for CMU by electronic mail.

        /s/   John E. Hall

John E. Hall
Timothy P. Ryan
ECKERT SEAMANS CHERIN & MELLOTT, LLC
U.S. Steel Tower
600 Grant Street, 44th Floor
Pittsburgh, PA 15219
Phone: (412) 566-6000
Fax: (412) 566-6099
jhall@eckertseamans.com
tryan@eckertseamans com

Edward J. DeFranco  (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000 Telephone
(212) 849-7100 Facsimile
eddefranco@quinnemanuel.com

*Attorneys for Defendants,*
*Marvell Technology Group, Ltd. and*
*Marvell Semiconductor, Inc.*