# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CARNEGIE MELLON UNIVERSITY,<br><br>Plaintiff,<br><br>v.<br><br>MARVELL TECHNOLOGY GROUP, LTD.<br>and MARVELL SEMICONDUCTOR, INC.,<br><br>Defendants. | Civil Action No. 2:09-cv-00290-NBF |

## DECLARATION OF JONATHAN BONDY

I, Jonathan Bondy, declare as follows:

1. I am a Member of the law firm Wolff & Samson PC. Since late 1995, my principal and primary area of practice has been representing and advising surety companies with respect to performance and payment bond claims, the defense of prevailing wage claims, affirmative surety claims, loss recovery, bankruptcy issues and contractor workouts. I author and lecture on surety law topics for various surety groups, including the Fidelity & Surety Law Committee of the Tort Trial & Insurance Practice Section of the American Bar Association. I previously served as an assistant district attorney in Kings County (Brooklyn), New York. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would competently testify to them.

2. My firm was retained by Zurich American Insurance Company and Ace American Insurance Company (and their respective surety affiliates, which include, for Ace, Westchester Fire Insurance Company and Pacific Employers Insurance Company) to negotiate a supersedeas bond in connection with this case.

3.  My firm does not represent any party in this case. I was asked to review the Declaration of Patrick J. McElhinny of the law firm K&L Gates in order to provide this Declaration to address numerous statements in his Declaration, some of which I believe are incorrect.

4.  I negotiated the bonding issues directly with CMU's and Marvell's counsel during November and December, 2013. During this period, I also interfaced with and had numerous communications with Marvell's bond broker, Robert McDonough. I kept him apprised of updates from my clients and worked for weeks attempting to work out a deal on an "interim" bond to be put in place pending the issuance of a final judgment (from which I understand Marvell intends to appeal).

5.  In his declaration, Mr. McElhinny states that "[a]t no time during the discussions with Marvell or Mr. Bondy did anyone indicate that Marvell would have to provide security to obtain a $1.5 billion bond." This is incorrect. On our very first call, I told Mr. McElhinny that one of the big issues in providing a bond prior to knowing the amount of the final judgment was that it would require substantial collateral from the bond principal, and likely 100% cash collateral.

6.  Mr. McElhinny also states that "at no time did anyone from Marvell or on behalf of the sureties ever" make a statement to the effect that arranging an interim bond of $1.5 billion would not be possible, and that "[t]o the contrary, until early December, 2013, Marvell and Mr. Bondy were indicating that Marvell would post the previously promised $1.5 billion bond." This is also incorrect. I reviewed CMU's proposed terms for the bond with the understanding that CMU (a) wanted the bond to stay in place through the conclusion of the appellate process even if the judgment was enhanced, (b) that CMU would not subordinate its position to the sureties, and that (c) any one surety would potentially have to answer, in part,

for the obligations of some of all of the others. Those terms were unacceptable to the sureties, this was conveyed by me to CMU's counsel, and we at no point accepted CMU's revisions to the draft bond.

7. I negotiated for weeks and worked with CMU's counsel in good faith. The sureties my office represents had every intention of working out a deal, and still do, if one can be had. If there was a period of time that I did not provide an update to Mr. McElhinny, it was because there was no update to report. The original deal presented to the sureties was for a supersedeas bond in the amount of $1.5 billion after the entry of final judgment, without additional collateral. That was before CMU demanded a Rule 62(b) interim bond that would stay in place after final judgment and without CMU subordinating to the sureties. Under the new terms and without the certainty of a final damages number, an interim bond was impossible, because the sureties that I represent would need 100% cash collateral to agree to any such interim bond.

8. CMU's proposed bond terms were not acceptable to the sureties for several reasons. One reason was that the proposed terms provided that no surety was allowed to assert any assignment or subrogation rights until every other surety had paid what it might owe under the proposed bond. As is standard practice is the surety industry, a surety requires that its bond principal execute an indemnification agreement whereby the bond principal agrees to indemnify the surety for any loss or expense the surety may obtain as a result of having issued bonds on behalf of the bond principal or in enforcing the sureties' rights under the indemnity agreement. The proposed language proffered by CMU would not have allowed one surety to pursue recovery efforts against Marvell until such time as every other surety had paid what such other sureties owed under the bond. This would potentially prejudice a surety

that had paid what it owed under the bond, because it would not be able to pursue recovery of its loss until every other surety had performed its respective obligations under the bond.

9. Furthermore, the terms were objectionable because they gave CMU recourse against any surety for the failure of another surety to pay its obligations under the bond, even if the surety that had satisfied its obligations had not been required to pay its maximum amount of financial exposure. This would, in effect, make each surety a reinsurer of each other surety under the bond, which was not acceptable to the sureties.

10. CMU also declined to agree to subordinate its rights to the sureties in the event that the sureties made a payment under the bond. Since a final judgment has not yet been entered, the possibility existed, and still exists, that if the sureties paid the full penal sum of any interim bond ($1.5 billion) and the final judgment was for an amount in excess of $1.5 billion, CMU would be able to maintain a priority position with respect to any portion of the final judgment that was not satisfied by payment of the interim bond. In a normal supersedeas bond situation, a surety, when it pays a judgment creditor, is subrogated to, and ordinarily assigned the rights of, the judgment creditor. The underlying judgment is therefore not marked "satisfied", but the paying surety now stands in the shoes of the judgment creditor and has the right to maintain the priority position that the judgment creditor had vis-à-vis other creditors of the judgment debtor. Since the bond being discussed with CMU was not for a final judgment, the sureties ran the risk that they would be, absent full collateral, put in a position where they were obligated to pay CMU under the interim bond, and then find themselves in an inferior position vis-à-vis CMU with respect to any monies still owed CMU over and above those paid by the sureties under any interim bond.

11. CMU, moreover, was asking for terms to which, frankly, it was, and is, not entitled at this point in the proceedings. No final judgment has been entered. The only

judgment entered is the judgment for approximately $1.17 billion entered by this Court in January 2013 following the issuance of the jury verdict in December 2012. CMU wanted not only an interim bond in the amount of $1.5 billion, but for this bond to remain in place through the conclusion of the appellate process, which was not reasonable or practical under the circumstances.

12.     Finally, the most significant issue that has prevented the issuance of a bond is the uncertainty as to the amount of the final judgment, which I understand will not be established until the Court resolves the open post-judgment motions filed by the parties. Absent being fully collateralized for any interim bond they may issue, the sureties' risk is not quantifiable because the amount of the final judgment has not yet been determined. It is one thing for the sureties to issue a $1.5 billion bond when there is a final $1.5 billion judgment, because the impact of the potential judgment on the financial viability of the bond principal (here, Marvell) is an underwriting determination that can be properly evaluated. If, however, a final judgment is entered in a significantly larger amount, the sureties' risk of a loss may be significantly higher because the financial strength of the bond principal may not be adequate to fully indemnify the sureties for any loss they may sustain as a result of the affirmance of such a judgment. In my discussions with CMU and Marvell, it was constantly CMU's position that the sureties' exposure remained fixed at an aggregate amount of $1.5 billion. That statement is, and was, correct, but does not take into account the risk, as opposed to the exposure, of any loss. It is the uncertainty of the amount of the final judgment that made impossible the issuance of the interim bond proffered by CMU.

13.     It should be noted, however, that the sureties have been in discussions with Mr. McDonough and Marvell regarding the issuance of a final appeal bond once the amount of the final judgment is known.

14. Counsel for Marvell asked me to review Mr. McDonough's declaration of December 20, 2013. I reviewed it and agree with Mr. McDonough's statements.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 15th day of January, 2014, in West Orange, New Jersey.

                                                                      JONATHAN BONDY